# No. 25-2027

IN THE

# United States Court of Appeals

FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

*Respondent-Appellant,*

v.

MARA MORILLO,

*Petitioner-Appellee.*

On Appeal from the United States District Court for the
District of New Hampshire, No. 1:15-cr-174
The Hon. Stephen A. McAuliffe

## OPENING BRIEF FOR THE UNITED STATES

ERIN CREEGAN
  *United States Attorney*
  *District of New Hampshire*

MATTHEW VICINANZO
  *Assistant U.S. Attorney*
  *District of New Hampshire*

A. TYSEN DUVA
  *Assistant Attorney General*
  *Criminal Division*

JOSHUA A. GOLDFOOT
  *Deputy Assistant Attorney General*
  *Criminal Division*

MICHAEL A. ROTKER
  *Attorney*
  *Criminal Division, Appellate Section*
  *United States Department of Justice*
  *950 Pennsylvania Ave NW, Suite 1264*
  *Washington, DC 20530*
  michael.rotker@usdoj.gov

# TABLE OF CONTENTS

**Pages**

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ....................... ix

JURISDICTIONAL STATEMENT ...................................... 1

STATEMENT OF THE ISSUE ............................................ 2

STATEMENT OF THE CASE .............................................. 3

    A.    Procedural History ............................................. 3

    B.    Legal Standards Governing
           Coram Nobis Petitions ...................................... 3

    C.    Statement Of Facts ............................................ 7

          1.    Morillo Pleads Guilty To Participating
                In A Drug Trafficking Conspiracy .......................... 7

          2.    Morillo Seeks Coram Nobis Relief From
                Her Guilty Plea And Conviction ............................ 15

    D.    Ruling Under Review ........................................ 18

SUMMARY OF ARGUMENT ........................................... 21

ARGUMENT .............................................................. 26

**Pages**

THE DISTRICT COURT ERRED IN GRANTING
MORILLO'S CORAM NOBIS PETITION AND
VACATING HER GUILTY PLEA AND CONVICTION .............. 26

    I.     Standard Of Review ........................................................... 26

    II.    Analysis .............................................................................. 26

           A.     The District Court Erred In Finding
                    That Morillo Was Eligible For Coram
                    Nobis Relief ............................................................. 27

                    1.     Morillo's Failed To Adequately Justify
                                Her Nine-Year Delay In Seeking
                                Coram Nobis Relief ....................................... 27

                    2.     Morillo's Conviction Is Not Tainted
                                  By Fundamental Error ................................. 38

                              a.     The Pre-Plea Advice Saxe
                                        Provided Morillo Was Consistent
                                        With *Padilla* ........................................ 39

                              b.     Morillo Was Not Prejudiced .............. 48

           B.     The District Court Abused Its Discretion
                      In Granting Coram Nobis Relief ........................... 55

CONCLUSION ....................................................................................... 60

CERTIFICATES OF COMPLIANCE AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Aceituno* v. *United States,*
132 F.4th 563 (1st Cir. 2025)......................................................*passim*

*Ahmed* v. *Rosenblatt,*
118 F.3d 886 (1st Cir. 1997) ............................................... 34

*Andiarena* v. *United States,*
967 F.2d 715 (1st Cir. 1992) (per curiam)...................................... 58

*Bousley* v. *United States,*
523 U.S. 614 (1998)............................................................... 58

*Brady* v. *Maryland,*
373 U.S. 83 (1963)...........................................................6, 39

*Brady* v. *United States,*
397 U.S. 742 (1970)........................................................55-56, 56

*Dor* v. *Bondi,*
161 F.4th 1 (1st Cir. 2025)........................................... 40-41

*Enwonwu* v. *United States,*
199 Fed. Appx. 6, 7 (1st Cir. 2006) (unpub.) ................................... 39

*Fernandez-Garay* v. *United States,*
996 F.3d 57 (1st Cir. 2021) .........................................24, 47

*Francis* v. *Maloney,*
798 F.3d 33 (1st Cir. 2015) .......................................34-35

*Gish* v. *Hepp,*
955 F.3d 597 (7th Cir. 2020)........................................... 49

**Pages**

*Hager* v. *United States*,
  993 F.2d 4 (1st Cir. 1993) ....................................................... 7

*Hill* v. *Lockhart*,
  474 U.S. 52 (1985)...........................................................24, 40

*Iowa* v. *Tovar*,
  541 U.S. 77 (2004).................................................................. 39

*Koon* v. *United States*,
  518 U.S. 81 (1996).................................................................. 55

*Lafler* v. *Cooper*,
  566 U.S. 156 (2012)............................................................... 39

*Lee* v. *United States*,
  582 U.S. 357 (2017)........................................................*passim*

*Manguriu* v. *Lynch*,
  794 F.3d 119 (1st Cir. 2015) ............................................... 15

*Matus-Leva* v. *United States*,
  287 F.3d 758 (9th Cir. 2002).................................................. 2

*McMann* v. *Richardson*,
  397 U.S. 759 (1970)...........................................................39, 45

*Mendoza* v. *United States*,
  690 F.3d 157 (3d Cir. 2012) ................................................. 2

*Miranda-Gonzalez* v. *United States*,
  181 F.3d 164 (1st Cir. 1999) ............................................... 57

*Missouri* v. *Frye*,
  566 U.S. 134 (2012)............................................................... 58

**Pages**

*Moncrieffe* v. *Holder*,
    569 U.S. 184 (2013)............................................................ 44

*Murray* v. *United States*,
    704 F.3d 23 (1st Cir. 2013) ..........................................6, 39

*Nissinbaum* v. *Jennings*,
    148 F.4th 548 (7th Cir. 2025) ........................................ 53

*Nolan* v. *Holmes*,
    334 F.3d 189 (2d Cir. 2003) .......................................... 10

*Padilla* v. *Kentucky*,
    559 U.S. 356 (2010)................................................*passim*

*Ramos-Martinez* v. *United States*,
    638 F.3d 315 (1st Cir. 2011) .......................................... 33

*Ragbir* v. *United States*,
    950 F.3d 54 (3d Cir. 2020) ..................................30, 37-38

*Rivera-Rivera* v. *United States*,
    844 F.3d 367 (1st Cir. 2016) ....................................32-33

*Rodi* v. *S. New Eng. Sch. of L.*,
    389 F.3d 5 (1st Cir. 2004) .............................................. 15

*Rose* v. *Lundy*,
    455 U.S. 509 (1982)....................................................... 33

*Strickland* v. *Washington*,
    466 U.S. 667 (1984)...............................39, 40, 45, 47

*Tasios* v. *Reno*,
    204 F.3d 544 (4th Cir. 2000)........................................ 10

*Trenkler* v. *United States*,
   536 F.3d 85 (1st Cir. 2008) ............................................................. 2, 4

*Turkhan* v. *Perryman*,
   188 F.3d 814 (7th Cir. 1999) ............................................................. 10

*United States* v. *Bailey*,
   444 U.S. 394 (1980) ............................................................. 50, 50-51

*United States* v. *Castro-Taveras*,
   841 F.3d 34 (1st Cir. 2016) ............................................................. 7, 26, 41

*United States* v. *Colón-Torres*,
   382 F.3d 76, 86 (1st Cir. 2004) ............................................................. 40

*United States* v. *Delhorno*,
   915 F.3d 449 (7th Cir. 2019) ............................................................. 32

*United States* v. *Denedo*,
   556 U.S. 904 (2009) ............................................................. 4, 5, 26

*United States* v. *Frady*,
   456 U.S. 152 (1982) ............................................................. 58

*United States* v. *George*,
   676 F.3d 249 (1st Cir. 2012) ............................................................. 4, 5, 6, 7, 55, 57

*United States* v. *Gonzalez-Perez*,
   778 F.3d 3 (1st Cir. 2015) ............................................................. 5-

*United States* v. *Hyde*,
   520 U.S. 670 (1997) ............................................................. 56

*United States* v. *Lesane*,
   40 F.4th 191 (4th Cir. 2022) ............................................................. 6

*United States* v. *Lockhart,*
   165 F.4th 933 (5th Cir. 2026) ........................................... 29

*United States* v. *Marion,*
   404 U.S. 307 (1971).......................................................... 57

*United States* v. *Mayer,*
   235 U.S. 55 (1914)..........................................................5, 38

*United States* v. *Michaud,*
   901 F.2d 5 (1st Cir. 1990) ................................................. 4

*United States* v. *Norvell,*
   729 F.3d 788 (8th Cir. 2013)............................................ 31

*United States* v. *Pellerito,*
   878 F.2d 1535 (1st Cir. 1989) .......................................... 54

*United States* v. *Riedl,*
   496 F.3d 1003 (9th Cir. 2007) .......................................... 34

*United States* v. *Sutherland,*
   103 F.4th 200 (4th Cir. 2024) .......................................... 29

*United States* v. *Timmreck,*
   441 U.S. 780 (1979)......................................................58, 59

*United States* v. *White,*
   766 F.2d 22 (1st Cir. 1985) ...........................................51-52

*United States* v. *Wilkozek,*
   822 F.3d 364 (7th Cir. 2016)............................................. 2

*Voravongsa* v. *Wall,*
   349 F.3d 1 (1st Cir. 2003) ................................................ 33

**Pages**

*Welch* v. *United States*,
578 U.S. 120 (2016)................................................................ 33

*Williams* v. *United States*,
858 F.3d 708 (1st Cir. 2017) ....................................38, 41, 55, 56

*Woodward* v. *United States*,
905 F.3d 40 (1st Cir. 2018) ................................................. 5

## Constitution, Statutes and Rules

U.S. Const. amend. VI................................................................ 39

8 U.S.C. § 1101(a)(43)(B) ........................................................ 15

8 U.S.C. § 1101(a)(43)(U) ........................................................ 15

8 U.S.C. § 1227(a)(2)(A)(iii)................................................... 10

18 U.S.C. § 3231 ........................................................................ 2

21 U.S.C. § 841(a)(1)............................................................ 3, 8

21 U.S.C. § 846 .................................................................*passim*

28 U.S.C. § 1291 ........................................................................ 2

28 U.S.C. § 1651 ........................................................................ 2

28 U.S.C. § 2255 .............................................................*passim*

28 U.S.C. § 2255(a)............................................................... 3, 4

28 U.S.C. § 2255(f) .................................................................... 6

**Pages**

Fed. R. Crim. P. 11(b)(1)(O) ........................................................12, 19, 41

Fed. R. Evid. 201 .................................................................................... 15

**Miscellaneous**

Rules Governing Section 2255 Proceedings, Appendix ..................... 33

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal presents the question whether the district court erred in granting a convicted federal defendant's petition for a writ of error coram nobis and vacating her guilty plea and conviction. This Court recently heard oral argument in another government appeal challenging a similar grant of coram nobis relief, see *Aceituno* v. *United States*, 132 F.4th 563 (1st Cir. 2025), and the government submits the Court would benefit from hearing oral argument in this case as well.

IN THE

# United States Court of Appeals

FOR THE FIRST CIRCUIT

_____

No. 25-2027

_____

UNITED STATES OF AMERICA,

*Respondent-Appellant,*

v.

MARA MORILLO,

*Petitioner-Appellee.*

_____

## OPENING BRIEF FOR THE UNITED STATES

_____

## JURISDICTIONAL STATEMENT

This is an appeal from a final order of the district court granting convicted federal defendant Mara Morillo's petition for a writ of error coram nobis and vacating her 2016 guilty plea to (and conviction for) a federal drug conspiracy offense. The order was docketed on September 26, 2025, and the government timely filed a notice of appeal on October 23, 2025. Add. 1-10; App. 206.[1] The district court

_____

[1] "Add." refers to the addendum to this brief; "App." refers to the public appendix; and "S. App." refers to the sealed appendix.

had jurisdiction over the petition under the All Writs Act, 28 U.S.C. § 1651, in aid of its preexisting jurisdiction over the underlying criminal case under 18 U.S.C. § 3231. See, *e.g.*, *Mendoza* v. *United States*, 690 F.3d 157, 159 (3d Cir. 2012); *Matus-Leva* v. *United States*, 287 F.3d 758, 759 (9th Cir. 2002); see also *United States* v. *Wilkozek*, 822 F.3d 364, 368 (7th Cir. 2016) ("[T]he district court's power to hear a [coram nobis] petition * * * derives from the statute conferring subject-matter jurisdiction in the original criminal case."). This Court has jurisdiction pursuant to 28 U.S.C. § 1291. See *Trenkler* v. *United States*, 536 F.3d 85, 94-95 (1st Cir. 2008).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding sound reasons existed for Morillo's nine-year delay in seeking coram nobis relief.

2. Whether, assuming Morillo's attorney erred by failing to advise her that her guilty plea to a federal drug conspiracy offense was virtually certain to result in her deportation, the district court nonetheless erred in finding that this misadvice prejudiced Morillo.

3. Whether the district court abused its discretion in finding that the equities of Morillo's case warranted coram nobis relief.

**STATEMENT OF THE CASE**

A.    Procedural History.

Following a guilty plea in 2016, Mara Morillo was convicted in the United States District Court for the District of New Hampshire of conspiracy to distribute, and to possess with intent to distribute, controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). App. 137. She was sentenced to 84 months of imprisonment to be followed by three years of supervised release. App. 138. In 2025, after completing both her prison sentence and her term of supervised release, Morillo filed a petition for a writ of error coram nobis, alleging that her trial counsel prejudicially misadvised her regarding the deportation consequences of her guilty plea, in violation of *Padilla* v. *Kentucky*, 559 U.S. 356, 374 (2010). S. App. 21-36. The district court granted Morillo's petition and vacated her guilty plea and conviction. Add. 1-10, 11-38.

B.    Legal Standards Governing Coram Nobis Petitions.

Federal prisoners may collaterally attack a final judgment of conviction by filing a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255(a). Section 2255 is only available to prisoners

who are "in custody," however, see 28 U.S.C. § 2255(a); *United States v. Michaud*, 901 F.2d 5, 7 (1st Cir. 1990), so a defendant who is no longer in custody cannot invoke Section 2255 to challenge a conviction (and thereby alleviate the ongoing collateral consequences of it). See *Chaidez* v. *United States*, 568 U.S. 342, 345 n.1 (2013). To bridge this gap, a defendant who is no longer in custody may mount a post-conviction challenge to a conviction by filing a common-law petition for a writ of error coram nobis under the All Writs Act. See *United States* v. *Denedo*, 556 U.S. 904, 910 (2009); see also *Trenkler*, 536 F.3d at 97 ("Section 2255 does not preempt the entire array of common-law writs authorized under the All Writs Act.").

