NO. 25-2027

_____

IN THE

# United States Court of Appeals

FOR THE FIRST CIRCUIT

_____

Mara Morillo

Appellee/Petitioner

Vs.

United States of America

Appellant/ Respondent

_____

In Opposition of the Appeal of
The United States District Court
Decision of the Hon. Stephen A. McAuliffe
District of New Hampshire
Case No.: 1:15-cr-00174

_____

Brief on Behalf of Appellee, Mara Morillo

_____

Stephanie Mc Clure, Esq.
Law Office of Stephanie Mc Clure LLC
101 Avenue of the Americas; 9th Floor
New York, New York 10013
Tel: 646-417-8380
Email: Stephanie@smclawgroup.com

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………….. i

TABLE OF AUTHORITIES……………………………………………… ii

STATEMENT REGARDING ORAL ARGUMENT…………………….. 1

STATEMENT OF THE ISSUES………………………………………... 1

STATEMENT OF THE CASE………………………………………….. 1

    A. PROCEDURAL HISTORY……………………………………... 1

    B. LEGAL STANDARDS OF CORAM NOBIS PETITIONS…….. 2

    C. STATEMENT OF FACTS……………………………………… 4

SUMMARY OF ARGUMENT…………………………………………... 12

ARGUMENT…………………………………………………………... 19

THE DISTRICT COURT EXERCISED APPROPRIATE
DISCRETION IN GRANTING MS. MORILLO'S CORAM
NOBIS PETITION AND VACATING HER CONVICTION…………… 19

    A. Ms. Morillo Was Denied The Effective Assistance
       Of Plea Counsel Due To The Failure To Provide Accurate
       Advice As To The Immigration Consequences Of Her
       Guilty Plea……………………………………………………… 20

    B. The District Court Properly Found That Ms. Morillo
       Provided Sufficient Reasoning To Explain The Delay
       In Filing……………………………………………………… 31

    C. The District Court Did Not Abuse Its Discretion
       In Granting Coram Nobis Relief………………………………... 35

CONCLUSION……………………………………………………… 40

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Aceituno v. United States*,
132 F.4th 563 (1st Cir. 2025)…………………………………… 16, 32, 37

*Brady v. United States,*
397 U.S. 742 (1970)………………………………………….. 26, 31

*INS v. St. Cyr,*
533 U.S. 289 (2001)…………………………………… 14, 22, 28

*Kovacs v. United States*,
744 F.3d 44 (2d Cir. 2014)…………………………… ……………20

*Lee v. United States*,
582 U.S. 357 (2017)…………………………………… 13, 21, 28

*Libretti v. United States,*
516 U.S. 29 (1995)………………………………………….. 27

*Mabry v. Johnson,*
467 U.S. 504 (1984)………………………………………… 26

*McMann v. Richardson,*
397 U.S. 759 (1970)………………………………………… 27

*Nix v. Whiteside,*
475 U.S. 157 (1986)………………………………………… 26

*Padilla v. Kentucky,*
559 U.S. 356 (2010)………………………………… 27-29, 31,  37

*Strickland v. Washington*,
466 U.S. 668 (1984)………………………………… 12, 16, 20, 24, 26

*Telink, Inc. v. United States,*
24 F.3d 42 (9th Cir. 1994)………………………………….. 15, 32

*Tollett v. Henderson,*
 411 U.S. 258 (1973)……………………………………………… 26

*Trenkler v. United States*,
 536 F.3d 85 (1st Cir. 2008)………………………………….. 3, 36

*United States v. Akinsade,*
 686 *F.3d* 248 (4th Cir. 2012)……………………………… 21

*United States v. Bonilla*,
 637 F.3d 980 (9th Cir. 2011)……………………………….. … 13

*United States v. Cariola,*
 323 F.2d 180 (3rd Cir. 1963)……………………………… 26

*United States v. Castro-Taveras*,
 841 F.3d 34 (1st Cir. 2016)………………………… ..3, 16, 19, 33, 36

*United States v. Frederick*,
 526 F. App'x 91 (2d Cir. 2013)………………………………13, 21, 28

*United States v. George*,
 676 F.3d 249 (1st Cir. 2012)……………………………… 3, 19, 36

*United States v. Harding*,
 104 F.4th 1291 (11th Cir. 2024)……………………………….. 18, 37

*United States v. Morgan*,
 346 U.S. 502 (1954)……………………………………….. 18, 32

*United States v. Murillo,*
 No. 18-6844 (4th Cir. June, 24, 2019)………………………….. 21

*United States v. Swaby,*
 855 *F.3d* 233 (4th Cir. 2017)……………………………… 21

*Von Moltke v. Gillies,*
 332 U.S. 708 (1948)…………………………………… 26, 27, 31

*Williams v. United States*,
　858 F.3d 708, 715 (1st Cir. 2017)…………………………………. 3, 20, 36

FEDERAL STATUTES

8 U. S. C. §1227(a)(2)(B)(i)…………………………………………… 22, 25

8 U.S.C. § 1182(a)(2)(A)(ii)(II)……………………………………… 25

28 U.S.C. § 1651(a)……………………………………………. 2, 15, 27

Fed. R. Crim. P. 11(c)…………………………………………….. 20, 21

MISCELLANEOUS

3 Criminal Defense Techniques §§60A.01, 60A.02[2] (1999)…………… 14, 29

**STATEMENT OF THE ISSUES**

1. Whether the district court properly determined that Ms. Morillo's plea counsel failed to provide effective assistance of counsel by providing incorrect advice regarding the immigration consequences of her guilty plea.

2. Whether the district court properly found sufficient reason for the delay in Ms. Morillo's filing for coram nobis relief.

3. Whether the district court's decision granting coram nobis relief was an abuse of discretion.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee believes oral argument will materially assist this court in its disposition of this matter.

**STATEMENT OF THE CASE**

**A. Procedural History**

On May 11, 2016, Mara Morillo pled guilty in United States District Court for the District of New Hampshire in accordance with a plea agreement arranged by former appointed criminal counsel. Appellant's Appendix 51-64; 65-85[1] Sentence

---

[1] Petitioner-Appellee hereby adopts Respondent-Appellant's addendum and addendum citations. Petitioner-Appellee adopts the portions of the Respondent-Appellant's appendix referenced herein. However, Petitioner-Appellee objects to the inclusion of irrelevant and inflammatory items in Respondent-Appellant's that have no bearing on the issue of ineffective assistance of counsel.

was imposed on May 11, 2017. Appellant's Appendix 101-136 Subsequent to her release, the record establishes that a final order of removal was entered (not served) on September 7, 2021. Appellant's Appendix 208 In June 2025, Ms. Morillo, by way of counsel, filed a petition for writ of coram nobis. Pa An evidentiary hearing was held September 25, 2025 with respect to the application, where the District Court heard evidence from several witnesses and oral argument. Appellant's Appendix 153-205 On September 26, 2025, the District Court entered an order granting Ms. Morillo's petition and vacating her conviction. Appellant's Addendum 1-10 A corresponding memorandum opinion was entered by the district court on October 15, 2025. Appellant's Addendum 11-38

**B. Legal Standards of Coram Nobis Petitions**

The All Writs Act, 28 U.S.C. § 1651(a), provides federal courts the authority to issue writs of error coram nobis to redress a fundamental error in a criminal case. *United States v. George*, 676 F.3d 249, 253 (1st Cir. 2012). Coram nobis relief is appropriate where, as here, the defendant is no longer in custody and a motion under 28 U.S.C. § 2255 is unavailable. *Trenkler v. United States*, 536 F.3d 85, 98 (1st Cir. 2008).