Although such relief remains available, "[t]he Supreme Court has always envisioned coram nobis as strong medicine, not profligately to be dispensed," *United States* v. *George*, 676 F.3d 249, 254 (1st Cir. 2012), and, as this Court has emphasized, "situations warranting the deployment of the writ" will be "rare[]." *Id.*; see also *id.* ("[S]uccessful petitions for coram nobis are hen's-teeth rare."). That is so because the standards for securing such belated post-conviction relief are appropriately demanding and reflect the societal

interest in the finality of criminal judgments.  See *Denedo*, 556 U.S. at 916 (emphasizing, in the coram nobis context, that "judgment finality is not to be lightly cast aside"); see also *George*, 676 F.3d at 258 ("The further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment. * * * The writ of error coram nobis lies at the far end of this continuum.").

Consistent with these principles, this Court has held that, as a "remedy of last resort," *George*, 676 F.3d at 253, coram nobis is not available unless the petitioner "'[1] explain[s] his failure to seek earlier relief from the judgment, [2] show[s] that he continues to suffer significant collateral consequences from the judgment, and [3] demonstrate[s] that the judgment resulted from an error of the most fundamental character.'" *Woodward* v. *United States*, 905 F.3d 40, 43 (1st Cir. 2018); accord *Aceituno* v. *United States*, 132 F.4th 563, 569 (1st Cir. 2025).  These three judicially-imposed criteria serve distinct purposes that reflect the extraordinary nature of this remedy and its "limited scope."  *United States* v. *Mayer*, 235 U.S. 55, 69 (1914).  The first requirement "compensates for the fact that there is no applicable

statute of limitations for initiating a coram nobis petition." *United States* v. *Lesane*, 40 F.4th 191, 200 (4th Cir. 2022); compare 28 U.S.C. § 2255(f) (one-year statute of limitations for Section 2255 motions). The second requirement ensures that a live case-or-controversy exists and that the case is not moot. See *Estate of McKinney* v. *United States*, 71 F.3d 779, 782 (9th Cir. 1995). And the third requirement ensures that this remedy is reserved for a small class of transcendent errors and is used to raise ordinary run-of-the-mine errors. See *George*, 676 F.3d at 258 ("Words have meaning, and an error 'of the most fundamental character' must denote something more than an error simpliciter.") (citation omitted); see also, *e.g.*, *Murray* v. *United States*, 704 F.3d 23, 30 (1st Cir. 2013) (holding that a claim alleging a violation of *Brady* v. *Maryland*, 373 U.S. 83 (1963), even if proven, "would not alone be enough to establish that there was a fundamental error").

A coram nobis petitioner's failure to satisfy each of these requirements mandates the denial of relief, but the converse is not true: a satisfactory showing as to each of these requirements does not compel a court to grant relief. Rather, an otherwise-eligible coram

nobis petitioner is not entitled to relief unless she makes an additional showing, in light of the equities of the case, that "'justice demands the extraordinary balm of coram nobis relief.'" *United States* v. *Castro-Taveras*, 841 F.3d 34, 39 (1st Cir. 2016) (quoting *George*, 676 F.3d at 255); see also *Hager* v. *United States*, 993 F.2d 4, 5 (1st Cir. 1993) ("[T]he writ of coram nobis is an unusual legal animal that courts will use to set aside a criminal judgment of conviction only under circumstances compelling such action to achieve justice.").

## C. Statement Of Facts.

### 1. Morillo Pleads Guilty To Participating In A Drug Trafficking Conspiracy.

a. *The Offense Conduct.* In 2014, the Drug Enforcement Administration began an investigation into a suspected drug trafficking ring operating in Massachusetts and New Hampshire. S. App. 5 (¶ 9). The investigation revealed that Mara Morillo (hereafter Morillo) and her husband Franklyn were distributing cocaine and Oxycodone pills out of their Haverhill, Massachusetts, home, using a small network of distributors. S. App. 5 (¶ 9). Between November 2014 and February 2015, a confidential informant purchased between 10 and 50 Oxycodone pills directly from Morillo or one of her

associates five different times. S. App. 5-6 (¶¶ 10, 12). Law enforcement officers lawfully intercepted communications in which Morillo and her husband discussed their plans to distribute Oxycodone and cocaine. S. App. 6 (¶ 13). In August 2015, agents obtained a warrant to search the Morillos' residence. S. App. 6-7 (¶ 15). Morillo and her husband were present when the warrant was executed, and both made statements admitting they received between 50 and 100 grams of cocaine per week and between 200 and 500 pills per month from different suppliers (whom they identified) over a period of several years. S. App. 6-7 (¶ 15). Agents also recovered more than $18,000 in United States currency. S. App. 6-7 (¶ 15).

b. *The Indictment And Arrest.* On September 23, 2015, a grand jury in the District of New Hampshire charged Morillo (and others) with conspiracy to distribute, and to possess with intent to distribute, controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). App. 45-48. Morillo and her husband were subsequently arrested at their Massachusetts home; during a subsequent search of those premises, officers recovered several dozen Oxycodone pills along with $2,120 in cash. S. App. 7 (¶ 17). Following the receipt of *Miranda*

warnings, Morillo made a statement implicating herself, her husband, and others in a drug trafficking ring.  S. App. 7 (¶ 17).  Further investigation revealed that Morillo was a Venezuelan citizen who first entered the United States in 1996 on a one-year travel visa.  S. App. 12 (¶ 46), 37 (¶¶ 1-2).[2]

    c.  *Morillo's Plea Agreement*.  Following the indictment, Assistant Federal Public Defender Jonathan Saxe, who was appointed to represent Morillo, engaged in plea negotiations with the government.  At the September 2025 evidentiary hearing on Morillo's coram nobis petition, Saxe testified that he could not recall any specific discussions with Morillo about the deportation consequences of a guilty plea in her case.  App. 165.  He then explained that, while he was "not an immigration attorney," he was "fairly conversant in immigration law in a limited way that was pertinent to criminal defense," App. 166, and that, in "[e]very" case where he represented a noncitizen, he would research the possibility of deportation and

---

[2]    The district court found that Morillo came to the United States on a travel visa "[i]n 2016," Add. 12, but that finding is clearly erroneous:  Morillo acknowledged that she first came to the United States in 1996, S. App. 37 (¶ 2); App. 127, and the criminal conduct in which she engaged occurred in 2014 and 2015.

convey that information to his client before they signed a plea agreement.  App. 166-167, 170-171.  Saxe testified that he had no recollection that there was any "immigration related deal" for Morillo.  App. 167-168.  And Saxe testified to his recollection that, if a noncitizen pleaded guilty to a crime that qualified as an "aggravated felony," the conviction "would result in deportation."  App. 167.[3/]

On April 19, 2016, Morillo agreed to plead guilty.  App. 51.  In exchange for her guilty plea, the government agreed to a base offense level of 30 and further agreed not to oppose a 3-level reduction for early acceptance of responsibility.  App. 51, 57-59.  (The parties had no other agreements regarding sentencing.  App. 57.)  The plea agreement also memorialized Morillo's "understand[ing]" that "if she is not a citizen of the United States, she may be removed from the United States, denied citizenship, and denied admission to the United States in the future as a consequence of her conviction."  App. 61.

---

[3/]   See 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."). At the time of the events in question in this case, other circuits had concluded that a drug conspiracy conviction under 21 U.S.C. § 846 is an "aggravated felony."  See, *e.g.*, *Nolan* v. *Holmes*, 334 F.3d 189, 191 (2d Cir. 2003); *Tasios* v. *Reno*, 204 F.3d 544, 546 (4th Cir. 2000); *Turkhan* v. *Perryman*, 188 F.3d 814, 817-818 (7th Cir. 1999).

Morillo signed the agreement, and in doing so, "certifie[d] that she has read this 14-page Plea Agreement and that she fully understands and accepts its terms." App. 64. Saxe likewise signed the agreement, and he too certified that he "read and explained" this "14-page Plea Agreement" to Morillo and that "advised [him] that she understands and accepts its terms." App. 64.

d. *Morillo Pleads Guilty.* At the start of the May 11, 2016, change-of-plea hearing, Morillo was placed under oath and told she would be questioned by the court and that she was required to answer its questions "truthfully." App. 66-67. Following some preliminary questioning, the court asked the government to set out the factual basis for the charge, App. 69-72, and, after the government did so, Morillo told the court that the government's factual recitation was "true and correct," and that she was pleading guilty because she was, "in fact, guilty." App. 72. Morillo then confirmed that she had reviewed "each term of the written plea agreement" with Saxe, App. 73-74, and that she was "satisfied" with his representation, App. 81, and Saxe confirmed that he had reviewed "each paragraph of the written plea agreement" with Morillo. App. 81. The court next

reviewed the specific rights Morillo would waive by pleading guilty;

as part of that colloquy, the following exchange took place:

> [AUSA]: Your Honor, I'm sorry to interrupt. There was one other inquiry I'd ask the Court to make, which is with respect to the * * * immigration consequences of this conviction on the defendant.
>
> THE COURT: Okay. Are you a citizen? You're not a citizen of the United States?
>
> [MORILLO]: No.
>
> THE COURT: All right. Do you understand that a conviction, pursuant to your plea of guilty, could result in immigration consequences that may include deportation? Do you understand that?
>
> [MORILLO]: Yes.
>
> THE COURT: Do you understand, in other words, by admitting this offense and then subsequently being convicted, that conviction may be taken into account by the government in determining whether or not to deport you? Do you understand that?
>
> [MORILLO]: Yes.

App. 81-82; see also Fed. R. Crim. P. 11(b)(1)(O) (requiring courts to

advise "a defendant who is not a United States citizen" that, if they

are convicted, they "may be removed from the United States").

Morillo then pleaded guilty, App. 83, and the court accepted her plea, finding it was made knowingly and voluntarily, App. 83-84.

e. *The Presentence Investigation Report.* The Presentence Investigation Report calculated a total offense level of 33—the agreed-upon base level of 30, reduced by 3 levels for early acceptance of responsibility and enhanced by 6 levels (a 2-level stash house enhancement and a 4-level leadership role enhancement). S. App. 9-10 (¶¶ 26-35)—which, when combined with a criminal history category of I, resulted in a guidelines range of 135-to-168 months' imprisonment. App. 119-120; S. App. 14 (¶ 55). The PSR also noted that Morillo "will face deportation proceedings due to her conviction for the instant offense." S. App. 14 (¶ 53).

Prior to sentencing, Saxe filed a memorandum objecting to the two guidelines enhancements and seeking a below-guidelines sentence based in part on Morillo's difficult upbringing and the fact that she was abused. App. 88-93; S. App. 10 (¶¶ 27, 29). The memorandum concluded by stating, as the PSR had observed, that Morillo was "facing a lengthy prison sentence, with almost certain

deportation at the end of that sentence," and that, once she completes her sentence, "[s]he will be deported to Venezuela." App. 93.

f. *Morillo's Sentencing.* At the May 11, 2017, sentencing hearing, the district court overruled Morillo's objections to the guidelines enhancements and adopted the PSR's calculations. App. 119-120. Saxe then asked the court to impose a 48-month sentence, which he claimed was warranted in part because Morillo was "going to be deported * * * when [her] sentence is over" and that, while she would face "a very fractured, unstable situation where she's going to go * * * she's not going to have any choice but to go there." App. 125.

During her allocution, Morillo told the court that she accepted "full responsibility [for her] actions" and acknowledged she was "guilty." App. 129. She acknowledged that she "of course * * * broke the rules" by not "do[ing] what [she] was supposed to do," and instead made "a really bad decision" to do "what was convenient in that moment." App. 129-130.

The district court granted Morillo's motion for a variance and imposed an 84-month below-guidelines sentence to be followed by three years of supervised release. App. 119-120, 132-133, 138-139.

## 2. In 2025, Morillo Seeks Coram Nobis Relief From Her 2016 Guilty Plea And Conviction.

On August 23, 2021, as Morillo was nearing the completion of her prison sentence, she was served with a "Notice of Intent to Issue a Final Administrative Removal Order" that stated that she was deportable because she had "been convicted of an aggravated felony as defined in * * * 8 U.S.C. 1101(a)(43)(B/U)." App. 207; S. App. 42 (¶ 33). The notice advised Morillo of her rights to seek certain forms of administrative and judicial relief, but Morillo did not do so, and accordingly, on September 7, 2021, a "Final Administrative Removal Order" was entered declaring Morillo deportable and ordering her removed to Venezuela. App. 147, 208.[4]

_____

[4] The notice (App. 207) and the final removal order (App. 208) were discussed by the parties and the court, Add. 21; App. 147; S. App. 42 (¶ 33), but neither document was placed on the district court docket, perhaps because of the emergency nature of the proceedings. Nonetheless, the government asks that this Court take judicial notice of these two one-page documents because they are relevant to the question, discussed *infra*, pp. 27-39, of whether Morillo exercised reasonable diligence. See Fed. R. Evid. 201; *Manguriu* v. *Lynch*, 794 F.3d 119 (1st Cir. 2015) (reiterating that "courts normally can take judicial notice of agency determinations"); cf. *Rodi* v. *S. New Eng. Sch. of L.*, 389 F.3d 5, 19 (1st Cir. 2004) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

Morillo was released from prison soon thereafter and began serving her three-year term of supervised release.  App. 139.

a.  *Morillo's Coram Nobis Petition.*  On June 13, 2025, Morillo filed a petition for a writ of error coram nobis under seal in the district court, seeking to set aside her plea and vacate her conviction based on her claim that Saxe provided ineffective assistance of counsel regarding the deportation consequences of her plea, in violation of *Padilla*.  S. App. 21-36.  In an accompanying sealed affidavit, Morillo stated that she told Saxe prior to pleading guilty that her priority was to remain in the United States and Saxe told her that she would be able to stay in the United States and work out her immigration situation after serving her sentence.  S. App. 38-41 (¶¶ 15-20, 24). Morillo further stated that, after receiving the deportation notice in 2021, she attempted to contact Saxe (at an unspecified date) to no avail; spoke to two different immigration lawyers (at unspecified dates), who told her there was nothing she could do; and that, "[i]n or around February 2025," she was referred to new counsel who filed a coram nobis petition on her behalf.  S. App. 42 (¶¶ 33-34).  Morillo also

stated that, had she been properly advised, she would not have pleaded guilty and would have gone to trial.  S. App. 39 (¶ 18).