The First Circuit has formulated a "tripartite test" to determine whether to grant coram nobis relief. *United States v. Castro-Taveras*, 841 F.3d 34, 39 (1st Cir.

_____

"Pa" refers to Petitioner-Appellee's appendix.

2016) (quoting *United States v. George*, 676 F.3d 249, 254 (1st Cir. 2012)). "Under it, a coram nobis petitioner must: (1) **explain** his failure to seek earlier relief from the judgment; (2) show that he continues to suffer significant collateral consequences from the judgment, and (3) demonstrate that the judgment resulted from an error of the most fundamental character." *Id*.

**If one faces deportation due to a conviction, one is "continu[ing] to suffer significant collateral consequences from the judgment." *Williams v. United States*, 858 F.3d 708, 715 (1st Cir. 2017)**. Ineffective assistance of counsel can be "error of the most fundamental character." See generally *Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016). Other circuits have likewise held that ineffective assistance of counsel is sufficiently fundamental to warrant coram nobis relief. See, *e.g., Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

It is axiomatic that criminal defendants are entitled to Sixth Amendment counsel. When counsel gives affirmative legal misadvice to a client, and that client relies on that incorrect legal advice, the result is that critical constitutional waivers are not knowing or voluntary, (the right to a trial, a jury, and to remain silent for example).

### C. Counterstatement of Facts

First, the Statement of Facts submitted by Appellant must be stricken and will be the subject of a motion to strike. The alleged facts in the statement go far beyond

that which is part of the record below and include uncorroborated hearsay from police reports never tested or substantiated. **<u>Further, they were no part of the record below</u>** which consisted only of: 1) the petition coram nobis, the opposition, a reply, witness affidavits, police reports corroborating Morillo's claims of violence by her husband at the relevant time, and transcripts of the initial plea and sentence. None of the other claimed "facts" are appropriate to be considered on this record.

That said, the following is within the record.

Ms. Morillo was born in 1975 in Venezuela and came to the United States legally in 1996. Pa Affidavit of Mara Morillo ("Mara Aff.") at ¶ 2. Ms. Morillo was born into poverty and was abandoned by her mother. She was sent as a young child to live with a relative in another country (Columbia). There, she was the subject of <u>unrelenting sexual abuse</u> throughout her childhood, by multiple men, including family members, and some of whom, to this day, she is still too fearful and shamed to name. Her suffering and victimization was never treated and left lasting and serious effects on her mental health. She lived her life from the time she was a young child, neurologically in "survival mode." Pa Affidavit of Mara Morillo

At a young age, she became pregnant by a "boyfriend" who abused her and abandoned her and their child. She was forced to drop out of school as a result. She decided to come to the United States to try to find a better life.

Ms. Morillo met her abuser husband and co-defendant, Franklin Morillo in Massachusetts. He was initially charming and she felt safe with him. They entered into a relationship. He got along with her two children. Pa See Mara Aff, as it corrects [DE 189.] They married in 2013. However, Franklin became a violent alcoholic and cocaine user. He became extremely mentally and physically abusive toward her. His violence was extreme and unrelenting. Police and Witness Reports submitted to the District Court Confirm. On one occasion, he broke into her home through a glass sliding door in the basement and seriously assaulted one of their friends, a male, he found inside. He was charged criminally for the burglary and the assault on that occasion and a restraining order issued that he ignored. Pa See Attached Police Reports Ex. A, See also Mara Aff. at ¶¶ 8-13

Angelina Morillo, her daughter, was present in the home and corroborated the abuse and manipulation as she was old enough to understand, fear, and remember at the time. Frank was violent, manipulative, and controlling to an extreme. He would track their movements, control all the money and question her every conversation. He would explode with anger and severely abuse her to the point she and Angelina feared he was going to kill her. For example, Angelina recalled a time in detail that Morillo was chasing her mother with a knife, and choked her by the neck so severely she thought he was going to kill her. Angelina and her mother tried to barricade the bedroom door in order to survive. This was domestic violence to an extreme and it

was corroborated by Angelina, a contemporaneous witness, as well as contemporaneous police reports submitted to the district court. Morillo was a slave in the relationship. Pa Mara Aff. at ¶ 8. She never divorced Frank out of a perpetuating fear of retaliation. Pa Mara Aff. at ¶ 5. Frank told Ms. Morillo that if she ever left him, he would find her and all her friends and family and "kill them all." Pa Mara Aff. at ¶ 12.

Mara initially thought that Frank was in the real estate business when they met. Pa Mara Aff. at ¶ 9. He never brought his illegal drug "business" into the home in an obvious way and was very secretive. Ms. Morillo rarely knew what Frank was doing, where he was, who he was with, or why. Pa Mara Aff. at ¶ 10. She would never dare ask Frank questions about his "business," as the few times she did, Frank scolded her and hit her for "intruding on him as the man or 'ruler' of the house." Pa Mara Aff. at ¶ 11.

When Ms. Morillo was jailed, paradoxically, she felt somewhat relieved because she was safe from Frank's relentess abuse. Pa Mara Aff. at ¶ 13. She knew nothing about the legal process but knew she needed a lawyer. Pa Mara Aff. at ¶ 14. Jonathan R. Saxe was assigned as her attorney. Pa Mara Aff. at ¶ 15. Mara made clear to him that she did certain tasks for her husband only because, if she did not Frank would hurt her, perhaps kill her, and the children. She endured years of abuse

and controlling behavior because she believed that was what was needed to survive for her children. She was a hostage in her own life. Pa Mara Aff. at ¶ 16.

When Ms. Morillo spoke with plea counsel, she made it abundantly clear that staying in the United States was her priority. Pa Mara Aff. at ¶ 16. Counsel was not interested in hearing Mara's thoughts or desire to explain her side of the story. To Ms. Morillo, it seemed as though counsel just wanted to finish her case as quickly as possible. Pa Mara Aff. at ¶ 17. Importantly, Ms. Morillo tried to explain her life and hardships to him. Instead of investigating potential defenses as a result of her overwhelming life of abuse and survival mechanisms, counsel told her that the court would be lenient on her because of her abuse, (which is consistent with his attempts at sentencing, though irrelevant as to the issues before this court here which concern pre-plea affairs.)