In its opposition to Morillo's petition, the government explained that the record evidence showed, contrary to Morillo's current claim, that she had been repeatedly advised, not only by Saxe but also by the court, that her decision to plead guilty carried a risk of deportation, and that there was no *Padilla* violation.  The government also asserted that Morillo had not adequately justified the lengthy delay preceding her petition or otherwise explained her failure to challenge her plea and conviction earlier, and that, in any case, the equities of the case did not warrant exceptional coram nobis relief.  App. 146-150.

b.  *The Evidentiary Hearing.*  On September 25, 2025, the district court, having previously granted Morillo's request for expedited consideration of her petition based on her claim that she was facing "imminent deportation," Add. 2, held an emergency evidentiary hearing during which three witnesses testified virtually.  App. 155; Add. 1.  Morillo called her daughter and a family friend, both of whom briefly testified that Morillo spoke frequently of her "plan" to address her immigration status upon release from prison.  App.

157-58, 160-61.  The government called Saxe who, as noted (p. 9, *supra*), testified that his regular practice was to investigate the possibility of deportation and notify his noncitizen clients "[e]very time that [he] had a case that had potential immigration consequences."  App. 166; see App. 166 (Saxe's testimony that providing such advice was "basic").  Saxe also testified that he could not recall any instance where "the government ever agree[d] to make arrangements with respect to immigration consequences as part of a plea bargain."  App. 167.

### D.    Ruling Under Review.

On September 26, 2025, the day after the hearing, the district court, in the ruling under review, granted Morillo's petition and vacated her conviction.  Add. 9.  In a subsequent memorandum opinion, the court found that Morillo was eligible for relief and that the equities of her case warranted it.  Add. 27-38.  More specifically, the court found that (a) Morillo had no reason to challenge her plea and conviction earlier, and that she had diligently sought coram nobis relief once she "fully and properly appreciated" that her plea subjected her to deportation, Add. 27-28; (b) she continues to suffer

collateral consequences from her conviction, Add. 28-29; and (c) her conviction was tainted by fundamental error, namely, ineffective assistance of counsel under *Padilla* regarding the deportation consequences of her plea, Add. 29-34.

With respect to the merits question, the district court did not find, as Morillo had alleged, that Saxe told her that her plea included a side deal in which she would not be deported or that she would be able to work out her immigration situation later; instead, the court found that Saxe had misadvised Morillo about the deportation consequences of her plea. The court found that there was no specific evidence about what Saxe told Morillo before her plea, and that the statement in the plea agreement that she "may" be deported (which the court repeated during the colloquy under Rule 11(b)(1)(O)) was "legally incorrect" because it did not convey to Morillo that deportation was a "virtual certainty." Add. 3; Add. 34. The court acknowledged that Saxe's sentencing memorandum as well as his "unambiguous" statements at sentencing notified Morillo that a guilty plea "would almost certainly lead to her deportation"—the standard the court held applicable—but it deemed this advice irrelevant

because it was conveyed to Morillo *after* she pleaded guilty and thus could not have influenced her decision to plead guilty. Add. 18-19.

The court also found that, but for this misadvice, there was a reasonable probability that Morillo would not have pleaded guilty and would instead have stood trial. Add. 35. The court reasoned that Morillo could plausibly have raised coercion-type defenses at trial based on her husband's abuse, and that the existence of a defense, coupled with her assertion that her "unequivocally-articulated goal [was] to remain in the United States at all costs," Add. 31, sufficed to establish prejudice. Add. 31, 35.

Lastly, having determined Morillo was eligible for coram nobis relief, the court then found that Morillo's difficult upbringing and life justified this extraordinary relief. Add. 36-37. Accordingly, it vacated her guilty plea and conviction. *Id.*

# SUMMARY OF ARGUMENT

The district court erred in granting Morillo's coram nobis petition and vacating her guilty plea to, and resulting conviction for, a drug trafficking conspiracy. Morillo was not eligible for coram nobis relief, and the equities of her case did not justify this exceptional form of relief.

I.  Contrary to the district court, Morillo failed in two respects to demonstrate her eligibility for coram nobis relief.

A.  Morillo did not adequately explain her lengthy, years-long delay in seeking to challenge her plea and conviction. Morillo has known, since she pleaded guilty in May 2016, that her decision to plead guilty carried at least the possibility of deportation, and she has known, since her May 2017 sentencing, that deportation was not merely possible but virtually certain. Notwithstanding this knowledge, Morillo took no steps to challenge her plea until 2025 when her deportation was imminent. Morillo has not adequately explained why she bypassed opportunities to raise her claims earlier, either by way of a motion to withdraw her plea at sentencing or in a Section 2255 motion while she was in custody. Indeed, Morillo's failure to file

a Section 2255 motion in 2021 or any time thereafter when she was still on supervised release is particularly inexplicable given that she knew, at that time, that a final order for her removal had been entered as a result of her conviction. A reasonably diligent person so situated—particularly one claiming, as Morillo now does, that their overarching goal was to remain in the United States—would have, and should have, taken steps to challenge her conviction at that time. But Morillo did not.

B. Separately, Morillo has failed to show that her guilty plea resulted from an error "of the most fundamental character." Even assuming, as this Court has, that a garden-variety ineffective-assistance-of-counsel claim can constitute a fundamental error remediable in a coram nobis petition, Morillo's ineffective-assistance claim lacks merit because, regardless of the propriety of the advice she received, she suffered no prejudice.

1. The Sixth Amendment right to the effective assistance of counsel requires criminal defense counsel to "inform her client whether his plea carries a risk of deportation." *Padilla*, 559 U.S. at 374 (2010); *id*. at 367 ("The weight of prevailing professional norms

supports the view that counsel must advise her client regarding the risk of deportation."). Saxe's unrebutted testimony regarding his established practice of advising noncitizen clients, coupled with the statement in Morillo's plea agreement that she "may" be deported (which she repeatedly acknowledged having read and understood), as well as her sworn statements during the change-of-plea hearing, alerted her that she faced a "risk of deportation."

b. The district court disagreed, deeming this advice legally incorrect because it notified Morillo that deportation was possible as opposed to virtually certain. It is far from clear that the district court's reading of *Padilla*—that criminal defense lawyers must provide nuanced risk assessments and tiered advice regarding the likelihood of deportation, at least when the law is "truly clear" (559 U.S. at 369)—is correct. Even if the law here were truly clear (which is open to question because this Court has never held that a drug conspiracy conviction is an "aggravated felony"), immigration law is a complex specialty, so a defendant notified by her defense lawyer that she faces a risk of deportation should consult with an immigration lawyer for a more specific risk assessment.

Nonetheless, this Court does need not decide whether the district court correctly interpreted *Padilla* to require tiered advice in order to decide this case. Even if it did, and even if Morillo was therefore misadvised by not being told deportation was virtually certain, the district court still erred in finding that Morillo was prejudiced. See, *e.g.*, *Fernandez-Garay* v. *United States*, 996 F.3d 57, 62 (1st Cir. 2021) (holding that courts can, and should, bypass the deficient performance prong if prejudice does not exist).

2. The prejudice inquiry turns on whether there is a reasonable probability that, but for the alleged misadvice, the defendant would not have pleaded guilty and would instead have elected to stand trial. See *Lee* v. *United States*, 582 U.S. 357, 366-368 (2017); *Hill* v. *Lockhart*, 474 U.S. 52, 59 (1985). In finding prejudice, the district court suggested Morillo might have stood trial because she had "plausible" defenses based on alleged coercion from her husband. But these defenses were not plausible because the prerequisites for presenting them are absent; and, in the absence of a viable defense, it is exceedingly difficult for Morillo to show that she was prejudiced by her decision to accept the more favorable disposition resulting from

her guilty plea.  *Lee*, 582 U.S. at 366-368.  To do so, Morillo must be able to point to "contemporaneous evidence" in the record to substantiate her claim that she would not have pleaded guilty even though she had no viable defense.  *Id.* at 369.  But no such contemporaneous evidence exists here; in fact, the only evidence the district court relied on was Morillo's June 2025 affidavit.  But that is precisely the sort of "*post hoc* assertion[] * * * about how [s]he would have pleaded but for [her] attorney's deficiencies," *id.*, that are not properly considered in the prejudice calculus.

II.  Even if Morillo were eligible for coram nobis relief, the district court abused its discretion in granting such relief here.  The court's analysis focused entirely on the hardships and difficulties Morillo has faced, but its analysis was one-sided and failed to address several countervailing equities—namely, that Morillo's conviction resulted from a guilty plea in which she admitted her guilt; that the government would be harmed by attempting to retry the case against Morillo years after the fact; and that the grant of relief here would have a destabilizing effect on the finality of criminal judgments.

## ARGUMENT

### THE DISTRICT COURT ERRED IN GRANTING MORILLO'S CORAM NOBIS PETITION AND VACATING HER GUILTY PLEA AND CONVICTION.

I.      **Standard Of Review.**

In an appeal from an order granting coram nobis relief, this Court reviews the district court's legal conclusions *de novo*, its findings of fact for clear error, and its discretionary decision to grant relief for an abuse of discretion. See, *e.g.*, *Aceituno*, 132 F.4th at 569; *Castro-Taveras*, 841 F.3d at 38-39.

II.      **Analysis.**

Morillo's coram nobis petition sought an exceptional form of post-conviction relief:    vacatur of a nine-year-old judgment of conviction. Because "judgment finality is not to be lightly cast aside," *Denedo*, 556 U.S. at 916, Morillo bore the burden of showing she was eligible for, and entitled to, this relief. See *United States* v. *Morgan*, 346 U.S. 502, 512 (1954) (emphasizing that, in the coram nobis context, the trial proceedings are "presumed * * * correct," so "the burden rests on the accused to show otherwise"). The district court erred in finding that Morillo met these burdens.

**A.    The District Court Erred In Finding That Morillo Was Eligible For Coram Nobis Relief.**

Morillo neither adequately explained the lengthy years-long delay preceding her coram nobis petition nor demonstrated that her conviction was tainted by fundamental error.[5/]

**1.    Morillo Failed To Adequately Justify Her Nine-Year Delay In Seeking Coram Nobis Relief.**

The first coram nobis eligibility prerequisite required Morillo to show "sound reasons exist[ed]" for her "failure to seek appropriate relief earlier." *Morgan*, 346 U.S. at 512.  As the district court explained, the "sound reasons" standard required Morillo to adequately "explain her failure to seek relief from her conviction earlier in a more timely and traditional manner (for example, through a [Section] 2255 petition while she was still in custody) and [show] that she exercised due diligence."  Add. 27; see, *e.g.*, *Aceituno*, 132 F.4th at 570.  The district court then found Morillo had exercised reasonable diligence because she "had no reason to pursue [Section 2255] habeas relief while she was incarcerated," and she diligently attempted to

_____

[5/]    The government agrees that Morillo has shown ongoing collateral consequences attributable to her conviction.

challenge her conviction. Add. 28.  The court's findings and conclusions are erroneous:  Morillo had ample reason to challenge her plea and conviction years before she did, and her failure to do justifies reversal.  *Aceituno*, 132 F.4th at 570 (reversing grant of coram nobis relief based in part on the petitioner's failure to challenge a guilty plea earlier).

a. The record establishes that Morillo has known since at least May 2016 that her guilty plea could result in her deportation.  Though Saxe had no specific recollection of the advice he gave Morillo, the district court did not dispute his testimony that, without exception, he would research the issue and advised his clients if a risk of deportation existed.  Consistent with what Saxe presumably told her, Morillo signed a plea agreement advising her she "may" be deported if she pleaded guilty, and she acknowledged she had read and discussed each and every provision of her agreement—which includes the provision  regarding deportation—with Saxe.  Furthermore, Morillo reaffirmed for the court, under oath, that she had discussed the agreement with Saxe, stated she was satisfied with his representation, and told the court she understood that, because she was a noncitizen,

she "may" be deported.  In addition, the record contains evidence establishing that Morillo has known since at least her May 2017 sentencing that deportation was not only possible, but was exceedingly likely:  Saxe unequivocally told the court in his written sentencing memorandum and again orally at the sentencing hearing, in Morillo's presence, that she was "going to be deported" and that she was not going to have any choice but to return to Venezuela.

Notwithstanding this knowledge, Morillo did not challenge her plea or conviction at any time prior to 2025, nine years after she was told deportation was possible and eight years after she was told that deportation was virtually certain.  Her lengthy delay in seeking relief was excessive and unjustified.  See *United States* v. *Sutherland*, 103 F.4th 200, 211-212 (4th Cir. 2024) (finding petitioner's delay unjustified in part because "the facts that form the basis of his [claim] were facts that Sutherland knew" years earlier); see also *United States* v. *Lockhart*, 165 F.4th 933, 937 (5th Cir. 2026) (holding petitioner's six-year delay in filing coram nobis petition was excessive).

b.  In excusing Morillo's delay, the district court found she had no reason to challenge her plea before 2025, and that she acted diligently in seeking coram nobis relief "once she fully and properly appreciated" the deportation consequences of her guilty plea.  Add. 28.  Those determinations were erroneous.  Morillo inexplicably bypassed opportunities to challenge her plea and conviction earlier; indeed, it is precisely because coram nobis requires a petitioner to exercise diligence that courts have held that "[a] defendant seeking to avoid the collateral consequences of a conviction"—*i.e.*, deportation— "cannot postpone seeking relief until it appears that a collateral consequence is imminent." *Ragbir* v. *United States*, 950 F.3d 54, 63 (3d Cir. 2020).  Yet that is exactly what Morillo did.

(i.)  The district court accepted that Morillo was told, before she pleaded guilty, that deportation was possible, but concluded that it was prejudicial error for Saxe not to have told her that deportation was virtually certain.  Add. 6; Add. 16-21.  Putting to one side for the moment whether Saxe's advice ran afoul of *Padilla*, see pp. 39-46, *infra*, the salient point, for present purposes, is that the court's own findings refute its determination Morillo exercised diligence.

Even if, as the court found, Morillo pleaded guilty in May 2016 based on erroneous advice that deportation was merely possible, the district court never explained why it forgave Morillo for standing by silently when, during her May 2017 sentencing hearing, Saxe "unambiguous[ly]" (Add. 18) told the court, in Morillo's presence, that Morillo "*will be* deported to Venezuela" (App. 93) (emphasis added), and that she was "not going to have any choice but to go there." App. 125; see also S. App. 14 (¶ 53) (stating that Morillo "will face deportation proceedings due to her conviction for the instant offense"). Far from alerting her lawyer or the court that she had a different understanding of her deportability when she pleaded guilty, Morillo did not say or do anything, including making any effort to try to get out from under her plea. See Fed. R. Crim. P. 11(d)(2) (allowing a defendant to move to withdraw a guilty plea "after the court accepts the plea, but before it imposes sentence," if the defendant can show a "fair and just reason"); see also, *e.g.*, *United States* v. *Norvell*, 729 F.3d 788, 795 (8th Cir. 2013) (ineffective assistance of counsel under *Padilla*, if proven, can constitute a "fair and just reason" to withdraw a plea under Rule 11(d)(2)). Her silence is particularly indefensible if,

as Morillo claims, she believed at the time that she would be able to work out her immigration status after completing her sentence. S. App. 39-40 (¶¶ 18-21). Morillo's silence and inaction does not reflect reasonable diligence. See *United States* v. *Delhorno*, 915 F.3d 449, 455 (7th Cir. 2019) (emphasizing that a reasonably diligent coram nobis petitioner could have discovered, from the records of his case, the possibility of deportation and then taken affirmative steps to challenge the conviction giving rise to his deportability).