Counsel told Ms. Morillo her only option was to accept a plea deal that he had negotiated with the prosecution. Pa Mara Aff. at ¶¶ 18, 20. She was advised that if she took the deal, she would do some time but that she would be able to stay in the United States and **<u>work out her immigration situation once she got out</u>**. He told her that she would be safe from deportation due to her unique circumstances. Pa Mara Aff. at ¶¶ 20, 22, 24, 38. Counsel never told Ms. Morillo that he did not practice immigration law or that she should seek the advice of an immigration attorney. Pa Mara Aff. at ¶ 25.

Counsel submitted a set of facts that he never even discussed with Ms. Morillo privately and had her sign a Plea Agreement which, itself, contained errant immigration advice. Pa ; Appellant's Appendix 161 (paragraph 11 states "… if she is not a citizen of the United States she *may* be removed from the United States, denied citizenship, and denied admission to the United States in the future…"). (emphasis added) Plea counsel made no corrections to the misinformation contained on the Plea Agreement. At the plea hearing, counsel told Ms. Morillo to answer "yes" to all the questions the judge asked her regarding the plea deal. Pa Mara Aff. at ¶ 23. Plea counsel also failed to interject during the plea hearing when the court inquired as to Ms. Morillo's status, compounding the misadvice by questioning whether she understood that a conviction "*could* result in immigration consequences that *may* include deportation?" (emphasis added) Appellant's Appendix 82. Ms. Morillo would never have accepted the plea deal if she knew the truth: that it would make her 100% unquestionably deportable and that it would make her permanently inadmissible in the United States, and that no **"immigration attorney could help her straighten this out and get her papers after she was released" like plea counsel had informed her**. Pa Mara Aff. at ¶ 18.

After the plea deal was accepted, Mara had no reason to question plea counsel's advice. Pa Mara Aff. at ¶¶ 28-33. While she was in prison, an immigration officer visited her and asked her to sign papers. Pa Mara Aff. at ¶ 28. <u>Ms. Morillo</u>

did not understand and refused to sign, and she advised the officer that plea counsel had worked out a deal already pursuant to which she would be able to get a visa and straighten out her immigration situation once she was out of prison. Pa Mara Aff. at ¶ 29. After the immigration officer's visit, no other immigration authorities came back, nor any papers sent, reinforcing her belief that plea counsel's advice was correct and her deal would spare her from any immigration consequences. Pa Mara Aff. at ¶ 31.

After Ms. Morillo was released from prison, she complied with the requirements imposed by the court, and she remained in America, with no problems with immigration. Pa Mara Aff. at ¶ 32. At the very end of 2021, Ms. Morillo received a notice of deportation. Pa Mara Aff. at ¶ 33. She believed that per Saxon's advice, all she had to do was to get a lawyer to explain to the immigration authorities what had been told to her by plea counsel as to the disposition of the case and she would be fine. Ms. Morillo attempted to contact Saxon, but could not get in touch with him. Pa Mara Aff. at ¶ 33. She contacted an immigration attorney, who told her in a consultation that there was nothing that could be done (though did not explain further.). Pa Mara Aff. at ¶ 33. Nothing happened in the meantime. She had no court hearings and it seemed to her that she had time to hire a lawyer to explain the situation to immigration authorities, just as Saxon told her, and that she would be fine. She saved and did just that, which, importantly, was consistent with her

immigration plan which was to apply for residency in 2025 when Angelina Morillo her daughter and U.S. citizen turned 21 and was able to sponsor her. Two witnesses testified to this before the district court. Appellant's Appendix 153-205

Immediately in the beginning of 2025, consistent with her immigration plan, Ms. Morillo spoke with an immigration attorney who questioned the consequences of her conviction and referred her to present counsel for assessment. Pa Mara Aff. at ¶ 34. It was then that Ms. Morillo was advised that her conviction made it 100% impossible for her to ever get status in the United States. Pa Mara Aff. at ¶ 35. Additionally, she was advised that the conviction immediately and forever made her mandatorily deportable and inadmissible to the United States, and that not only could Mara not get her papers, but if she left or was deported, she could never return to see her children. Pa Mara Aff. at ¶ 35.

As a result of these revelations, a petition for a writ of coram nobis was filed on behalf of Ms. Morillo without delay. The district court held an evidentiary hearing on the petition September 25, 2025. Appellant's Appendix 153-205. At the hearing, Ms. Morillo called her adult daughter and a long-time family friend to testify on her behalf. Both women testified that Ms. Morillo planned to get a green card after she was released from prison. Appellant's Appendix 157-161. Her daughter testified that Ms. Morillo spoke with her about her plan "all the time." She also confirmed that

she was going to sponsor her mother after she turned twenty-one. Appellant's Appendix 159-161.

The government called Jonathan Saxe, plea counsel, as a witness. On both direct and cross-examination, plea counsel testified that he had no specific recollection as to what occurred in the case beyond remembering the case name. He stated he had no recollection of any interaction between himself and Ms. Morillo. Appellant's Appendix 165-166. Plea counsel could only speak in generalities of his prior practice when questioned about any discussion of immigration consequences of the plea. Appellant's Appendix 166. When further questioned by the court, plea counsel reiterated that he had no recollection of the guilty plea, had no recollection of any specific conversations with Ms. Morillo, and had no recollection if he advised her of the immigration consequences of the plea using the language mandatory deportation or certain deportation. Appellant's Appendix 170-174.

Following the hearing, the district court granted the petition and vacated Ms. Morillo's conviction. Appellant's Addendum 9. The court issued a subsequent memorandum opinion detailing its findings. Appellant's Addendum 27-38. The court found that Morillo sufficiently sought relief once she was actually aware that her plea triggered mandatory consequences contrary to what Saxon told her. Further, she continues to suffer collateral consequences as a result of the conviction, and that the conviction could not withstand the ineffective assistance of counsel due to

counsel's direct and affirmative misstatements of law to Morillo regarding the consequences of her plea. The district court found that Ms. Morillo had been misadvised as to the immigration consequences of her plea and that, but for this misadvice, there was a reasonable probability that Ms. Morillo would not have pled guilty.

## SUMMARY OF ARGUMENT

The district court's decision to grant Ms. Morillo's coram nobis petition and vacate her conviction was proper.

1. Ms. Morillo was denied the effective assistance of counsel by misadvice of counsel pertaining to immigration consequences.

To prove ineffective assistance of counsel, a petitioner must show (i) that the attorney's performance was unreasonable under prevailing professional norms, and (ii) prejudice (i.e., a reasonable probability that, but for counsel's errors, a different outcome would have occurred). *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). Counsel's **affirmative misadvice** of immigration law satisfies the first prong. *Padilla v. Kentucky*, 559 U.S. 356, 366-69 (2010).

The second prong is satisfied if the petitioner shows a reasonable probability that he would not have pleaded guilty had he known it would lead to removal. *Lee v. United States*, 582 U.S. 357, 363-71 (2017). "In the context of plea negotiations,

12

a defendant can make this showing by producing a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for counsel's deficient performance and also some additional 'objective evidence' supporting his claim." See, e.g., *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013).