(ii.) Indeed, Morillo not only failed to try to undo her plea when she was sentenced, but she also failed to take any steps to challenge her plea and conviction after she was sentenced and while she was in custody. To repeat: in May 2017, Morillo heard Saxe unequivocally state at her sentencing hearing that she was going to be deported; as a result, even though she did not move to withdraw her plea, she could have filed a Section 2255 motion once she began serving her sentence to try to undo her plea and conviction due to alleged misadvice by Saxe. See, *e.g.*, *Rivera-Rivera* v. *United States*, 844 F.3d 367, 372 (1st Cir. 2016) (holding that claims alleging a violation of the Sixth Amendment right to effective assistance of counsel can be raised

under Section 2255).  True, Morillo likely would have had to proceed *pro se*, but that does not excuse her failure to do so.  See *Voravongsa* v. *Wall*, 349 F.3d 1, 8 (1st Cir. 2003) (holding that a defendant's *pro se* status does not excuse a failure to timely file a post-conviction pleading).

Federal prisoners have no automatic right to counsel when seeking postconviction relief, but they have shown themselves to be capable of filing uncounseled Section 2255 motions.  See, *e.g.*, *Welch* v. *United States*, 578 U.S. 120, 126 (2016); *Ramos-Martínez* v. *United States*, 638 F.3d 315, 319 (1st Cir. 2011).  Morillo, no less than any other federal prisoner, thus was free to "use the federal habeas machinery," *Rose* v. *Lundy*, 455 U.S. 509, 520 (1982), on her own, and doing so would not have been difficult or burdensome.  A standard, pre-printed form exists for such motions and it provides detailed instructions on the specific information they must provide.  See Rules Governing Section 2255 Proceedings, Appendix.  And, in setting out her claim,  Morillo need only have provided a factual description of its basis (*e.g.*, "My lawyer did not tell me I was going to be deported before I pleaded guilty").  And, while Morillo could perhaps have

supplemented her claim by referencing the 2010 *Padilla* decision, cf. *United States* v. *Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (emphasizing, in finding inadequate reasons for the delay, that "[t]he relevant law has remained the same throughout this litigation"), her failure to do so would have been of no consequence:  her *pro se* status would have placed the onus on the district court to liberally construe her factual assertions as a *Padilla* claim.  See *Ahmed* v. *Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997) ("The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled.").[6/]

Yet Morillo did not file a Section 2255 motion when she was first imprisoned in 2017 or at any time during the next four years while she was still imprisoned.  Nor did Morillo take any steps to file a Section 2255 motion after she was released from prison in 2021 while she was on supervised release.  See *Francis* v. *Maloney*, 798 F.3d 33, 37 (1st Cir. 2015) (reiterating that "an individual serving a supervised release

───────────────

[6/] It bears noting that, while Morillo's plea agreement contained a waiver of her right to seek Section 2255 relief, the waiver expressly exempted ineffective-assistance-of-counsel claims.  App. 62.

term" is "'in custody'").  Morillo's inaction while on supervised release is especially problematic and inexcusable because, in 2021, Morillo had actual knowledge that the government was seeking and had obtained a final order of removal.  App. 207-08.

At that moment, and regardless of any advice she had been given earlier, she knew that deportation was not merely possible or even probable, but that it was inevitable.  Despite such knowledge, Morillo did not file a Section 2255 motion to set aside her plea and conviction in order to prevent her deportation.  Her inaction, far from reflecting diligence, belies her claim her overarching desire was to remain in the United States.  Viewed another way, a reasonably diligent person, having learned that a final order of removal had been entered based on a conviction they believed was erroneous, would have taken action to challenge that conviction at that time.  But Morillo did not.

Morillo asserts that, even though she did not file a Section 2255 motion, she did make some efforts regarding her conviction:  she attempted to contact Saxe (at an unspecified date) to no avail, and spoke to two different immigration lawyers (at unspecified dates), who

told her there was nothing she could do, before eventually finding a lawyer who agreed to file a claim on her behalf challenging her plea. S. App. 42 (¶¶ 33-35). The problem for Morillo (and the district court) is that Morillo could have simultaneously sought Section 2255 relief while also making efforts to locate and consult with counsel; the two approaches are not mutually exclusive. The fact that she pursued the latter course and not the former reflects a lack of diligence. Cf. *Aceituno*, 132 F.4th at 570 (finding Aceituno's reasons for delay inadequate in part because his request for administrative relief did not "explain in any way why he did not during this period seek to attack his criminal conviction") (internal quotation marks omitted).

The district court seemed to excuse Morillo's failure to challenge her plea and conviction earlier (by moving to withdraw or under Section 2255) by finding that Morillo had exercised diligence once "she fully and properly appreciated" the deportation consequences of her guilty plea, which, the court found, occurred in 2025. Add. 28; see also S. App. 42 (¶¶ 34-35). The court's conclusion is legally and factually flawed.

Legally, the court's focus was mistaken: whether a coram nobis petitioner exercised diligence does not turn on how expeditiously the petitioner sought *coram nobis* relief; rather, it turns on whether the petitioner's failure to raise their claim earlier can be excused because they exercised reasonable diligence. See *Aceituno*, 132 F.4th at 570 ("The district court misapprehended the correct inquiry [into delay]. The correct inquiry was * * * whether it was reasonable for Aceituno to wait ten years from entry of his guilty plea to attempt to withdraw his plea and challenge his convictions.").

And factually, even if the pre-plea advice Morillo received in May 2016 was deficient, Morillo, the record shows, "properly appreciated" the true consequences of that plea by the time of her sentencing in May 2017. Thus, while the district court's logic might excuse Morillo's delay in not challenging her plea before 2017, the court did not explain how or why Morillo acted diligently by failing to challenge her plea between 2017 and 2025 after she learned her deportation was virtually certain—and she did not. See *Aceituno*, 132 F.4th at 571 (holding the defendant's "thin rationale" for his lengthy delay in seeking coram nobis relief "underscore[d] its

unreasonableness") (citing cases); see also *Ragbir*, 950 F.3d at 63 ("[T]he more time that elapses between a party's conviction and his petition for coram nobis, the less likely it becomes that sound reasons exist.").

For all these reasons, the district court erred in concluding that sound reasons existed to justify Morillo's delay; as a result, the district court's order granting coram nobis relief should be reversed on this basis alone.

## 2. Morillo's Conviction Is Not Tainted By Fundamental Error.

The district court separately erred in concluding that Morillo demonstrated that her plea and the resulting conviction were tainted by an "'error[] of the most fundamental character.'" *Morgan*, 346 U.S. at 509 n.15 (quoting *Mayer*, 235 U.S. at 69). Assuming that an ineffective-assistance-of-counsel claim under *Padilla* properly ranks as a fundamental error redressable in a coram nobis petition, the

district court nevertheless erred in concluding that *Padilla* error occurred here.[1/]

                    **a.**     **The Pre-Plea Advice Saxe Provided Morillo Was Consistent With Padilla.**

The Sixth Amendment right to the "Assistance of Counsel for his defence," U.S. Const. amend. VI, is the right to "the effective assistance of competent counsel," *McMann* v. *Richardson*, 397 U.S. 759, 771 (1970), during "all critical stages of the criminal process," *Iowa* v. *Tovar*, 541 U.S. 77, 80-81 (2004), including the entry of a guilty plea. See *id*. at 81; see also, *e.g.*, *Lafler* v. *Cooper*, 566 U.S. 156, 162

---

[1/]   This Court has stated that *Padilla* claims qualify as fundamental errors, see, *e.g.*, *Williams* v. *United States*, 858 F.3d 708, 715 (2017), but that determination was not necessary to decide those cases because the Court denied relief on alternative grounds. And the statement that such claims are fundamental is at odds with a pre-*Padilla* coram nobis decision from this Court holding that this type of claim was a "run-of-the-mill ground for collaterally attacking a conviction" and did not present an "'error of the most fundamental character.'" *Enwonwu* v. *United States*, 199 Fed. Appx. 6, 7 (2006) (unpub.); see also, *e.g.*, *Murray*, 704 F.3d at 30 (holding that an alleged violation of *Brady* v. *Maryland*, 373 U.S. 83 (1963), "would not alone be enough to establish that there was a fundamental error"). *Enwonwu*'s conclusion is correct: unlike a conviction for non-criminal conduct, a garden-variety claim of ineffective assistance of counsel is not a "fundamental" error. Although the government did not challenge the treatment of *Padilla* errors as "fundamental" below, this Court may wish to revisit this issue in an appropriate case.

(2012) ("Defendants have a Sixth Amendment right to counsel * * * that extends to the plea-bargaining process.").  In *Strickland* v. *Washington*, 466 U.S. 668 (1984), the Supreme Court adopted a now-familiar two-part test holding that a defendant is deprived of this constitutional right if his attorney provides deficient legal representation and the deficiency was prejudicial.  *Id.* at 687. *Strickland* developed this two-part standard to gauge the effectiveness of counsel in cases that proceed to trial, but the Court soon thereafter held that "the same two-part standard * * * appli[es] to ineffective-assistance claims arising out of the plea process." *Hill*, 474 U.S. at 57; accord *United States* v. *Colón-Torres*, 382 F.3d 76, 86 (1st Cir. 2004).

(i.)  In *Padilla* v. *Kentucky*, the Supreme Court applied *Strickland* and *Hill* to hold that a criminal defense lawyer provides deficient representation if he fails to advise, or affirmatively misadvises, a noncitizen defendant "regarding the risk of deportation" associated with a guilty plea.  559 U.S. 356, 366-370 (2010); see also *Chaidez*, 568 U.S. at 344 ("In *Padilla* * * * this Court held that the Sixth Amendment requires an attorney for a criminal defendant to

provide advice about the risk of deportation arising from a guilty plea."). This Court's post-*Padilla* precedents repeatedly use the "risk of deportation" terminology. See, *e.g.*, *Dor* v. *Bondi*, 161 F.4th 1, 10 (1st Cir. 2025) ("[I]n *Padilla*, the Supreme Court held that the Sixth Amendment right to counsel requires criminal defense attorneys to inform noncitizen clients whether their plea carries a risk of deportation."); accord *Castro-Taveras*, 841 F.3d at 38; *Williams* v. *United States*, 858 F.3d 708, 713 (1st Cir. 2017); *Matos-Santana* v. *Holder*, 660 F.3d 91, 93 (1st Cir. 2011).

The record here shows that Morillo received that advice before she pleaded guilty. Saxe's undisputed testimony was that his settled practice was to notify a client, like Morillo, that a guilty plea would carry a risk of deportation, and the written plea agreement Morillo signed, after discussing it with Saxe, alerted her to this risk. See pp. 9-10, *supra*. That Morillo neither expressed surprise nor confusion at this provision in her plea agreement bolsters the inference that she had been told of this possibility by Saxe before she pleaded guilty. And, if more were necessary, Morillo was later advised by the court, under oath and in accordance with Fed. R. Crim. P. 11(b)(1)(O), that

she "may" be deported and she told the court she understood this possibility.

(ii.) Despite Morillo's awareness of the risk of deportation if she pleaded guilty, the district court understood certain language in *Padilla* to require a defense lawyer to advise a noncitizen, not merely that deportation is possible, but that it is virtually certain, at least if the law on this point is "'truly clear.'" Add. 27 (quoting *Padilla*, 559 U.S. at 369). The court further concluded that this heightened standard of virtual certainty applied here because the offense to which Morillo was pleading guilty (a Section 846 narcotics conspiracy) was an aggravated felony for which deportation was virtually certain. Add. 27. The court thus concluded that the pre-plea advice Morillo was given as to the risk of deportation was "legally incorrect" because it did not convey that deportation was virtually certain. Add. 18, 30. And, as noted, while the court found that Saxe's unambiguous statements *at sentencing* conveyed the requisite degree of virtual certainty, it deemed these statements irrelevant because they were made *after* Morillo entered her plea. Add. 18-19.

It is far from clear that the district court's reading of *Padilla* is correct. To begin with, the question before the Court was simply whether a criminal defense lawyer had any obligation at all to advise a noncitizen about the deportation consequences of a plea. After all, prior to *Padilla*, many courts, including the Kentucky Supreme Court in Padilla's own case, held that the Sixth Amendment did not require any such advice because deportation was understood to be a collateral consequence of a criminal conviction. 559 U.S. at 359-360. Without deciding whether deportation is a "collateral consequence," *id.* at 366, the Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," *id.*, and, on that basis, held that "counsel must advise her client regarding the risk of deportation." *Id.* at 367; see also pp. 39-40, *supra*. Accordingly, Padilla's allegation that he had not received any deportation-related advice was sufficient to state a claim of deficient performance. 559 U.S. at 369. So understood, *Padilla* merely decided that deportation advice is not beyond the Sixth Amendment but because Padilla himself had received no such advice,

the Court had no occasion to decide how much advice—that is, whether tiered advice—is required.

Even if *Padilla* could be read (as the district court did) to require tiered advice in cases where "the deportation consequence is truly clear," *id.* at 369, such clarity does not exist here. Saxe testified that his recollection was that a conviction for an "aggravated felony" offense "would result in deportation." App. 167; but see *Moncrieffe* v. *Holder*, 569 U.S. 184, 187 (2013) ("[A] noncitizen who has been convicted of an 'aggravated felony' *may* be deported") (emphasis added). Saxe, however, did not testify about his understanding, if any, of whether a Section 846 drug conspiracy conviction qualified as an "aggravated felony." And, while some courts had held at the time of the events in this case a Section 846 conviction is an aggravated felony, see p. 9 n.3, *supra*, *this Court* had not addressed the issue at that time (and has not done seven today). The absence of controlling precedent casts doubt on whether the law on this point can fairly be termed "truly clear." Cf. *United States* v. *Muñoz-Gonzalez*, 145 F.4th 21, 26 (1st Cir. 2025) (holding that an error is not "plain" in the sense of being "clear or obvious" if there is no binding precedent so holding) (internal

quotation marks omitted).  Against this backdrop, it is difficult to accept the district court's conclusion that Saxe's advice to Morillo was so objectively unreasonable that it amounted to constitutionally-deficient performance.  That Saxe perhaps could have provided Morillo with a more nuanced assessment of her deportation risk does not mean that the advice he provided violated *Padilla*.