**In *Padilla*, the Court held that "when the deportation consequence is truly clear, … the duty to give correct advice is equally clear. *Padilla* at 369.** "[A] criminal defendant who faces almost certain deportation is entitled to know more than it is *possible* that a guilty plea could lead to removal; he is entitled to know that it is a virtual certainty." *United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011).

Plea counsel told Ms. Morillo directly that she could "work out" her immigration situation once she was released and that she would be able to stay here in the USA with her children.  The truth, however, was that the guilty plea forever and immediately made her mandatorily deportable and forever unable to come or remain in the USA with no waivers or exceptions available and it had nothing to do with whether the court's construed it as an "aggravated felony" as appeals counsel would have this court believe as further explained below in legal argument. Counsel's misadvice was corroborated by both the written plea agreement and colloquy on the record during the change of plea hearing.  Paragraph 11 of the plea agreement states that if Ms. Morillo is not a U.S. citizen she "may" be removed,

denied citizenship, or denied admission based on her conviction. Appellant's Appendix 61. There were no corrections made on the plea agreement itself to correct the misinformation. Additionally, during the court's questioning of Ms. Morillo at the change of plea hearing, she was asked if she understood that her conviction "could" result in immigration consequences. Appellant's Appendix 82. Counsel failed to correct that misinformation as well.

Under identical circumstances to the case at bar, the United States Supreme Court in *Padilla* court found that it is reasonable that a person would opt out of a plea if the truth of immigration consequences were known. The court observed that " '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.' " *Padilla* at 360 citing *St. Cyr*

, 533 U.S., at 323 (quoting 3 Criminal Defense Techniques §§60A.01, 60A.02[2] (1999)). Here, Ms. Morillo would not have pled guilty if she knew that it would lead to her deportation. Pa Mara Aff. at ¶ 18. Staying in the United States was her primary concern. Pa Mara Aff. at ¶ 16.

Plea counsel provided ineffective assistance of counsel by giving Ms. Morillo incorrect advice about the immigration consequences of a guilty plea, prior to, and to entice her to, plead guilty. In so doing, counsel's performance was unreasonable under prevailing professional norms, which prejudiced Ms. Morillo by leading her

to plead guilty when she otherwise would have chosen differently. She would not have waived her critical constitutional rights to a trial, a jury, and to remain silent for example, if she knew the truth about the immigration consequences. As a result of counsel's ineffective assistance, Mara is forever unable to get status in the United States, is permanently banned from the United States in fact, and is presently facing mandatory deportation and separation from her children, two of which are U.S. Citizens. Morillo has been in immigration custody for nearly a year, separated from her children (whose father is not in their lives) including an 11 year old little girl. All the children have been displaced from their home and are forced to live separately.

**2. Ms. Morillo provided legally sufficient reasoning to explain the delay in filing.**

There is no specific statute of limitations for the filing of a coram nobis petition. *Telink, Inc. v. United States,* 24 F.3d 42, 45 (9th Cir. 1994); *see also United States v. Morgan*, 346 U.S. 502, 507 (1954) (explaining that coram nobis petitions are allowed "without limitation of time"). Appellant mis-states the law in this area, directing this court that it must find a petitioner "exercised reasonable diligence" to discover an error. This is not the law. In the context of ineffective assistance of counsel claims, it is not the time between the judgment and the petition for writ of coram nobis that is the primary consideration, but rather the time between when the

petitioner learned that coram nobis relief was a possibility and the filing of the petition. *See United States v. Castro-Taveras*, 841 F.3d 34, 54 (1st Cir. 2016) (remanding for evidentiary hearing on Strickland's two-prong test where, inter alia, petitioner sought immigration advice in 2011, was informed that guilty plea in 2002 would bar him from becoming U.S. citizen was subject to mandatory removal, and then brought petition for writ of coram nobis).

This petitioner is nothing like the petitioner in Aceituno, who waited eight years without any explanation at all, **after being deported,** to bring a challenge to an ancillary issue. Morillo's case is completely different. She was given incorrect legal advice by counsel and after sentencing her life circumstances seemed to her to corroborate Saxon's bad advice. She fully explained this to the district court, unlike Aceituno, and the district court found the explanation sufficient. First, she did her time in prison under the "deal" but was then released. She was not turned over to ICE for deportation. That was a strong signal that Saxon "was right." Also, while she was in prison, an immigration officer visited Ms. Morillo and asked her to sign papers (presumably voluntary deportation as is their standard tactic). Pa Mara Aff. at ¶ 28. She refused to sign and instead told the immigration officer what Saxon told her to say; about the deal she'd received and about working out her papers down the line. **After that visit, no other immigration authorities came back, and she never received any correspondence or notices further after that, which reinforced Ms.**

**Morillo's perception that what plea counsel had told her was correct.** To her it seemed Saxon was right and that she'd be out of prison and could work her papers out down the line. Pa Mara Aff. at ¶ 31. **She had no reason to question counsel's advice** this is a primary difference between Morillo and Aceituno. Pa Mara Aff. at ¶ 32. At the end of 2021, Ms. Morillo received a notice of deportation. Pa Mara Aff. at ¶ 33. She attempted to contact plea counsel, but could not get in touch with him. Pa Mara Aff. at ¶ 33. Nothing further arrived. She was not arrested. She did not receive a court date. Again, she believed that authorities were aware of the "unique circumstances" that she explained to them when they visited her in jail and again, everything was fine and that she could pursue her immigration plan – to have Angelina sponsor her in 2025.

In 2025, not wasting any time, she contacted an immigration attorney, in advance of Angelina's 21st birthday in order to prepare documents in advance. That first lawyer did not accept her case. Pa Mara Aff. at ¶ 33. She was confused and saved money continuing to research counsel so that in early 2025, she could continue with the immigration plan Saxon told her was feasible. In 2025, she was led to current counsel. It was not until Ms. Morillo's consultation with current counsel that she learned of the mandatory and permanent immigration consequences of her guilty plea, as well as the possibility of coram nobis relief. Pa Mara Aff. at ¶¶ 34-35. Once Ms. Morillo was made aware of the mandatory consequences and the availability of

relief, she hired current counsel immediately who filed the petition in the district court. The efforts of Ms. Morillo are fully and reasonably explained in detail and the district court accepted the testimony as true, in particular, as corroborated by two witnesses during the hearing who were present contemporaneously during the relevant time and had personal knowledge of same.

3. **The district court did not abuse it discretion in granting Ms. Morillo's petition.**

A district court's grant or denial of coram nobis relief is reviewed for abuse of discretion. "A district court abuses its discretion when its ruling rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Harding*, 104 F.4th 1291, 1295-96 (11th Cir. 2024) (quotation omitted). As the district court did not rest its opinion on any of the three aforementioned factors, the order granting coram nobis relief was properly entered.