Furthermore, the district court's reading of *Padilla* to require nuanced advice unmoors the decision from its constitutional grounding.  The Sixth Amendment ensures that a criminal defendant receives legal advice that is "'within the range of competence demanded of attorneys *in criminal cases*.'"  *Strickland*, 466 U.S. at 687 (quoting *McMann*, 397 U.S. at 771) (emphasis added). The "range of competence," therefore, is measured by a reasonable *criminal defense* lawyer, not a reasonable *immigration* lawyer.  See, *e.g.*, *Padilla*, 559 U.S. at 384 (Alito, J., concurring) ("[M]astery of immigration law is not required by *Strickland*."); *Farhane* v. *United States*, 121 F.4th 353, 386 n.3 (2d Cir. 2024) (en banc) (Pérez, J., concurring) ("*Padilla* does not encumber defense counsel with the obligations of knowing all the ins and outs of immigration law.").  And

with good reason: as *Padilla* itself emphasized, "[i]mmigration law can be complex, and it is a legal specialty of its own," 559 U.S. at 369, and a reasonably competent defense attorney should know that it is not "appropriate or responsible" to provide legal advice to a client "on a difficult and complicated subject matter with which they are not familiar"; instead, the better course is for a defense lawyer to encourage a client who wants more specific advice to seek out an immigration lawyer with that expertise. *Padilla*, 559 U.S. at 385 (Alito, J., concurring); *id.* ("Candor concerning the limits of one's professional expertise * * * is within the range of duties reasonably expected of defense attorneys in criminal cases.").

(iii.) Notwithstanding the foregoing, and as the district court observed, two out-of-circuit decisions provide some support for its conclusion that, at least when the law is truly clear, *Padilla* requires a criminal defense lawyer to notify a defendant that deportation is virtually certain. Add. 32-34 (discussing *United States* v. *Akinsade*, 686 F.3d 248 (4th Cir. 2012), and *United States* v. *Rodriguez-Vega*, 797 F.3d 781 (9th Cir. 2015)). This Court does not need to weigh in on whether these cases correctly interpret *Padilla* in order to resolve

this case, however, because even if they are, and even if the relevant law here was truly clear, the district court still erred in finding that Morillo has shown prejudice.  See, *e.g.*, *United States* v. *Caparotta*, 676 F.3d 213, 219-220 (1st Cir. 2012) ("If the defendant fails to satisfy either prong of the *Strickland* test, his claim fails."); *Tevlin* v. *Spencer*, 621 F.3d 59, 66 (1st Cir. 2010) (same).

For this reason, the Supreme Court has held that federal courts may—and, when it is easier, ordinarily should—bypass *Strickland*'s (often difficult) performance component and decide ineffective-assistance claims on lack-of-prejudice grounds.  See, *e.g.*, *Smith* v. *Robbins*, 528 U.S. 259, 286 n.14 (2000) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'") (quoting *Strickland*, 466 U.S. at 697); *Fernandez-Garay*, 996 F.3d at 62 (bypassing deficient performance prong because defendant failed to prove prejudice).  The Court should follow that course here because, as we will show, any allegedly deficient pre-plea advice she received as to deportation consequences was not prejudicial.

### b. *Morillo Was Not Prejudiced.*

The Supreme Court's decision in *Lee* explains the parameters and operation of the prejudice inquiry in the *Padilla* context. A straightforward application of that decision compels reversal.

(i.) Jae Lee pleaded guilty to a federal drug possession offense after his lawyer told him the government "would not deport him if he pleaded guilty." *Lee* v. *United States*, 582 U.S. 357, 360 (2017). When Lee later learned this advice was incorrect, he filed a Section 2255 motion invoking *Padilla*. The lower courts found that, even though the advice Lee received was in fact erroneous, he suffered no prejudice. The Supreme Court reversed, however. Like the lower courts, the Supreme Court accepted that Lee had been misadvised so the Court focused on whether Lee had shown prejudice.

The Court began by explaining that, as a "general matter," a defendant "who has no realistic defense to a charge * * * will be unable to carry his burden of showing prejudice from accepting a guilty plea." *Id.* at 366-367. Absent a viable defense, a defendant is "highly likely to lose at trial," and thus "will rarely be able to show prejudice from accepting a guilty plea that offer[ed] him a better resolution than

would be likely after trial." *Id.* at 367; *id.* ("Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one."). In short, "the certainty of less jail time creates an incentive to avoid the longer shot of an acquittal at trial." *Gish* v. *Hepp*, 955 F.3d 597, 606 (7th Cir. 2020).

But even though Lee himself had no viable defense, the Court did not hold that the lack of such a defense is a *per se* bar to finding prejudice; rather, the Court recognized that, in rare cases, a defendant who lacks such a defense may still be able to show prejudice, 582 U.S. at 366, but only if they can point to "contemporaneous evidence" in the record showing that they were willing, at the time they pleaded guilty, to forego a more favorable disposition in favor of "throwing a Hail Mary at trial." *Id.* at 367-369. The Court then held that the "unusual circumstances" of Lee's case fit within this narrow exception because Lee's claim that he would not have pleaded guilty had he been properly advised was consistent with statements he made at the time he entered his plea. *Id.* at 369; see also *Gish*, 955 F.3d at 606 (terming *Lee* the "rare exception" to the

general rule that the lack of a viable defense precludes a finding of prejudice).

(ii.) The district court misapplied *Lee* in finding Morillo suffered prejudice here. The court first determined Morillo's claim that she would have stood trial was reasonable because she had "plausible" defenses that she could have raised at trial—"coercion, diminished capacity, and/or battered wife syndrome"—based on the abuse she received from her husband. Add. 35. But evidence that Morillo was abused would not have been sufficient to present a coercion or duress defense; rather, Morillo would have been required to show a nexus between the abuse and the illegal activity—that is, that she was required to traffic drugs to stave off an imminent threat of serious bodily harm. See *United States* v. *Bailey*, 444 U.S. 394, 409-410 (1980) (holding that, for purposes of a duress defense, the relevant threat is that which "caused the actor to engage in conduct violating the literal terms of the criminal law"); see also *United States* v. *Gonzalez-Perez*, 778 F.3d 3, 14 (1st Cir. 2015) (same). Showing that she was the victim of domestic abuse would not alone be sufficient to show that she

engaged in drug trafficking *because* she faced an imminent threat of serious harm had she not done so.

Furthermore, any such coercion or duress-based defense would have been unavailable for a second reason—namely, that Morillo did not lack "a reasonable, legal alternative to violating the law." *Bailey*, 444 U.S. at 410; see also *United States* v. *Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002) ("The duress defense to criminal liability is strict and is unavailable unless there is no reasonable legal alternative to violating the law that would also avoid the threatened harm."). As this Court has long recognized, duress defense often falter precisely because the defendant had alternatives available that did not involve violating the law, including contacting the police. See *United States* v. *Vazquez*, 724 F.3d 15, 28 (1st Cir. 2013) (upholding the district court's refusal to give a duress instruction because the defendant could have found "a few minutes in private when she could have contacted the police"); *R.I. Recreation Center, Inc.* v. *Aetna Cas. & Surety Co.*, 177 F.2d 603, 605-606 (1st Cir. 1949) (civil case to the same effect); see also *United States* v. *Alicea*, 837 F.2d 103, 107 (2d Cir. 1988) (following *R.I. Recreation Center*).

Finally, the district court's suggestion that Morillo potentially could have raised a diminished-capacity defense is equally misplaced. See, *e.g.*, *United States* v. *White*, 766 F.2d 22, 24 (1st Cir. 1985) (holding a diminished-capacity defense unavailable where the defendant "is in fact cognizant that the law is being violated by the proscribed actions"). The intercepted phone calls where Morillo discussed drug trafficking, combined with Morillo's statements to law enforcement and to the court during her plea colloquy, as well as the statements she made during her sentencing allocution, convincingly show that Morillo understood the illegality of her participation in this drug ring.

(iii.) Without a viable defense, Morillo cannot show that her acceptance of a more favorable disposition of her case—a reduced sentence—was prejudicial unless she can identify some contemporaneous evidence to substantiate her current claim that she would not have pleaded guilty but for the misadvice. She has not done so. The only evidence she pointed to—and the only evidence the district court relied on in finding prejudice—was Morillo's June 2025 affidavit, where she asserted she would not have pleaded guilty had

she known her deportation was virtually certain because her overarching goal was to remain in the United States. S. App. 39 (¶ 16). But the court erred in relying on these statements because they are "*post hoc* assertions * * * about how [s]he would have pleaded but for [her] attorney's deficiencies," *Lee*, 582 U.S. at 369, which, *Lee* held, cannot undergird a finding of prejudice. *Id.* Without any *contemporaneous* evidence, of the sort Lee presented in his case, the district court erred in finding prejudice.

In fact, the contemporaneous evidence in this case not only fails to support Morillo's current assertions, but actually undermines it. See *Nissenbaum* v. *Jennings*, 148 F.4th 548, 556 (7th Cir. 2025) (rejecting defendant's claim of prejudice where "the contemporaneous evidence as to his preferences undermines []his assertion"). For one thing, the fact that Morillo did not challenge her conviction between 2017 and 2025, an eight-year period when she knew her deportation was virtually certain, belies her current assertion that her paramount goal was to remain in this country. Additionally, Morillo also knew that she remained in this country illegally since her visa expired in 1997, but she did not take steps to

renew her visa or seek legal residency or citizenship. S. App. 12 (¶ 46). Morillo's inaction in this regard similarly undercuts her current narrative regarding the paramount importance of remaining in this country. For these reasons, the district court erred in uncritically accepting Morillo's current, self-serving affidavit to find prejudice, particularly when the assertions therein conflict with the contemporaneous facts of record. Cf. *United States* v. *Pellerito*, 878 F.2d 1535, 1543 (1st Cir. 1989) ("When an accused seeks to withdraw a guilty plea, the court is not obligated to treat self-serving accounts as gospel.").

*

In sum, the district court erred in determining that Morillo was eligible to seek coram nobis relief: Morillo neither adequately explained her years-long delay in seeking to vacate her plea and conviction nor demonstrated that her conviction is tainted by fundamental error, *i.e.*, prejudicial ineffective assistance of counsel. This Court should therefore reverse the district court's order granting her coram nobis petition.

### B. The District Court Abused Its Discretion In Granting Coram Nobis Relief.

Even if Morillo were eligible for coram nobis relief, the district court still would have abused its discretion in granting relief "because the equities of this case do not justify issuance of the writ." *Aceituno*, 132 F.4th at 572. The district court's equitable analysis was flawed because it singularly focused on the personal circumstances of Morillo's life without considering relevant countervailing considerations. See, *e.g.*, *id.*; *Koon* v. *United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."). The district court's equitable analysis reflects three analytical errors.

*First*, this Court has emphasized time and again that requests for coram nobis relief filed by defendants who pled guilty raise "red flags" and counsel "great caution." *Aceituno*, 132 F.4th at 572 (internal quotation marks omitted); *George*, 676 F.3d at 257-258; *Williams*, 858 F.3d at 718 (internal quotation marks omitted), because, unlike a defendant is convicted after trial, a defendant who pleads guilty has necessarily admitted his guilt. See *Brady* v. *United States*, 397 U.S. 742, 748 (1970) ("Central to the plea and the

foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment."). The district court's failure to mention Morillo's sworn admissions of guilt when balancing the equities was error. *Aceituno*, 132 F.4th at 572 (reversing a grant of coram nobis relief and faulting the district court for failing to consider the fact that the defendant "repeatedly acknowledged * * * that he did, in fact, commit the [underlying] offense"); see also, *e.g.*, *Williams*, 858 F.3d at 718 ("[G]iven that [Williams] entered a guilty plea in this case, it seems dubious that granting the writ w[ould] promote the interests of justice.") (internal quotation marks omitted).

After all, a guilty plea is not "a mere gesture, a temporary and meaningless formality reversible at the defendant's whim," *United States* v. *Hyde*, 520 U.S. 670, 677 (1997), but is instead a "grave and solemn act." *Brady*, 397 U.S. at 748. By pleading guilty—and admitting, under oath, that she knowingly participated in a drug conspiracy and representing that she was, "in fact, guilty," App. 72; see also pp. 9-10, *supra*—Morillo derived tangible sentencing benefits from the government that reduced her guidelines range and

contributed to a shorter prison sentence. See *George*, 676 F.3d at 256 ("The petitioner's conviction resulted from a guilty plea. Undeniable advantages, such as limiting exposure to punishment, flow from this decision."). Now, years later, Morillo's interests appear to have changed, but a change in circumstances does not permit her to disavow her prior sworn admissions, especially since she has already reaped the benefits of her plea. Cf. *Miranda-Gonzalez* v. *United States*, 181 F.3d 164, 165 (1st Cir. 1999) ("A defendant who pleads guilty to an offense and later attempts to wipe the slate clean bears a heavy burden, for he possesses no absolute right to retract his plea.").

*Second*, the court, in granting relief and vacating Morillo's conviction, did not "explain[] why it would be equitable to force the government to retry the case" more than a decade later. *Aceituno*, 132 F.4th at 572 (relying on the lack of a similar explanation in reversing a grant of coram nobis relief); cf. *United States* v. *Marion*, 404 U.S. 307, 321 (1971) (noting, in the speedy-trial context, that the "[p]assage of time" may be prejudicial as it can "impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself").