The facts underlying the defendant's coram nobis petition in *Aceituno v. United States*, 132 F.4th 563 (1st Cir. 2025) are readily distinguishable from the facts in the present matter. Defendant Aceituno, unlike Ms. Morillo, failed to establish that he was denied the effective assistance of counsel and therefore could not demonstrate that the judgment resulted from an error of the most fundamental character. The district court in this matter fully addressed the tripartite test established to determine the propriety of coram nobis relief.

**ARGUMENT**

**THE DISTRICT COURT EXERCISED APPROPRIATE DISCRETION IN GRANTING MS. MORILLO'S CORAM NOBIS PETITION AND VACATING HER CONVICTION.**

The All Writs Act, 28 U.S.C. § 1651(a), provides federal courts the authority to issue writs of error coram nobis to redress a fundamental error in a criminal case. *United States v. George*, 676 F.3d 249, 253 (1st Cir. 2012). The First Circuit has formulated a "tripartite test" to determine whether to grant coram nobis relief. *United States v. Castro-Taveras*, 841 F.3d 34, 39 (1st Cir. 2016) (quoting *United States v. George*, 676 F.3d 249, 254 (1st Cir. 2012)). "Under it, a coram nobis petitioner must explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character." *Id*.

If one faces deportation due to a conviction, one is "continu[ing] to suffer significant collateral consequences from the judgment." *Williams v. United States*, 858 F.3d 708, 715 (1st Cir. 2017). Ineffective assistance of counsel can be "error of the most fundamental character." See generally *Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016). Other circuits have likewise held that ineffective assistance of counsel is sufficiently fundamental to warrant coram nobis relief. See, *e.g., Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

**A. Ms. Morillo Was Denied The Effective Assistance Of Plea Counsel Due To <u>His Providing Affirmative Mistatements of Law</u> As To The Immigration Consequences Of Her Guilty Plea.**

Ineffective assistance claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance of counsel, a petitioner must show (i) that the attorney's performance was unreasonable under prevailing professional norms, and (ii) prejudice (i.e., a reasonable probability that, but for counsel's errors, a different outcome would have occurred). *Id*. at 687-96. Counsel's affirmative misadvice of law, or failure to inform the client of the accurate immigration consequences of a guilty plea, satisfy the first prong. *Padilla v. Kentucky*, 559 U.S. 356, 366-69 (2010). The two avenues are distinct; affirmative misadvice versus a failure to advise; however, each satisfy the inquiry. Here, we have affirmative misadvice of law, corroborated by the plea agreement and the plea transcript.

The second prong is satisfied if the petitioner shows a reasonable probability that he would not have pleaded guilty had he known it would lead to removal. *Lee v. United States*, 582 U.S. 357, 363-71 (2017). "In the context of plea negotiations, a defendant can make this showing by producing a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for counsel's deficient performance and also some additional 'objective evidence' supporting his claim." See, e.g., *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013).

In *Padilla*, the Court held that "when the deportation consequence is truly clear, … the duty to give correct advice is equally clear. *Padilla* at 369. "[A] criminal defendant who faces almost certain deportation is entitled to know more than it is *possible* that aa guilty plea could lead to removal; he is entitled to know that it is a virtual certainty." *United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011) "General and equivocal" court instructions or advice from counsel as to the immigration consequences of pleas are constitutionally insufficient. *United States v. Akinsade,* 686 *F.3d* 248, 254 (4th Cir. 2012). *See also United States v. Swaby,* 855 *F.3d* 233 (4th Cir. 2017); *United States v. Murillo,* No. 18-6844 (4th Cir. June, 24, 2019). Simply stated, when a guilty plea will automatically trigger removal proceedings, a defendant must be <u>explicitly</u> informed of this repercussion. In the absence of this notice, a defendant's plea cannot be considered knowing and voluntary.

Courts around the country have held consistently with *Padilla*, that equivocal warnings of immigration consequences, given in terms of the "possibility" for adverse immigration consequences, are not appropriate in the face of consequences made certain by the law. A particular Federal Judge, Judge Robert Hinkle, sitting in the Northern District of Florida, put this concept into excellent perspective: **"Warning of the possibility of a dire consequence is no substitute for warning of its virtual certainty. 'I know every time I get on an airplane that it could**

21

**crash. But if you tell me its going to crash, I'm not getting on**.'"  U.S. v. Choi, Case no.: 4::08-cv-00386 [DE 96] at 52 (D.Fla. 2008).

In both *Padilla* and this case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for conviction and it has nothing to do with whether an immigration court considers the plea to be an "aggravated felony" as misstated by Saxon during the hearing and by Appellate Counsel ad nauseum in his opening brief to this court. The controlling law is 8 U. S. C. §1227(a)(2)(B)(i), which, since 1996 has stated: "Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance … , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable."  The district court took care, in fact, at the hearing to research and determine whether that statute has been construed to mean that deportation is "mandatory" and the United States Supreme Court in Padilla said, yes, it does mean that deportation is presumptively mandatory, and in it's opinion it was no difficult task to make that determination.  *Padilla* at 368, see also the transcript of the district court proceeding wherein the court made the inquiry on the record.  The Supreme Court in Padilla explained: *"(i)n the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction, pointing to 8 U.S.C. §*

22

*1227(a)(2)(B)(i).... The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect."* Id. at 368.

Ms. Morillo's counsel, just as Padilla's counsel, could have easily determined that this plea would make her mandatorily deportable simply from reading the text of the statute, which addresses not some broad classification of crimes in the aggravated felony statute, but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Ms. Morillo's counsel, just as Padilla's counsel, provided false assurance that her conviction would not result in his removal from this country under her unique and tragic life circumstances. Under those exact circumstances, the *Padilla* Court held "this is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." *Id*.

Here, plea counsel went beyond a mere failure to advise; **Saxon actually gave affirmative advice that was incorrect**. He told Ms. Morillo directly that she could "work out" her immigration situation once she was released and that she would be able to stay here in the USA with her children. The truth, however, was that the guilty plea forever and immediately made her mandatorily deportable and forever

unable to come or remain in the USA with no waivers or exceptions available. His wrongful advice is inexcusable given the clarity of the relevant statute. This satisfies the first prong of *Strickland* per se.

Counsel's misadvice was corroborated by both the written plea agreement and colloquy on the record during the change of plea hearing. Paragraph 11 of the plea agreement states that if Ms. Morillo is not a U.S. citizen she "may" be removed, denied citizenship, or denied admission based on her conviction. Appellant's Appendix 61. Further the district court itself in taking the plea likewise misinformed Morillo that the government could ***"take (the conviction) into account by the government when deciding whether or not to deport her."*** App. 81-82. This delivery by the court implies "options," or "discretion" in the law that does not exist and served to cosign counsel's misadvice that she could hire an attorney and work out her papers down the line. The court's statement corroborated by her attorney's insistence that she would not be deported based on her unique circumstances, further assured Ms. Morillo that she would avoid deportation due to her circumstances and she could straighten out her "papers" when she got out of jail. Counsel failed to correct that misinformation on the record (corroborating the fact that he wrongly believed the government had discretion of some kind not to deport her and that she would be able to argue against deportation and situate her status once she was released. In fact, just the fact alone that Saxon spoke with Morillo in terms of what

24

she could do post-release, alone suggests his incorrect beliefs about the true immigration consequences of this plea. This is because the immediate and mandatory trigger of deportation would have warranted her being turned over to ICE and never released at all prior to deportation. The pertinent portion of the INA was succinct, clear, and explicit in defining the concrete removal consequences. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance ..., other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable"). **Additionally, 8 U.S.C. § 1182(a)(2)(A)(ii)(II) is plain that, any plea, including conspiracy, to a crime involving narcotics trafficking, immediately and forever renders someone inadmissible to the United States. There are no "maybes" or "discretions" or "potential" for immigration consequences**. The consequences were known and concrete – no discretion; no equivocal terminology.