*Third*, the district court's equitable analysis did not discuss finality considerations. As the Supreme Court has emphasized, "'the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas,'" *Bousley* v. *United States*, 523 U.S. 614, 621 (1998) (quoting *United States* v. *Timmreck*, 441 U.S. 780, 784 (1979)), because the vast majority of federal convictions result from guilty pleas. See *Missouri* v. *Frye*, 566 U.S. 134, 143 (2012) ("Ninety-seven percent of federal convictions * * * are the result of guilty pleas."). Coram nobis relief, no less than other forms of collateral relief, thus pose a threat to the government's interest in the finality of its convictions. See *Andiarena* v. *United States*, 967 F.2d 715, 717 (1st Cir. 1992) (per curiam) ("'[T]he Federal Government, no less than the States, has an interest in the finality of its criminal judgments.'") (quoting *United States* v. *Frady*, 456 U.S. 152, 166 (1982)). And a byproduct of granting such relief without rigorous adherence to the prerequisites for such relief encourages more regularized and routine use of a remedy that should be reserved for redressing exceptional cases involving fundamental errors. See *Aceituno*, 132 F.4th at 572 ("Finality would be undercut,

not served, by issuance of the writ."). The forced expenditure of judicial and prosecutorial resources to respond to, and resolve, these petitions, in turn, has a systemic cost as well in that it will "inevitably delay[] and impair[] the orderly administration of justice." *Timmreck*, 441 U.S. at 784 (internal quotation marks omitted); cf. *Bousley*, 523 U.S. at 632-635 (Scalia, J., dissenting) (emphasizing that a rule allowing defendants to collaterally attack unobjected-to guilty pleas threatens to "overload the criminal-justice system" by permitting relief "where equity demands that relief be denied").

For all these reasons, the flawed and incomplete nature of the district court's equitable analysis provides an independent basis for reversing its order granting relief. *Aceituno*, 132 F.4th at 572 ("[T]he district court abused its discretion in granting Aceituno's petition because the equities of this case do not justify issuance of the writ.").

## CONCLUSION

The district court's order granting Morillo's petition for a writ of error coram nobis should be reversed.

Respectfully submitted,

ERIN CREEGAN
  *United States Attorney*
  *District of New Hampshire*

A. TYSEN DUVA
  *Assistant Attorney General*
  *Criminal Division*

MATTHEW VICINANZO
  *Assistant U.S. Attorney*
  *District of New Hampshire*

JOSHUA A. GOLDFOOT
  *Deputy Assistant Attorney General*
  *Criminal Division*

*/s Michael A. Rotker*

By: _____

MICHAEL A. ROTKER
  *Attorney*
  *Appellate Section*
  *United States Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Suite 1264*
  *Washington, DC 20530*
  *(202) 514-3308*
  *michael.rotker@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the applicable rules of appellate procedure in that it contains 11,693 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century ExpdBT MT 14-point type.

s/ *Michael A. Rotker*
Michael A. Rotker
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on February 27, 2026, I caused a true and correct copy of the foregoing brief to be served through the Court's CM/ECF system upon the filing user:

Stephanie McClure, Esq.
*Counsel for Appellee*

s/ *Michael A. Rotker*
Michael A. Rotker
U.S. Department of Justice

**ADDENDUM**

**Pages**

1. Order Granting Coram Nobis Petition (Sept. 26, 2025)
   (Dkt. 279) ........................................................................1-10

2. Memorandum Opinion (Oct. 15, 2025) (Dkt. 280) .................. 11-38

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,

     v.                              Case No. 15-cr-174-SM
                                       Opinion No. 2025 DNH 115

<u>Mara Morillo</u>,
     Petitioner

# O R D E R

Mara Morillo is a citizen of Venezuela.  Pursuant to a plea agreement negotiated with the government, Morillo pled guilty to one count of conspiracy to distribute, and possess with intent to distribute, controlled substances.  She was sentenced to serve 84 months in prison.  Morillo completed her term of incarceration and was released by the Bureau of Prisons. Subsequently, however, she was taken into custody by Immigration and Customs Enforcement and is currently being detained.  A final order for her removal has issued and her deportation is imminent. Morillo moved this court to stay her deportation while she challenged the basis for it – her felony drug conviction. That motion was denied as the court found that it was without jurisdiction to grant it.

Pending before the court is Morillo's Petition for Writ of Coram Nobis.  In it, she moves the court to vacate her felony drug conviction on grounds that she received ineffective assistance of counsel during plea negotiations.  The court held an expedited evidentiary hearing on September 25, 2025, by agreement.  For reasons the court will explain more fully in a subsequent written opinion, Morillo's petition is granted and her felony drug conviction vacated.  The prejudice defendant faces (deportation to Venezuela) arising from the ineffective representation she received is both severe and imminent; thus, expedited resolution is warranted.

In short, the court concludes that Morillo has proved the three essential elements necessary to obtain Coram Nobis relief: (1) she has plausibly explained her failure to seek relief from her conviction earlier; (2) she has shown that she continues to suffer significant collateral consequences from her conviction (it is the sole basis for her imminent deportation and the sole obstacle to her ability to seek legal permanent residency, applications for which are pending); and (3) she has shown that her conviction resulted from an error of the most fundamental character: ineffective assistance of counsel.  See, e.g.,

**Add. 2**

<u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Murray v.</u>
<u>United States</u>, 704 F.3d 23, 29–30 (1st Cir. 2013); <u>United States</u>
<u>v. George</u>, 676 F.3d 249, 254 (1st Cir. 2012).

   As to the latter element, Morillo has shown that she
received constitutionally deficient representation in that
counsel failed to correctly advise her that if she were to
accept the government's plea offer, her guilty plea would render
her immediately and mandatorily deportable, to a virtual
certainty, and that no exception applied to her case.

   Evidence presented at the hearing (in the form of Morillo's
affidavit) tends to show that counsel affirmatively mis-advised
Morillo, assuring her that her conviction would not necessarily
result in deportation.  Additionally, Morillo's claimed
understanding is consistent with the testimony of witnesses who
testified at the evidentiary hearing that Morillo always spoke
of addressing her immigration status and getting a green card
once she was released from prison, anticipating that when her
American citizen daughter reached the age of 21, she would
sponsor Morillo's application for citizenship.  Under such

**Add. 3**

circumstances, the Supreme Court has concluded that counsel
rendered constitutionally deficient representation.

> Padilla's counsel provided him false assurance that
> his conviction would not result in his removal from
> this country.  This is not a hard case in which to
> find deficiency:  The consequences of Padilla's plea
> could easily be determined from reading the removal
> statute, his deportation was presumptively mandatory,
> and his counsel's advice was incorrect.

Padilla v. Kentucky, 559 U.S. 356, 368–69 (2010).

Defense counsel understandably had no present recollection
of either Morillo or the facts related to her plea.  All he
could describe was his general practice with respect to advising
clients about immigration consequences following a guilty plea.
But, even assuming counsel followed his described typical
practice and discussed the immigration consequences of Morillo's
plea with her, still, the record does not support a conclusion
that he correctly told her that her conviction would certainly,
mandatorily lead to her deportation.  It is just as likely that
counsel warned her that her plea "might" prompt her deportation,
or likely would, or predictably would, or usually does.  Indeed
that probably explains Morillo's steadfast recollection that he
told her that her conviction would not prompt automatic
deportation (and is consistent with other witnesses' testimony
about her resolute plans throughout her incarceration and since

**Add. 4**

her release from prison to obtain legal status), and perhaps also explains her understanding and affirmative answer during the plea colloquy when asked if she understood that she could potentially be deported. No doubt, had the court advised her that she certainly, mandatorily would be deported, her response would have been different.

Finally, even if the court assumes that counsel correctly explained to Morillo that she would be deported as a consequence of her guilty plea (which the court does not find), there is no evidence that counsel told her that the subsequent formal statements inconsistent with that reality were wrong. Indeed, counsel testified that it was not his normal practice to correct such statements.

Defendant's guilty plea rendered her mandatorily deportable pursuant to 8 U.S.C. § 1227(a)(2)(B)(i) and permanently inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(2)(A)(i)(II). See Padilla, 559 U.S. at 360 and 368 (describing 8 U.S.C. § 1227(a)(2)(B)(i) as making an alien convicted of certain drug offense subject to "automatic deportation" and stating that the statute "commands removal").

**Add. 5**

In <u>Padilla</u>, the Supreme Court explained that:

> When the law is not succinct and straightforward,
> . . . a criminal defense attorney need do no more than
> advise a noncitizen client that pending criminal
> charges <u>may carry a risk</u> of adverse immigration
> consequences.  But <u>when the deportation consequence is
> truly clear, as it was in this case, the duty to give
> correct advice is equally clear</u>.

<u>Padilla</u>, 559 U.S. at 369 (emphasis supplied).

I find that defendant was given mis-advice with respect to
the certain immigration consequences of her plea by the
government and the court.  The plea agreement incorrectly, in
writing, advised defendant in equivocal terms, that immigration
consequences could or may include deportation.  The court,
during the Rule 11 plea colloquy, used similar language,
incorrectly conveying that deportation was not a mandatory,
certain consequence of her plea, but merely a possibility.
Defense counsel was asked at the plea colloquy if he had
reviewed each paragraph of the agreement with the defendant, and
he confirmed that he had done so.  Defense counsel was also
present and in consultation with defendant when the court
provided incorrect advice to defendant regarding the immigration
consequences of her plea.  While defense counsel may well not
have had any professional responsibility to inform the

**Add. 6**

government of the error in the written plea agreement, or this
court of the error in its Rule 11 questioning, counsel, of
course, was obligated to advise the defendant that neither the
immigration consequence representations in the written
agreement, nor those made by the court during the colloquy were
correct, and that she must understand that deportation was
indeed not a mere possibility or even a likelihood or
predictable, but was a mandatory certainty.  See Padilla, 559
U.S. at 360.

There is no evidence suggesting that counsel ever provided
such clarification to defendant before she pled guilty, or at
anytime thereafter.  Obviously, the mis-advice in the plea
agreement and given during the colloquy was entirely consistent
with defendant's asserted view that she might work out her
immigration issues after serving her sentence and she had a
reasonable expectation of being able to arrange to remain, even
attaining United States citizenship, given the advice she got,
and her cooperation with the government in the criminal case.

### Conclusion

The writ of coram nobis is a rarely granted, extraordinary
remedy.  But "rarely" is not a synonym for "never."  It is
available under limited and compelling circumstances to correct

**Add. 7**

fundamental errors that occurred in a criminal case, with a significant emphasis on achieving justice.  This case presents one of those rare circumstances in which issuance of the writ is warranted.  The very prejudice defendant sought to avoid was rendered mandatory by her plea, a plea she would not have offered had she been correctly advised of its mandatory consequences.  Defendant also alludes to counsel's failure to explore a possible "battered woman" defense.  She has not presented evidence sufficient to show a deficiency of counsel in that respect, but the evidence she has presented fairly shows that, had she been correctly advised about the immigration consequences of her plea, she could have gone to trial and had a plausible defense to offer, divorced from the government's evidence related to the elements of the offense charged.

At stake in this litigation is Morillo's fundamental constitutional right to effective assistance of counsel, as well as her ability to remain with her children in this country, pursue lawful status, and avoid removal to a dangerous and uncertain future in Venezuela.  Morillo is entitled to the conclusion (and the court so finds) that her unwavering and absolutely certain recollection of the events in question is more accurate than her counsel's lack of any specific recollection at all (and the government's suggestion that

**Add. 8**

counsel's "typical practice" was, in this specific case, adequate to meet the very exacting requirements of Padilla).

Finally, and perhaps most fundamentally, it is plain that counsel did not advise Morillo that deportation advice by the court and in the plea agreement was wrong and misleading – that there was no possibility that she would be allowed to remain in the country and pursue legal residency.  That failure to ensure that Morillo fully and correctly understood the consequences of her guilty plea before offering it amounted to constitutionally deficient representation.  Counsel failed to provide adequate representation with respect to a material matter of great importance to defendant, and she is suffering material prejudice as a result.

Morillo's unopposed Emergency Motion to Expedite Order of Vacatur (**document no. 273**) is granted.  For the forgoing reasons, as well as those set forth in a Morillo's legal memoranda (document no. 272), the Petition for Writ of Coram Nobis (**document no. 260**) is granted and Morillo's conviction in United States v. Morillo, no. 15-cr-174-SM-AJ-1, (document no. 207, May 11, 2017) is vacated.

**Add. 9**

Because Morillo's deportation is "imminent," the court has determined that this order must issue immediately.  A more detailed opinion explaining the court's legal reasoning will follow in due course.

 

 

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 26, 2025

cc:  Counsel of Record

**Add. 10**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,

      v.                                Case No. 15-cr-174-SM-AJ-1
                                        Opinion No. 2025 DNH 124

<u>Mara Morillo</u>,
     Petitioner

## O R D E R

Mara Morillo is a citizen of Venezuela.  In May of 2016, pursuant to a plea agreement negotiated with the government, she pled guilty to one count of conspiracy to distribute, and possess with intent to distribute, controlled substances.  She was sentenced to serve 84 months in prison.  Morillo completed her term of incarceration and was released by the Bureau of Prisons.  Subsequently, however, she was taken into custody by Immigration and Customs Enforcement and is currently being detained.  A final order for her removal has issued and the parties have notified the court that her removal is "imminent."

Pending before the court is Morillo's Petition for Writ of Coram Nobis.  In it, she moves the court to vacate her felony drug conviction on grounds that she received ineffective assistance of counsel during plea negotiations.  Morillo also

moved the court to stay her deportation while she challenged the
basis for it – her felony drug conviction.  That motion was
denied as the court found that it was without jurisdiction to
grant it.

Because Morillo's deportation is imminent, on September 25,
2025, the court held an emergency evidentiary hearing.  The
following day, the court entered an order granting Morillo's
petition, vacating her conviction, and briefly explaining the
court's reasoning for doing so.  This order explains that
reasoning in more detail.

**Findings of Fact**

Morillo was born in San Antonio, Venezuela, in 1975.  When
she was three years old, her mother abandoned her and she was
sent to live with her paternal great aunt, where she was
sexually victimized by two older relatives.  At age 10, she
began living with her maternal grandmother.  Later, she moved to
Columbia, where she remained until she was 20.  Morillo did well
in school and attended a university in Columbia, where she was
pursuing a degree in business management.  Her studies were
interrupted when she decided to leave that program early to
travel to the United States.  In 2016, Morillo came to the
United States on a Travel Visa and moved between Florida and New

**Add. 12**

York and eventually settled in Massachusetts.  Her travel visa expired in 2017.

Morillo has led an exceedingly difficult life.  Her past relationships have been characterized as tumultuous, violent, and sexually abusive.  A psychiatric evaluation conducted in February of 2016 (the "Reade Report"), states that Morillo has been diagnosed with depression, anxiety, and panic attacks. That evaluation reports that Morillo "bears the psychological scars from the inordinate amount of loss, dislocation, and adversity she has suffered over the course of her life." Presentence Investigation Report (document no. 195) (quoting the Reade Report and Psychological Evaluation).  Her marriage to one of her co-defendants - Franklyn Morillo - was characterized by frequent and significant violence that caused her both physical and emotional trauma.