Notwithstanding, Ms. Morillo had a right to rely on her lawyer's interpretation of her unique circumstances even over the court warnings. *Von Moltke v. Gillies,* 332 U.S. 708, 721 (1948). Courts are supposed to be passive and neutral. They do not do investigations; they do not develop legal strategies. They do not consult with the defendant on the merits of the prosecution's case or available defenses. They do

not consult with the defendant on the advantages or disadvantages of a plea. "A criminal court is in no position to advise on all the ramifications, of a guilty plea personal to a defendant", *Cariola,* 323 F.2d at 186; Fed. R. Crim. P. 11(c). A court's duty is limited to preventing abuses of power, which ensures that defendants are not deprived of liberty without due process of law. *See Brady,* 397 U.S. at 755-57; *Mabry v. Johnson,* 467 U.S. 504, 511 (1984). Unlike the court's narrow duty to ensure minimal knowledge and voluntariness, defense counsel's paramount duty is to protect the client's overall interests. "Counsel's concern is the faithful representation of the interest of his client." *Tollett v. Henderson,* 411 U.S. 258, 268 (1973). Thus, counsel must pursue "all reasonable lawful means to attain the objectives of the client." *Nix v. Whiteside,* 475 U.S. 157, 166 (1986); *see also Strickland,* 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive[s] the overarching duty to advocate the defendant's cause …."). With regard to guilty pleas, counsel (unlike a court) must investigate and advise the defendant of "the advantages and disadvantages of a plea agreement." *Libretti v. United States,* 516 U.S. 29, 50-51 (1995) (noting that the Sixth Amendment duties of counsel extend beyond "the small class of rights that require specific advice from the court under Rule 11(c)"); *Brady,* 397 U.S. at 754. "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion

as to what plea should be entered." *Von Moltke v. Gillies,* 332 U.S. 708, 721 (1948); *McMann,* 397 U.S. at 770-71 (counsel has a Sixth Amendment duty to provide reasonably competent advice on whether to plead guilty). Ms. Morillo had a right to believe that her lawyer, who was duty-bound to advise her accurately about the law and her unique circumstances over the standard script of the criminal court who was not charged with the same duty to know her unique immigration circumstances.

Plea counsel's testimony during the evidentiary hearing on September 25, 2025 fails to establish that he satisfied the requirements of *Padilla*. On both direct and cross-examination, plea counsel testified that he had no specific recollection as to what occurred in the case beyond remembering the case name. He stated he had no recollection of any interaction between himself and Ms. Morillo. Appellant's Appendix 165-166. Plea counsel could only speak in generalities of his prior practice when questioned about any discussion of immigration consequences of the plea. Appellant's Appendix 166. When further questioned by the court, plea counsel reiterated that he had no recollection of the guilty plea, had no recollection of any specific conversations with Ms. Morillo, and had no recollection if he advised her of the immigration consequences of the plea using the language mandatory deportation or certain deportation. Appellant's Appendix 170-174. As counsel had no recollection beyond the name of the case, there is no proof in the record that he

properly advised Ms. Morillo that her plea would subject her to mandatory deportation.

Plea counsel's misrepresentation of the immigration consequences also satisfies the second prong of *Strickland*, i.e. prejudice. The second prong is satisfied if the petitioner shows a reasonable probability that she would not have pleaded guilty had she known it would lead to removal. *Lee v. United States*, 582 U.S. 357, 363-71 (2017). "In the context of plea negotiations, a defendant can make this showing by producing a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for counsel's deficient performance and also some additional 'objective evidence' supporting his [or her] claim." *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013). Importantly, this case came after *Padilla*, *supra.*, which, under circumstances materially indistinguishable to the case at bar, found that it is reasonable that a person would opt out of a plea if the truth of immigration consequences were known. **The Supreme Court reasoned that " '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.' "** *Padilla* **at 360 citing** *St. Cyr***, 533 U.S., at 323 (quoting 3 Criminal Defense Techniques §§60A.01, 60A.02[2] (1999)).** The court went on to state, "(l)ikewise, we have recognized that "preserving the possibility of" discretionary relief from deportation under §212(c) of the 1952 INA, 66 Stat. 187, repealed by Congress in 1996, "would have been one

of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." *Id.*, citing *St. Cyr*, 533 U. S., at 323. The *Padilla* court set the standard stating that "(w)e expected that counsel who were unaware of the discretionary relief measures would "follo[w] the advice of numerous practice guides" to advise themselves of the importance of this particular form of discretionary relief. *Id.*, citing *Ibid*, n. 50. Despite what appeallate counsel would have this court believe, no court, neither the *Lee* court nor the *Padilla* court requires "contemporaneous evidence" of the fact that … had a petitioner known the true consequences that would be triggered by a plea, they would have opted for trial.

Here, Ms. Morillo would not have pled guilty if she knew that it would lead to her deportation. Pa Mara Aff. at ¶ 18. Staying in the United States was her primary concern, (which is corroborated by her terrible experience in Venezuela as a repeated crime victim). Pa Mara Aff. at ¶ 16. The living conditions in Venezuela were (and are) so poor, that Ms. Morillo considered deportation as worse than imprisonment. Pa Mara Aff. at ¶ 6. *See Padilla* (as to the reasonableness of this perspective), and *Lee*, at 363-71 (holding second prong of Strickland satisfied where consequences of taking a chance at trial were not markedly harsher than pleading **in the view of the defendant**).

The conviction was the sole basis for the ICE removal action as reflected in the record. Appellant's Appendix 207-208. Furthermore, Ms. Morillo had and has

multiple avenues to permanent residency which would render her overstay waived pursuant to INA 245(i). Ms. Morillo's daughter, a U.S. citizen, turned 21 in 2025 and immediately filed an I 130 to sponsor her mother which was approved. Morillo has undergone biometrics and has no other bars to adjustment as she entered the United States lawfully with inspection. Ms. Morillo would be able to achieve permanent residency through her daughter and her overstay would be waived pursuant to INA 245(i). She also has a VAWA petition pending, which would similarly waive overstay time. The only thing stopping her lawful adjustment was this conviction which was properly vacated by the district court. This conviction, and the ineffective assistance of counsel herein described is the sole and direct cause of the prejudice that is keeping her in custody without bond and threatening to permanently separate her from her children.