In September of 2015, a federal grand jury indicted Morillo, her husband (Franklyn), and four others on drug charges.  Morillo was charged with a single count of conspiracy. She was represented by an experienced and well-regarded attorney with the New Hampshire Federal Defenders Office.  On May 11, 2016, pursuant to a plea agreement with the government (document no. 84), Morillo pled guilty to conspiracy to distribute, and to

3

**Add. 13**

possess with intent to distribute, controlled substances, in violation of 21 U.S.C. § 846.  That conviction rendered her immediately and mandatorily deportable, see 8 U.S.C. § 1227(a)(B)(i), and permanently ineligible to reenter the United States, see 8 U.S.C. § 1182(a)(2)(A)(ii)(II).

In her petition (as supported by her accompanying affidavit), Morillo claims her defense counsel rendered ineffective assistance by failing to fully and accurately inform her of the collateral consequences of her guilty plea - specifically, that a felony drug conviction would render her immediately and mandatorily deportable.  According to Morillo, she made clear to defense counsel that "she did the things she did because if she didn't Frank would hurt her and the children. She endured him and his ways because she believed that was what was needed to survive for her children.  Importantly, she made it crystal clear that staying in the United States was her priority."  Petition at 3.  See also Affidavit of Mara Morillo (document no. 260-4) at paras. 16 and 18.

With regard to Morillo's plea agreement with the government, she asserts that defense counsel told her that "if she took the deal, she would do some time but that she would be

**Add. 14**

able to stay in the United States and work out her immigration
situation once she got out.  He told her that she would be safe
from deportation due to her unique circumstances."  Petition at
para. 21 (citing Morillo Affidavit at paras. 22, 22, 24, and 38)
(emphasis supplied).  See also Morillo Affidavit at para 24
([Counsel] "told me specifically that, if I took the deal, I
would be able to stay here in the United States after I did
whatever the government asked of me and did a reduced minimum
sentence.  He told me a visa could take forever to get but that
I wouldn't be subjected to consequences or deportation."); id.
at para. 38 ("My lawyer directly told me that I would be able to
stay in the United States because of the reduced sentence and
leniency he got me and because I cooperated with police.  He was
completely wrong and his mistake is now ruining my life and
could rip me from my children, 2 of whom are U.S. citizens.").

Finally, Morillo asserts that if she had been properly
apprised of the immigration consequences of her guilty plea, she
absolutely would not have pled guilty and would, instead, have
gone to trial.

> To this day, I don't understand or know the evidentiary
> basis for the charge against me.  I was never shown
> any evidence or reports or given any real
> understanding of the allegations against me.  All I
> knew is my lawyer told me he "got a deal" for me and
> that it was my "only" option.  I did not have the

**Add. 15**

foundational knowledge and he did not explain to me
that I did, in fact, have options.

If I had known that I would be 100% unquestionably
deportable and could never get lawful status in the
United States as a result of this "deal," he got for
me I would never have taken the plea deal.  I would
have gone to trial.  Specifically because I was
terrified beyond measure to be deported back to a
country that I fled in fear, and nothing would have
convinced me to risk being sent back there.  If I knew
I could have fought and not taken this deal, there is
no question I would have.

Morillo Affidavit at para. 18.  See generally Padilla v.
Kentucky, 559 U.S. 356, 368 (2010) ("We too have previously
recognized that preserving the client's right to remain in the
United States may be more important to the client than any
potential jail sentence.").  See also Lee v. United States, 582
U.S. 357, 370 (2017) (noting the "paramount importance" an alien
might naturally place on remaining in the country, regardless of
the criminal penalty they might face by going to trial).


At the emergency evidentiary hearing, a friend of Morillo's
family testified, as did Morillo's daughter.  Both stated that,
consistent with the advice counsel allegedly provided to
Morillo, as well as Morillo's understanding of the immigration
consequences of her plea, she frequently spoke of her plan to
address her immigration status upon her release from prison, to
obtain authorization to work, and to continue her education.

**Add. 16**

See also Affidavit of Attorney Nayela Esmail (document no. 278-3) at paras. 3-5 ("I was consulted by Mara Morillo several months ago for the purpose of straightening out her legal status.  Ms. Morillo believed she was eligible for adjustment . . . [and] was laboring under the misconception that she would be able to obtain status and explain her prior criminal conviction as long as she hired an attorney to handle it and that it would not render her ineligible to obtain lawful status.") (emphasis supplied).

    Morillo's defense counsel also appeared at the emergency hearing, but testified that he had no specific recollection of Morillo, her case, or the advice he provided to her.  He did note, however, that his typical practice was to explore the potential immigration consequences of a client's guilty plea and routinely shared those findings with his clients so they would be fully informed when making any decision about accepting a plea offer.  Nevertheless, even assuming he followed that practice, it is entirely uncertain whether he advised Morillo generally that a guilty plea "might" result in her deportation or whether, as required by Padilla, he properly informed her that such a plea would "certainly" result in deportation.

7

**Add. 17**

Despite the legally incorrect advice Morillo claims to have received from defense counsel, she was certainly informed - on two occasions - that her guilty plea would almost certainly lead to her deportation: in the sentencing memorandum counsel prepared on her behalf and at her sentencing hearing.

> **Sentencing Memorandum and Request for Variance** (document no. 189). In support of his argument in favor of a variant sentence, defense counsel wrote that, "Morillo is facing a lengthy prison sentence, with <u>almost</u> <u>certain</u> <u>deportation</u> at the end of that sentence. She will be deported to Venezuela with three small children." <u>Id</u>. at 8 (emphasis supplied).

> **Sentencing Hearing.** At Morillo's sentencing hearing, in support of his argument in favor of a variant sentence of 48 months, defense counsel noted that, "the other thing is that <u>she's going to be deported</u> when she's - when the sentence is over. As you could tell from Dr. Reade's report, it's kind of a very fractured, unstable situation where she's going to go, and she's not going to have any choice but to go there." Transcript of Sentencing Hearing (document no. 267) at 25 (emphasis supplied).

While it is unclear whether Morillo ever read the sentencing memorandum (that seems unlikely), she was present at sentencing when counsel argued on her behalf.

Despite the unambiguous language used by her counsel in his sentencing memorandum and at oral argument on sentencing, Morillo says that advice came far too late, long after she had already pled guilty. Rather, she says, the relevant advice

**Add. 18**

given to her is that which <u>preceded</u> her decision to plead

guilty, since that is the only advice that could have informed

and influenced her decision.  Moreover, says Morillo, the legal

advice given to her <u>prior</u> to her decision to plead guilty was

incorrect and entirely inconsistent with the holding in <u>Padilla</u>.

First, she points to the incorrect advice she says was provided

by her counsel assuring her that her conviction would not result

in deportation.  Next, she points to the language of her plea

agreement and the court's Rule 11 colloquy - neither of which

complied with the requirements of <u>Padilla</u>.

> **Morillo's Written Plea Agreement.**  The plea agreement
> contains a paragraph, entitled "Collateral
> Consequences," which states that if Morillo "is not a
> citizen of the United States, she <u>may be removed</u> from
> the United States, denied citizenship, and denied
> admission to the United States in the future as a
> consequence of her conviction."  <u>Id</u>. at para. 11
> (emphasis supplied).

> **Change of Plea Hearing.**  At the change of plea
> hearing, counsel for the government specifically asked
> the court to inquire of Morillo to determine whether
> she understood the immigration consequences of her
> guilty plea.  In response, the following exchange took
> place.

>> THE COURT:  You're not a citizen of the United
>> States?

>> THE DEFENDANT:  No.

>> THE COURT:  All right. Do you understand that a
>> conviction, pursuant to your plea of guilty,
>> <u>could result in immigration consequences</u> that <u>may</u>
>> <u>include deportation</u>?  Do you understand that?

**Add. 19**

THE DEFENDANT: Yes.

THE COURT: Do you understand, in other words, by admitting this offense and then subsequently being convicted, that conviction may be taken into account by the government in determining whether or not to deport you? Do you understand that?

THE DEFENDANT: Yes.

Transcript of Change of Plea Hearing (document no. 266) at 17-18 (emphasis supplied).

Those conditional and somewhat vague statements were entirely consistent with Morillo's claimed understanding of the situation (based on counsel's alleged misadvice) and reinforced her belief that her conviction would not automatically result in deportation and she would have the opportunity, upon release from prison, to address her immigration status. Even assuming that counsel had previously warned Morillo that her guilty plea would necessarily result in her deportation, the equivocal language in her plea agreement as well as that employed by the court was not consistent with Padilla and almost certainly clouded Morillo's understanding of the consequences of her plea.

To be sure, courts have concluded that proper advice from the court can "purge" any taint caused by defense counsel having earlier provided legally incorrect advice to their client. Here, however, neither the court's advice to Morillo at her

10

**Add. 20**

change of plea, nor the language of the plea agreement, served

to do so.  Rather, the language of the plea agreement and the

court's colloquy with Morillo exacerbated the situation by

affirmatively giving the legally incorrect impression that

Morillo's conviction might not lead to her deportation - that it

was an open and unresolved question.  It was not.  That advice

was categorically wrong and inconsistent with the requirements

of Padilla.

Some time after her release from prison, in August of 2021,

Morillo received a Notice of Intent to Issue a Final

Administrative Removal Order (document no. 278-1).  According to

Morillo,

> After serving time, I had no reason to question my
> lawyer's advice.  I complied with all the requirements
> of my sentencing and for all this while it appeared
> that my lawyer's advice was correct.  I was in
> America, my ex-husband was in jail, and things seemed
> to go back to normal.  I re-started my life and had no
> problems with immigration.  The government never sent
> me papers about my visa, but at the same time, for a
> long while, immigration never bothered me either.  I
> figured my lawyer was right about it all - taking a
> long time, but that I would be spared from anything
> negative.
>
> However, on August 23, 2021, I received a notice of
> deportation.  I was initially confused and tried to
> get in touch with my old lawyer.  I could not.  I
> naturally figured this was a mistake.  I went to one
> immigration lawyer who told me there was nothing I
> could do.  I went to another - same thing.  I wanted

**Add. 21**

    answers as to why this was happening when I already
    had made a deal with the government.

Morillo Affidavit at para. 33.  After trying unsuccessfully to

reach her trial counsel and then speaking with two other

lawyers, Morillo lacked the financial resources to contact any

other attorneys.  But, in February of 2025 (with the aid of

borrowed funds), Morillo "spoke with an immigration lawyer who

explained to me the consequences of my conviction.  I was then

referred to Stephanie McClure [Morillo's counsel of record]."

Id. at para. 34.  Morillo further testified that,

        Ms. McClure is a criminal lawyer who explained to me
        that my conviction would make it 100% impossible for
        me to ever get status in the United States.  The
        supposed "deal" that the lawyer told me was my "only
        option" to stay and to get leniency was not: in fact,
        it is exactly the opposite.

        Ms. McClure explained to me that the conviction
        immediately and forever made me mandatorily deportable
        and inadmissible to the U.S.  Not only could I not get
        my papers, but if I left or get deported, I cannot
        even come back to visit my children.  This was and
        still is absolutely life-changing, devastating news.

Id. at para. 35.  Since meeting with her current counsel,

Morillo has acted promptly to vacate her underlying criminal

conviction and to correct her current immigration status (she

has filed a Form I-360, Petition for Special Immigrant (document

no. 278-2) and also sought relief from deportation through a

**Add. 22**

petition for asylum).  <u>See</u> Affidavit of Attorney Nayela Esmail at para. 13.


    As noted earlier, Morillo filed a petition for writ of coram nobis in which she argues that she received constitutionally deficient assistance of counsel.  On that basis, she moved the court to vacate her felony drug conviction.[1]


**Governing Law**

I.  <u>Coram Nobis</u>.

    The writ of coram nobis is an extraordinary common law writ that serves as a remedy of last resort to correct errors of the most fundamental character in a criminal case.  <u>See</u> <u>Aceituno v. United States</u>, 132 F.4th 563, 569 (1st Cir. 2025); <u>Murray v.</u>

---

[1]    In addition to claiming that counsel failed to adequately explain the immigration consequences of her plea, Morillo also plausibly alleges that counsel provided constitutionally deficient representation by failing to adequately explore the possibility that Morillo is "actually innocent" of her crime of conviction.  Specifically, she says "a plethora of available evidence of extreme and unrelenting domestic abuse negated a conspiracy and the requisite elements of mens rea."  Reply Memorandum (document no. 272) at 7.  The evidence of record to support such a defense is largely undeveloped, but there are police reports documenting Franklyn Morillo's repeated physical abuse of her and a psychological report that does the same.  The record as it currently stands is inadequate to establish ineffective assistance in that regard, but what evidence exists lends credence to defendant's assertion that she would have gone to trial had she known of the <u>Padilla</u> consequences of her plea, and would have had a plausible defense to assert.

13

**Add. 23**

United States, 704 F.3d 23, 28 (1st Cir. 2013); United States v. George, 676 F.3d 249, 251 (1st Cir. 2012).  It is typically available to criminal defendants who are no longer in custody and for whom the remedies of 28 U.S.C. § 2255 are no longer available.  Trenkler v. United States, 536 F.3d 85, 98 (1st Cir. 2008).  This court has jurisdiction to issue the writ pursuant to the All Writs Act, 28 U.S.C. § 1651.

To demonstrate entitlement to such an extraordinary remedy, Morillo must make a three-part showing:

> First, she must explain her failure to seek relief from her conviction earlier, in a more timely and traditional manner; and
>
> Second, she must show that she continues to suffer significant collateral consequences from her conviction; and
>
> Finally, she must demonstrate that her conviction resulted from an error of the most fundamental character.

See, e.g., Murray v. United States, 704 F.3d 23, 29-30 (1st Cir. 2013); United States v. George, 676 F.3d 249, 254 (1st Cir. 2012).

Importantly, even if Morillo satisfies her burden and demonstrates each of the three essential elements necessary for coram nobis relief, that is not sufficient: she must still

14

**Add. 24**

persuade the court that justice demands the extraordinary relief sought.  See Murray, 704 F.3d at 29 ("Even if the petitioner meets all three of the conditions in the coram nobis eligibility test, the court retains discretion to grant or deny the writ, depending on the facts and circumstances of the individual case. Satisfying the three-part test is a necessary, but not a sufficient, condition for the issuance of the writ.") (citations and footnote omitted); United States v. Castro-Taveras, 841 F.3d 34, 39 (1st Cir. 2016) ("[Even when the three requirements are satisfied, the court retains discretion to deny the writ if the petitioner fails to show that justice demands the extraordinary balm of coram nobis relief.") (citation omitted).