The applicable deportation statute regarding CDS crimes, having nothing to do with a more complicated aggravated felony analysis, was crystal clear as described by the Supreme Court in Padilla. There were no discretions involved in Ms. Morillo's plea, only the presumptively mandatory deportation statute. Counsel's misadvice, that she could work out her papers after she got out of jail, and explanation that all she had to do was hire counsel to explain to the government were all patently incorrect; and corroborated by a plea form and plea record in court by the use of equivocal terminology that furthered Morillo's misunderstanding of the

consequences of her plea. Pursuant to Padilla, which interpreted this very same CDS trafficking statute (not the aggravated felony statute) it is clear that this misadvice of counsel was incorrect. The Supreme Court has not departed from the view that a guilty plea satisfies due process **only** if the individual entering into the plea has done so voluntarily, knowingly, and intelligently, **"with sufficient awareness of the relevant circumstances and likely consequences."** *Bradshaw v. Stumpf,* 545 U.S. 175, 183, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (quoting *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Morillo had a right to rely on her lawyer's advice as it is reasonable for client's to believe their attorneys' advice is based upon their unique circumstances, even over court warnings. *Von Moltke v. Gillies,* 332 U.S. 708, 721 (1948).

**B. The District Court Properly Found That Ms. Morillo Provided Sufficient Reasoning To Explain The Delay In Filing.**

There is no specific statute of limitations for the filing of a coram nobis petition. *Telink, Inc. v. United States,* 24 F.3d 42, 45 (9th Cir. 1994); *see also United* In the context of ineffective assistance of counsel claims, it is not the time between the judgment and the petition for writ of coram nobis that is the primary consideration, but rather the time between when the petitioner learned that coram nobis relief was a possibility and the filing of the petition. *See United States v. Castro-Taveras*, 841 F.3d 34, 54 (1st Cir. 2016) (remanding for evidentiary hearing

on Strickland's two-prong test where, inter alia, petitioner sought immigration advice in 2011, was informed that guilty plea in 2002 would bar him from becoming U.S. citizen was subject to mandatory removal, and then brought petition for writ of coram nobis). *States v. Morgan*, 346 U.S. 502 507 (1954) (explaining that coram nobis petitions are allowed "without limitation of time"). Consistent with that holding, this court in Aceituno v. US, found petitioner waited too long to avail himself of coram nobis relief where petitioner waited and completely failed to offer any reasoning for an 8 year delay **after he was deported** to bring a claim. Of course, this is completely different than the case at bar in every material way.

Morillo fully explained her reasoning to the district court who ruled properly on it. The fact is that, as soon as Ms. Morillo knew the consequences triggered by her plea, she acted immediately in hiring the undersigned who brought the petition in district court.

At the time of her plea, Morillo was laboring under specific and affirmative misadvice by counsel, telling her in sum and substance that she would not be deported in her unique circumstances, that she would do her time; be released; and that all she had to do was hire a lawyer, and she could work out her papers down the line based on the deal he got her. This was inadvertently corroborated by the court in its statements previously cited on the record which told Ms. Morillo that the government "could" consider the conviction "when deciding whether or not to

deport her." Again, for the reasons above, totally incorrect given the automatic and permanent trigger by the relevant CDS provision in the INA.

Laboring under that misadvice, corroborated by the court and the equivocal language in the plea form, Morillo was sentenced to prison as she was expecting based on her attorney's word. Pa Mara Aff. at ¶ 27. While she was in prison, an immigration officer visited her and asked her to sign papers. Pa Mara Aff. at ¶ 28. She did not understand, refused to sign, and explained to the officer, just as Saxon told her, that he had worked out a deal already pursuant to which she would be able to straighten out her immigration situation once she was out of prison. Pa Mara Aff. at ¶ 29. [2] After that visit, no other immigration authorities came back, no immigration papers were ever sent to her while in jail and she never received any correspondence or notices further after that regarding deportation, which reinforced Ms. Morillo's perception that what plea counsel had told her was correct and her deal would spare her from any immigration consequences. Pa Mara Aff. at ¶ 31. She had no reason to question Saxon as it appears he was correct. She was then released from prison (rather than being turned over to ICE). Pa Mara Aff. at ¶ 32. She complied with the requirements of her sentencing, and she remained in America, with no problems with deportation and she planned to adjust her status in 2025 once her daughter turned 21 and could sponsor her. Pa Mara Aff. at ¶ 32.

---

[2] Presumably, these papers sought voluntary deportation, as this is a rather ordinary practice of the government.

At the end of 2021, Ms. Morillo received a notice of deportation. Pa Mara Aff. at ¶ 33. She was confused because she believed she had already made a deal with the government and this was a non-issue. Pa Mara Aff. at ¶ 33. Per Saxon's direct advice, she still thought all she had to do was to get a lawyer to explain the deal to the immigration authorities and she would be fine. Pa Mara Aff. at ¶ 40. Consistent with that, she attempted to contact Saxon, but could not get in touch with him. Pa Mara Aff. at ¶ 33. She contacted an immigration attorney, who told her there was nothing he could do though did not explain further. Pa Mara Aff. at ¶ 33.

Thereafter Ms. Morillo saved money and hoped that, since she had no specific court date imminently, that she would be able to hire private counsel and proceed with her adjustment of status as Saxon previously advised her. In 2025, Angelina would be turning 21, so at that time, having made financial arrangements necessary to hire counsel, she consulted with an immigration attorney with full expectation that Saxon had been correct this whole time and that the immigration attorney would help her square away her papers once Angelina officially was of age in just a few month's time. However, that lawyer referred her to the undersigned, who explained the true consequences triggered by her plea and the relief that was available. Pa Mara Aff. at ¶ 34. It was not until that time in 2025, when Ms. Morillo consulted with current counsel, that she learned the true immigration consequences of her guilty plea; that Saxon had been wrong about what he told her regarding immigration. Pa Mara Aff.

at ¶¶ 34-35. Ms. Morillo learned that the conviction made it impossible for Mara to ever get status in the United States. Pa Mara Aff. at ¶ 35. Ms. Morillo was advised that the conviction immediately and forever made her mandatorily deportable and inadmissible to the United States, and that not only could Mara not get her papers, but if she left or was deported, she could never return to see her children. Pa Mara Aff. at ¶ 35  Once Ms. Morillo was made aware of the truth about the immigration consequences of her plea, she acted immediately. These circumstances justifiably explain her not seeking coram nobis relief earlier and are opposite of the cases cited by the Government, including *Aceituno*.  In fact, Morillo acted immediately when she learned of the issue, hiring the undersigned, which is perfectly consistent with the United States Supreme Court holding in *United States v. Castro-Taveras*, 841 F.3d 34, 54 (1st Cir. 2016) (remanding for evidentiary hearing on Strickland's two-prong test where, inter alia, petitioner sought immigration advice in 2011 and was told that guilty plea in 2002 would bar him from becoming U.S. citizen was subject to mandatory removal, and then properly brought petition for writ of coram nobis thereafter being informed).  The district court did not err in this regard.