The court notes that Morillo can meet the third element of the test - that is, showing that her conviction resulted from an error of the most fundamental character - by demonstrating that her guilty plea was the product of constitutionally deficient legal advice from her counsel (as she seeks to do here).  See, e.g., Williams v. United States, 858 F.3d 708, 712 (1st Cir. 2017) ("To be sure, such constitutionally deficient representation, if true, can function as the rock upon which a petitioner can build her coram nobis church."); Kovacs v. United States, 744 F.3d 44, 49 (2d Cir. 2014) ("ineffective assistance of counsel is one ground for granting a writ of coram nobis.").

15

**Add. 25**

That, in turn, requires her to meet the test articulated in
<u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984).


II.  <u>Ineffective Assistance of Counsel</u>.

To succeed with an ineffective assistance of counsel claim,
"a petitioner must show both that his counsel's representation
fell below an objective standard of reasonableness (the
performance prong) and that there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different (the prejudice prong)."
<u>Casey v. United States</u>, 100 F.4th 34, 42-43 (1st Cir. 2024)
(citation and internal punctuation omitted).  Additionally,
Morillo must demonstrate that, but for the erroneous advice of
counsel, she would not have accepted the government's plea offer
and would, instead, have gone to trial.  <u>See, e.g.</u>,  <u>Torres-
Estrada v. United States</u>, 122 F.4th 483, 494 (1st Cir. 2024).
<u>See also</u> <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).


The Supreme Court has held that counsel's failure to advise
a client of the deportation consequences attendant to a felony
drug conviction is, as a matter of law, constitutionally
deficient.

> Immigration law can be complex, and it is a legal
> specialty of its own.  Some members of the bar who

**Add. 26**

represent clients facing criminal charges, in either
state or federal court or both, may not be well versed
in it.  There will, therefore, undoubtedly be numerous
situations in which the deportation consequences of a
particular plea are unclear or uncertain.  The duty of
the private practitioner in such cases is more
limited.

When the law is not succinct and straightforward . . .
a criminal defense attorney need do no more than
advise a noncitizen client that pending criminal
charges may carry a risk of adverse immigration
consequences.  But <u>when the deportation consequence is
truly clear</u>, as it was in this case, <u>the duty to give
correct advice is equally clear</u>.

<u>Padilla v. Kentucky</u>, 559 U.S. 356, 369 (2010) (emphasis
supplied).  Here, as in <u>Padilla</u>, it was clear that Morillo would
be subject to automatic and mandatory deportation upon her
conviction.  <u>See</u> 8 U.S.C. § 1227(a)(2)(B)(i).  <u>See also</u> <u>Padilla</u>,
559 at 360, 368 (describing 8 U.S.C. § 1227(a)(2)(B)(i) as
making an alien convicted of certain drug offense subject to
"automatic deportation" and stating that the statute "commands
removal").

<b>Discussion</b>

I.  <u>Timely Relief</u>.

To satisfy this element, Morillo must explain her failure
to seek relief from her conviction earlier, in a more timely and
traditional manner (for example, through a 2255 petition while
she was still in custody) and that she exercised due diligence.
The court concludes that she has done so.

17

<b>Add. 27</b>

Based upon the alleged advice rendered by her trial counsel, as well as the incorrect and conditional language in both the plea agreement and the court's Rule 11 colloquy describing the immigration consequences of her guilty plea, Morillo had no reason to pursue 2255 habeas relief while she was incarcerated. And, once she was released and served with the Notice of Removal, she attempted (unsuccessfully) to contact her criminal defense counsel. She then consulted two attorneys for assistance, but received none and then ran out of money. As soon as she was able to afford proper counsel (with the benefit of borrowed funds), she consulted an immigration attorney and promptly filed the pending action, submitted a petition to immigration authorities to adjust her status, and filed an application for asylum.

There is no suggestion that Morillo slept on her rights or delayed taking action once she fully and properly appreciated that nature of her circumstances and the mandatory consequences of her guilty plea.

II.  Continuing Collateral Consequences.

There can be no doubt that Morillo is suffering from collateral consequences of her decision to plead guilty. Her

**Add. 28**

conviction makes her both mandatorily deportable and permanently
inadmissible to the United States.  That conviction also stands
as the sole obstacle to obtaining a change in her current
immigration status pursuant to her currently-pending application
for lawful status as a "self petitioner" under the Violence
Against Women Act.  See generally Affidavit of Attorney
Stephanie McClure (document no. 278).  See also VAWA petition
and exhibits (document no. 278-2).


III.  Fundamental Error (Ineffective Assistance).

    A.   Counsel's Advice was Constitutionally Deficient.

    There are two means by which to conclude that trial counsel
rendered ineffective assistance of counsel.  First, crediting
Morillo's unambiguous and essentially uncontested testimony,
counsel affirmatively misrepresented the immigration
consequences of Morillo's guilty plea when he assured her that
her conviction would not make her deportable and she could, upon
release from prison, make the necessary applications to alter
her immigration status.  Given the circumstances presented, such
advice was, as a matter of law, constitutionally deficient.  See
Padilla, 559 U.S. at 369.  And, as discussed earlier, the
testimony of Morillo's daughter and family friend was entirely

consistent with Morillo's claim that she received legally incorrect advice about the consequences of her plea.[2]

Moreover, counsel's understandably vague testimony about the advice given to Morillo is simply insufficient for the court to conclude that it met the minimum constitutional requirements articulated in <u>Padilla</u>. That is to say, even if counsel <u>did</u> follow his typical practice and discussed the immigration consequences of Morillo's plea with her, still the record does not support the conclusion that he specifically told her that her conviction would absolutely lead to her deportation. It is just as likely that he warned her that it "might" or "may" or "could" or "probably would" prompt her deportation. Indeed that scenario might explain Morillo's steadfast recollection that he told her that her conviction would <u>not</u> prompt certain deportation (and the witnesses' testimony that Morillo repeatedly spoke of her plan to obtain lawful status upon her release from prison).

---

[2]    The court describes Morillo's testimony on this point as "essentially uncontested" because her trial counsel testified that he could not recall any details of Morillo's criminal case, nor could he recall the specific advice he gave her regarding the immigration consequences of her decision to plead guilty. What arguably stands in weak opposition to Morillo's testimony is counsel's statement that it was his "customary practice" to properly advise clients of the immigration consequences of a conviction and, when such a conviction could lead to deportation, to warn them of the same.

**Add. 30**

At stake in this litigation is Morillo's fundamental
constitutional right to effective assistance of counsel, as well
as her ability to remain with her family in this country, pursue
lawful status, and avoid removal to a dangerous and uncertain
future in Venezuela.  Given the circumstances, Morillo has
demonstrated (and the court so finds) that her unwavering and
absolutely certain recollection of the events in question is
more reliable than her counsel's lack of any specific
recollection at all (and the government's suggestion that
counsel's "typical practice" was, in this specific case,
adequate to meet the exacting requirements of <u>Padilla</u>).

B.  <u>Counsel Failed to Correct the Mistaken Legal
    Advice Morillo Received in the Plea Agreement and
    the Court's Colloquy</u>.

Moreover, counsel did nothing to correct the misleading
legal advice given to Morillo in both the written plea agreement
and the court's Rule 11 colloquy.  Given the importance of
insuring that his client clearly and unmistakably understood
that she would absolutely be deported upon her conviction, and
given her unequivocally-articulated goal to remain in the United
States at all costs, counsel had an obligation to her to correct
those mistaken, conditional statements.  His failure to do so

**Add. 31**

fell below the constitutionally-mandated standard of reasonableness.

To be sure, courts can purge any taint associated with misinformation provided by counsel by clearly and correctly informing a defendant of the immigration consequences of his or her plea.  See, e.g., United States v. Murillo, 927 F.3d 808, 819 (4th Cir. 2019) (noting that "a district court can, by accurately informing a defendant of the immigration consequences of his plea, cure an attorney's incorrect advice").  Critically, however, that is not what occurred in this case.  Rather than clarifying and correcting any potential confusion about the mandatory consequences of Morillo's plea, both the plea agreement and the court's colloquy only added to that confusion.

The court of Appeals for the Fourth Circuit confronted an analogous situation, involving misadvice from an attorney and an insufficiently clear statement of the law from the court, noting that:

> A defendant may be unable to show prejudice if at the Rule 11 proceeding the district court provides an admonishment that corrects the misadvice and the defendant expresses that he understands the admonishment (citing United States v. Foster, 68 F.3d 86, 88 (4th Circ. 1995).

* * *

**Add. 32**

> The case before us is decidedly different.  Unlike
> Foster, the district court's admonishment was far from
> a "careful explanation" of the consequences of
> deportation.  Instead, the district court warned that
> Akinsade's plea *could* lead to deportation.  This
> general and equivocal admonishment is insufficient to
> correct counsel's affirmative misadvice that
> Akinsade's crime was not categorically a deportable
> offense.  More importantly, the admonishment did not
> "properly inform" Akinsade of the consequence he faced
> by pleading guilty: mandatory deportation.

United States v. Akinsade, 686 F.3d 248, 253-4 (4th Cir. 2012)

(emphasis supplied).  See also United States v. Murillo, 927

F.3d at 819 ("[T]he district court's warning that Appellant 'may

be deported' was insufficient to cure [counsel's] misadvice that

his crime was not a categorically deportable offense.").


     The Court of Appeals for the Ninth Circuit reached a

substantially similar conclusion:

> Here, the court's advisement and the statements in the
> plea agreement that Rodriguez-Vega faced the
> possibility of removal did not purge prejudice, if for
> no other reason than that they did not give her
> adequate notice regarding the actual consequences of
> her plea.  The plea agreement and plea colloquy, like
> the advice of her lawyer, each notified Rodriguez-Vega
> only that there existed a possibility of removal, when
> in fact her removal was virtually certain.  The plea
> agreement stated that "Defendant recognizes that
> pleading guilty *may* have consequences with respect to
> her immigration status." (Emphasis added.)  While
> warning of a dire consequence, the plea agreement
> characterizes its *likelihood* only as something that
> "may" happen.

**Add. 33**

> Warning of the possibility of a dire consequence is no
> substitute for warning of its virtual certainty.  As
> Judge Robert L. Hinkle explained, "Well, I know every
> time that I get on an airplane that it could crash,
> but if you tell me it's going to crash, I'm not
> getting on."

United States v. Rodriguez-Vega, 797 F.3d 781, 790-91 (9th Cir.

2015) (quoting United States v. Choi, Case No. 4:08-CV-00386-RH,

Transcript, Docket No. 96, at 52 (D.Fla. Sept. 30, 2008)).


Here, even if defense counsel did properly warn Morillo

that she would face mandatory deportation upon acceptance of her

guilty plea, he had an ongoing obligation to correct any

equivocal and legally incorrect statements about those

consequences coming from the government (in the plea agreement)

or the court (at the Rule 11 colloquy).  Counsel was likely not

required to notify the court or the government of those

misstatements of law.  He was, however, obligated to discuss

those incorrect statements of the law with Morillo, make clear

that she should not be confused or misled by them, and reiterate

that if she were to pursue a plea agreement with the government

her subsequent conviction would unquestionably and inevitably

lead to her deportation.  The record on that point is clear and

undisputed: he failed to meet that obligation by neglecting to

remedy Morillo's potential confusion, reiterate the warning of

mandatory deportation, or disabuse Morillo of any false hope she

**Add. 34**

might have entertained that she would be able to address her immigrations status after her conviction, and potentially remain.

Finally, the court concludes that Morillo has amply demonstrated that if she had not been misadvised of the consequences of her plea, she would not have pled guilty and would, instead, have proceeded to trial. See, e.g., Affidavit of Mara Morillo (document no. 260-4), at paras. 16, 18. Again, the record on that issue is unambiguous and undisputed. Indeed, had Morillo proceeded to trail, the record evidence fairly shows that she could have advanced a plausible defense to the charge against her based upon coercion, diminished capacity, and/or battered wife syndrome. And, such a defense would have been independent of whatever incriminating evidence the government had relating to the elements of the offense charged. While perhaps only a plausible defense, defendant likely would have taken a chance, to preserve a possibility of remaining with her children.

IV.  Demands of Justice.

Even though Morillo has met her obligation to establish the first three elements necessary to obtain coram nobis relief, she

**Add. 35**

must still demonstrate that awarding such relief is consistent
with the demands of justice.  She has met that burden.

By all accounts, Morillo has lived an extraordinarily
difficult life, punctuated by multiple, extended periods of
sexual abuse and physical violence.  Indeed, there is a
plausible argument that she lacked the requisite mens rea to be
guilty of her crime of conviction based upon diminished mental
capacity and/or battered wife syndrome.  Vacating the conviction
for which she has fully served her incarcerative sentence would
remove the sole obstacle to her ability to correct her
immigration status and become a lawful resident of the United
States.  It would also prevent her imminent deportation to
Venezuela, without a hearing on the merits on the criminal
charge, and separation from her children who reside in the
United States - at least two of whom are U.S. citizens.

Additionally, the court notes that if Morillo were deported
to Venezuela, not only would she be forced to leave her children
behind, but she would forever be barred from returning to this
country to visit them.  Lastly, the court notes that conditions
in Venezuela are decidedly unsafe and Morillo has expressed an
entirely credible fear of returning there.  Indeed, the U.S.
State Department has issued a "Level 4 - Do Not Travel" advisory

**Add. 36**

with respect to Venezuela, noting a "high risk of wrongful detention, torture in detention, terrorism, kidnapping, arbitrary enforcement of local laws, crime, civil unrest, and poor health infrastructure" and warning that "violent crimes, such as homicide, armed robbery, kidnapping, and carjacking, are common in Venezuela."

Given the totality of circumstances, the demands of justice counsel strongly in favor of granting Morillo's petition.

### Conclusion

The writ of coram nobis is a rarely granted, extraordinary remedy.  But, as the court noted in its prior order, "rarely" is not synonymous with "never."  It is available under limited and compelling circumstances to correct fundamental errors that occurred in a criminal case, with a significant emphasis on achieving justice.  This case presents one of those rare circumstances in which issuance of the writ is warranted.  The very prejudice defendant sought to avoid at all costs - deportation - was rendered mandatory by her plea, a plea she would not have offered had she been correctly advised of its mandatory consequences.

27

For the reasons discussed, as well as those set forth in a Morillo's legal memoranda (document no. 272) and the court's prior order on this matter (document no. 279), the court granted Morillo's Petition for Writ of Coram Nobis (**document no. 260**) and vacated her conviction in <u>United States v. Morillo</u>, no. 15-cr-174-SM-AJ-1.

        **SO ORDERED.**

                                _____

                                Steven J. McAuliffe
                                United States District Judge

October 15, 2025

cc:  Counsel of Record
     U.S. Probation
     U.S. Marshal

**Add. 38**