### C. The District Court Did Not Abuse Its Discretion In Granting Coram Nobis Relief.

The All Writs Act, 28 U.S.C. § 1651(a), provides federal courts the authority to issue writs of error coram nobis to redress a fundamental error in a criminal case. *United States v. George*, 676 F.3d 249, 253 (1st Cir. 2012). Coram nobis relief is

appropriate where, as here, the defendant is no longer in custody and a motion under 28 U.S.C. § 2255 is unavailable. *Trenkler v. United States*, 536 F.3d 85, 98 (1st Cir. 2008).

The First Circuit has formulated a "tripartite test" to determine whether to grant coram nobis relief. *United States v. Castro-Taveras*, 841 F.3d 34, 39 (1st Cir. 2016) (quoting *United States v. George*, 676 F.3d 249, 254 (1st Cir. 2012)). "Under it, a coram nobis petitioner must explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character." *Id*.

If one faces deportation due to a conviction, one is "continu[ing] to suffer significant collateral consequences from the judgment." *Williams v. United States*, 858 F.3d 708, 715 (1st Cir. 2017). Ineffective assistance of counsel can be "error of the most fundamental character." See generally *Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016). Other circuits have likewise held that ineffective assistance of counsel is sufficiently fundamental to warrant coram nobis relief. See, *e.g., Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

A district court's grant or denial of coram nobis relief is reviewed for abuse of discretion. "A district court abuses its discretion when its ruling rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper

application of law to fact." *United States v. Harding*, 104 F.4th 1291, 1295-96 (11th Cir. 2024) (quotation omitted). As the district court did not rest its opinion on any of the three aforementioned factors, the order granting coram nobis relief was properly entered.

The government cites to *Aceituno v. United States*, 132 F.4th 563 (1st Cir. 2025) in support of its argument that the district court abused its discretion in granting the petition. However, the facts underlying defendant Aceituno's petition are overtly distinguishable from the facts in the present matter. In *Aceituno*, it was determined that the defendant was afforded the effective assistance of counsel. Unlike Morillo, Aceituno had immigration counsel at the time of the plea and the record established clearly that the written plea agreement explained deportation was **"presumptively mandatory."** *Id.* at 572. Aceiento's position was **not** that he was not told he would be deported, but rather it was that he was not told he could never come back to the United States. This is a completely different issue on which this court found counsel not ineffective under *Padilla* specifically because Padilla speaks to issues pertaining to <u>deportation</u> and not other future consequences such as that raised by Aceituno. Aceituno at 571-572. Aceituno's plea agreement also contained explicit language detailing the actual immigration consequences of his plea, unlike Ms. Morillo's plea agreement. The court detailed that Aceituno's plea agreement stated that "because Defendant is pleading guilty to conspiracy to possess with intent

37

to distribute cocaine and attempted possession with intent to distribute cocaine, removal is *presumptively mandatory*." (emphasis added) *Id.* at 567. Unlike Ms. Morillo, Aceituno failed to demonstrate that the judgment resulted from an error of the most fundamental character as the error of which he complained fell outside of the precedent upon which he relied (Padilla).

Ms. Morillo's circumstance is entirely different and is based upon affirmative misrepresentations of counsel, which in the light of the clarity of the pertinent statute in the INA were clearly wrong and resulted in Ms. Morillo taking a plea she would not have otherwise, and waiving constitutional rights she would not have otherwise waived; thus an error so fundamental as to render her conviction unjust pursuant to Padilla's reasoning on the ineffectiveness of counsel and the voluntariness or involuntariness of plea agreements.

The district court's order and memorandum opinion fully addressed the tripartite test established to determine the propriety of coram nobis relief as well as the *Strickland* analysis. The court noted in misadvice of law versus the clarity of the relevant INA. The court also noted that the witnesses provided corroboration of Ms. Morillo's laboring under misadvice, having discussed her plan to get her green card openly with the witnesses after she was released; having been woefully misadvised as to the harsh reality of her true immigration consequences at that time. The court also noted the proper law in reviewing the prejudice caused by the misadvice; not

only would Morillo not have pleaded guilty, but she waived her constitutional rights to a trial, a jury, and to remain silent, in taking a plea deal without it being knowing or voluntary under the circumstances. The court also noted the potential defenses, though woefully mischaracterized by the government as a duress argument. A conspiracy requires a willing participant, and under conditions where this woman was a hostage in her own home to unrelenting and outrageous violence detailed by her daughter Angelina in striking detail in her affidavit in the record; an argument surely could have been made to a jury that she was not a conspirator at all. In order for her to have been found guilty at a trial, the government would have to prove, beyond a reasonable doubt, that Ms. Morillo "*knew the unlawful purpose of the agreement and joined in it* __*willfully*__*, that is, with the intent to further the unlawful purpose.*" *(see Model Jury Charge on Conspiracy.)* A jury hearing of relentless attempts to kill her, control her, track her, and even exculpating her during the underlying matter, may not have found any allegation **willful** at all. Under those circumstances and the threat of mandatory deportation, Ms. Morillo would not have accepted the plea deal had she known the truth; she would have opted to tell her story at trial. The district court properly recognized this, while not opining on the merits of any facts or arguments, the district court recognized, as it should have, that Morillo may reasonably have opted for trial under those circumstances. This is especially easy to do given the witnesses testimony and contemporary proof

submitted to the district court in the way of police reports exemplifying Frank Morillo's violence toward her, the home, and the prior restraining order.

The district court properly acknowledged that the relief sought was an extraordinary remedy that is rarely granted and "available under limited and compelling circumstances to correct fundamental errors that occurred in a criminal case, with a significant emphasis on achieving justice." Appellant's Addendum 7-8. The district court properly recognized that "[a]t stake in this litigation is Morillo's fundamental constitutional right" to the effective assistance of plea counsel. Appellant's Addendum 7-8. Given the foregoing, it is clear that the district court's granting of coram nobis relief was not an abuse of discretion.

## CONCLUSION

The district court's order granting Ms. Morillo's petition for a writ of coram nobis should be affirmed.

Respectfully submitted,

/s/ Stephanie Mc Clure
STEPHANIE MC CLURE, ESQ.
101 Avenue of the Americas, Floor 9
New York, NY 10013
Phone (office): (646) 417-8380
Stephanie@nycnjlawyer.com

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the applicable rules of appellate procedure in that it contains 10,003 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

/s/ Stephanie McClure
STEPHANIE MCCLURE
Counsel for Appellee

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 30, 2025, I caused a true and correct copy of the foregoing brief to be served through the Court's CM/ECF system upon the following registered user assigned to this case:

Michael A. Rotker
Attorney
U.S. Department of Justice

/s/ Stephanie McClure
STEPHANIE MCCLURE
Counsel for Appellee
