# United States Court of Appeals
## For the First Circuit

No. 25-2027

MARA MORILLO,

Petitioner, Appellee,

v.

UNITED STATES,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Stephen J. McAuliffe, U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Michael A. Rotker, Attorney, with whom Joshua A. Goldfoot, Deputy Assistant Attorney General, Criminal Division, A. Tysen Duva, Assistant Attorney General, Criminal Division, Erin Creegan, United States Attorney, District of New Hampshire, and Matthew Vicinanzo, Assistant U.S. Attorney, District of New Hampshire were on brief, for appellant.

Stephanie Mc Clure, with whom Law Office of Stephanie Mc Clure LLC was on brief, for appellee.

October 16, 2026

**GELPÍ**, **Circuit Judge**. Mara Morillo ("Morillo") sought a writ of coram nobis after discovering that her counsel's assurances that she could "work out" any immigration issues after pleading guilty and serving her sentence were wrong. In reality, her guilty plea rendered her presumptively removable. The district court reviewed Morillo's coram nobis petition and found that she had met all the requirements for relief: she sufficiently explained her delay in seeking relief, her counsel's advice had been constitutionally deficient, and she would not have pleaded guilty but for that misadvice. Thus, it granted her the writ. After careful review, we **affirm**.

## I. Background

Morillo was born in Venezuela in 1975, but spent most of her early years in Colombia, where she suffered from sexual abuse by multiple men, including some of her relatives. While she was in college, she became pregnant by her then-boyfriend, who later abandoned her and their child. As a result, Morillo dropped out of school to care for her son. In 1996, she came to the United States on a one-year travel visa, which she later overstayed. She traveled between New York and Florida before eventually settling in Massachusetts.[1] During that time, she met Franklyn Morillo (her

[1] The district court found that Morillo came to the United States on a travel visa "[i]n 2016," but that finding is clearly erroneous: Morillo acknowledged that she first came to the United

co-defendant, and hereinafter "Frank"),[2] with whom she began a relationship. Frank initially appeared very charming, and the two eventually married and had a daughter together. But their relationship deteriorated as Frank abused drugs and alcohol and became increasingly physically and psychologically abusive toward Morillo, conduct that ultimately led to assault charges and restraining orders against him. Frank ran a drug business, with which Morillo eventually became involved. That involvement eventually resulted in federal charges against both of them.

A grand jury sitting in the District of New Hampshire charged Morillo and Frank with one count of conspiracy to distribute, and to possess with intent to distribute, controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1). Morillo was appointed a Federal Public Defender ("counsel"), with whom she discussed a plea agreement offered by the government. She explained to counsel that her priority throughout the criminal process was staying in the United States. After all, she has two children who are U.S. citizens and, at that point, had been in the United States for almost two decades. Counsel assured her that "if she took the plea agreement, she would do some time but that

States in 1996, and the conduct leading to her criminal charges occurred in 2014 and 2015.

[2] We use Frank's first name to more easily distinguish between him and Morillo because they share the same last name. See, e.g., United States v. Gonzalez, 184 F.4th 23, 26 n.1 (1st Cir. 2026).

she would be able to stay in the United States and work out her immigration situation once she got out." So, Morillo pled guilty. As relevant here, the plea agreement stated that she "may be removed from the United States, denied citizenship, and denied admission to the United States in the future as a consequence of her conviction." And at the change-of-plea hearing, the district court told Morillo that her guilty plea "could result in immigration consequences that may include deportation." But in fact, her conviction rendered her immediately and presumptively removable and permanently inadmissible to the United States.

The case proceeded to sentencing, where Morillo's counsel sought a downward variance based on several mitigating circumstances, including the physical and emotional abuse Morillo had endured. In urging the court to impose a more lenient sentence, counsel argued that Morillo was "going to be deported" and asked the court to take that consequence into account. The district court ultimately varied downward and sentenced Morillo to 84 months' imprisonment followed by three years of supervised release.

In August 2021, after completing both her prison sentence and term of supervised release, Morillo received a Notice of Intent to Issue a Final Administrative Removal Order ("removal notice"). Certain it was a mistake, she attempted to contact her counsel from her criminal case. After her attempts failed, she

contacted two different attorneys and, when they finally explained the immigration consequence of her plea and she was able to gather the necessary funds, she retained new counsel in February 2025.

Morillo filed a petition for a writ of error coram nobis, alleging that counsel prejudicially misadvised her regarding the deportation consequences of her guilty plea, in violation of Padilla v. Kentucky, 559 U.S. 356, 374 (2010), and Lee v. United States, 582 U.S. 357 (2017). In support of her petition, she submitted an affidavit detailing what counsel had told her -- that she could "work out" her immigration status -- and explaining that she would never have accepted the plea had she known that it would render her removable.

The district court held an evidentiary hearing during which Morillo's family friend and daughter corroborated Morillo's impression of counsel's advice, testifying that Morillo frequently spoke about her plan to address her immigration status upon release from prison. Additionally, Morillo's counsel from her criminal case testified. He said he had "no specific recollection of Morillo, her case, or the advice he provided to her," but that "his typical practice was to explore the potential immigration consequences of a client's guilty plea and routinely shared those findings with his clients so they would be fully informed when making any decision about accepting a plea offer." The next day, the district court entered an order granting Morillo's petition

and vacating her conviction. In a second order, the district court explained that Morillo had met all the requirements for coram nobis relief. She had adequately justified her delay because she did not understand that her plea rendered her removable until after having served her sentence; counsel performed deficiently by advising her that she could remain in the United States; and counsel's advice prejudiced her because she had viable defenses and had shown that remaining in the United States was her paramount concern. Finally, the court concluded that equitable considerations weighed in favor of granting the writ.

The government timely appealed.

## II. Discussion

We review the district court's legal conclusions de novo, its findings of fact for clear error, and its ultimate decision to grant the writ for abuse of discretion. Aceituno v. United States, 132 F.4th 563, 569 (1st Cir. 2025).

Coram nobis is an ancient common-law writ that allows a petitioner who is no longer in custody -- and therefore cannot seek relief under habeas statutes -- to collaterally challenge a conviction. Chaidez v. United States, 568 U.S. 342, 345 n.1 (2013). Given the societal interest in finality, it is an "extraordinary remedy," United States v. Denedo, 556 U.S. 904, 916 (2009), and a petitioner seeking such relief must sufficiently: (1) "explain [her] failure to seek earlier relief from the

judgment," (2) "show that [she] continues to suffer significant collateral consequences from the judgment," and (3) "demonstrate that the judgment resulted from an error of the most fundamental character." Aceituno, 132 F.4th at 569 (quoting Woodward v. United States, 905 F.3d 40, 43 (1st Cir. 2018)). Moreover, even if a petitioner can make that showing, she must also persuade the court, in light of the equities of the case, that "justice demands the extraordinary balm of coram nobis relief." United States v. Castro-Taveras, 841 F.3d 34, 39 (1st Cir. 2016) (quoting United States v. George, 676 F.3d 249, 255 (1st Cir. 2012)).

We will walk through these requirements in turn, except the second, because the government concedes that Morillo's conviction carries ongoing collateral consequences (it renders her both mandatorily removable and permanently inadmissible to the United States). Ultimately, we conclude that the district court did not commit legal error or abuse its discretion in granting Morillo's petition for a writ of coram nobis.

**A. Timely Relief**

Let us start with the first requirement for coram nobis relief: showing that "sound reasons exist[ed]" for "fail[ing] to seek appropriate earlier relief," for example, by moving to withdraw a guilty plea under Fed. R. Crim. P. 11(d)(2), or by filing a Section 2255 petition while still in custody. United States v. Morgan, 346 U.S. 502, 512 (1954). This inquiry focuses

not on how promptly the petitioner moved once she sought coram nobis relief, but on whether her failure to raise the claim earlier can be excused. See id.

The district court concluded that Morillo's delay in seeking relief was justified. It reasoned that, while incarcerated, Morillo had no reason to challenge her conviction because she remained unaware that counsel had misadvised her about the immigration consequences of her guilty plea. Moreover, the district court concluded that, after Morillo received the removal notice, she acted promptly to retain counsel once she learned that she had received incorrect advice and was able to gather the necessary funds. Thus, Morillo did not "sle[ep] on her rights" or "delay taking action once she fully and properly appreciated . . . the mandatory consequences of her guilty plea."

The government sees it differently. It maintains that Morillo's delay in seeking relief was "excessive and unjustified" because she knew that she "may" be removed as early as 2016, when she pleaded guilty. And she knew that deportation was mandatory by 2017 because counsel told the court -- in his written sentencing memorandum and orally at the sentencing hearing -- that she was "going to be deported."

We do not think the district court abused its discretion in concluding that neither event was sufficient to put Morillo on notice that her guilty plea made deportation effectively

mandatory. The warnings in the plea agreement and the plea colloquy that Morillo "may be deported" did not necessarily alert Morillo that counsel's assurances were wrong. After all, those warnings were consistent with what counsel had told her -- that deportation was a possible consequence of her plea, but not an inevitable one because she could "work out" any issues after her release. The district court could therefore reasonably find that these warnings did not give Morillo reason to question counsel's advice or pursue relief before her release. In fact, the Fourth Circuit reached the same conclusion in nearly identical circumstances. In United States v. Akinsade, the court held that "the district court's admonishment . . . that [defendant's] plea could lead to deportation" was too "general and equivocal . . . to correct counsel's affirmative misadvise that [defendant's] crime was not a categorically deportable offense." 686 F.3d 248, 254 (4th Cir. 2012).

Counsel's subsequent statement at sentencing that Morillo was "going to be deported" does not change our conclusion. Counsel made that statement while urging the court to impose a more lenient sentence, not while advising Morillo about the immigration consequences of her plea. And he invoked removal alongside several other adverse consequences that Morillo faced in an effort to persuade the court that additional punishment was unnecessary. Nothing in that argument indicated to Morillo that

counsel was retracting his earlier advice that she would be able to "work out" her immigration situation after serving her sentence and remain in the United States. Against that backdrop, the district court could reasonably find that those statements did not put Morillo on notice that counsel's advice was erroneous.[3]

The 2021 removal notice does not change our conclusion either. While the dissent correctly observes that receipt of a similar document provided notice of immigration consequences in Aceituno, 132 F.4th at 567, Morillo's circumstances are crucially different in two ways. First, in Aceituno, the notice did not contradict attorneys' previous advice on the immigration consequences of the plea, meaning that the petitioner there had no reason to think the notice was a mistake. Id. Second, the petitioner in Aceituno "did not attempt to contact his criminal defense attorney or his immigration lawyer" after he received the notice. Id. In contrast, Morillo acted upon the notice she received (which she thought was a mistake) and attempted to contact her defense attorney from the prior criminal case. She also sought

[3] Our dissenting colleague is not persuaded that this context makes a difference because "counsel owes the court a duty of candor." Counsel, of course, had such a duty. But, as we'll discuss forthwith, he also had a duty to warn Morillo of the certain deportation consequences of her plea under Padilla v. Kentucky, 559 U.S. 356 (2010). Instead, he provided her with affirmative misadvice. We do not think the district court abused its discretion by not finding this statement put Morillo on notice of the deportation consequences of her plea when that statement directly contradicted his own advice.

assistance regarding her immigration status from two different attorneys.[4] And thus, the district court could reasonably conclude that Morillo sufficiently explained her failure to seek relief from judgment after any of these events.[5]

**B. Fundamental Error**

The second requirement for coram nobis relief is properly showing that the conviction resulted from a fundamental error. To make that showing, Morillo argued that her guilty plea

[4] The dissent takes issue with the district court's reference to Morillo's lack of financial resources, which was only substantiated by the statements of Morillo's attorney, who was not a sworn witness. And the dissent cites to Garuti v. Roden, 733 F.3d 18, 25 n.4 (1st Cir. 2013), in support of its disagreement with the district court's reliance upon counsel's representation. However, we do not think the evidentiary issue is as straightforward as the dissent suggests. In Garuti, this Court observed that the trial court's reliance on an unsubstantiated letter defendant presented from his trial attorney was probably an error and noted that "[t]he Judicial Code concerning habeas corpus makes provisions for the admission of certain evidence such as affidavits, 28 U.S.C. § 2246, and full transcripts, 28 U.S.C. § 2247, but unsworn statements are not made admissible by the statute." Id. But the Garuti court was not asked, and did not hold that unsworn statements in every instance are inadmissible or beyond consideration in a habeas proceedings (and just to remind, the petition here sounds in coram nobis, not habeas). Be that as it may, as relevant here, the government did not object to that representation as lacking evidentiary support below, and it has not made that argument on appeal. Any such argument would, therefore, be waived. United States v. Sacko, 247 F.3d 21, 24 (1st Cir. 2001).

[5] By contrast, in Aceituno, which the government and the dissent rely on to suggest Morillo's petition was not timely, it was uncontested that the petitioner learned no less than four years before he filed his petition that "he would be permanently barred as a consequence of his conviction from reentering the United States." Aceituno, 132 F.4th at 570.

resulted from ineffective assistance of counsel, which this Court has recognized may warrant coram nobis relief. See Williams v. United States, 858 F.3d 708, 712 (1st Cir. 2017). Ineffective assistance of counsel claims are analyzed under the familiar two-part test set out in Strickland v. Washington, under which a petitioner must show both that counsel's performance fell below an objective standard of reasonableness (in other words, that said performance was deficient) and that "the deficient performance prejudiced [her] defense." 466 U.S. 668, 687 (1984). We review each prong in turn.

**1. Deficient Performance**

Morillo argued that her counsel's performance was deficient because Padilla v. Kentucky, 559 U.S. 356 (2010), required him to explain that she would, without a doubt, be removed if she pleaded guilty to her charged offense. We agree.

Let us start by reviewing the Supreme Court's decision in Padilla. In that case, Padilla, a noncitizen, pleaded guilty to a deportable drug offense after his counsel advised him that he "did not have to worry about immigration status since he had been in the country so long." Padilla, 559 U.S. at 359. But in fact, a federal statute -- the same one that applies to Morillo -- clearly established that a person convicted of the charged offense was deemed "deportable." Id. at 368 (quoting 8 U.S.C. § 1227(a)(2)(B)(i)). His case went all the way to the

Supreme Court, which ultimately held that his counsel had been constitutionally deficient.

The Court began by recognizing that the immigration consequences of a conviction can "be more important to [a] client than any potential jail sentence" and that preserving the possibility of discretionary relief from deportation is often "one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial." Id. (quoting INS v. St. Cyr., 533 U.S. 289, 323 (2001)). Then, it noted that "[t]he weight of prevailing professional norms support[ed] the view that counsel must advise her client regarding the risk of deportation." Id. at 367 (collecting authorities). And it reasoned that because the immigration consequences of Padilla's guilty plea were clear and could have easily been determined by reading the relevant removal statute, Padilla's counsel had been constitutionally deficient. Id. at 369.

We think that case directly maps on to Morillo's. The district court made a factual finding, after considering Morillo's "unambiguous and essentially uncontested testimony," that counsel "assured her that her conviction would not make her deportable and she could, upon release from prison, make the necessary applications to alter her immigration status." The government did not present evidence to contradict that testimony (save for counsel's testimony that he did not remember Morillo's case, but

his "customary practice" was to advise clients of a "risk" of deportation) and the district court found Morillo credible. So, just as in Padilla, counsel affirmatively misadvised Morillo about clear[6] immigration consequences, and that misadvice fell below the standard that the Sixth Amendment requires.

The government asks us to read Padilla more narrowly. In its view, Padilla merely held that the Sixth Amendment requires counsel to advise a defendant about the immigration consequences of a guilty plea, but not to provide a technically precise account of immigration law. Thus, the government suggests that counsel could satisfy Padilla by conveying that a guilty plea exposes the defendant to a risk of deportation, even if counsel did not explain that the conviction makes deportation mandatory. We are not convinced.

As an initial matter, the district court did not make a factual finding that counsel advised Morillo that she "may" be deported. Counsel could not remember anything about Morillo's

[6] The government argues that it is not clear that Morillo's conviction rendered her removable because, although "some courts had held at the time of the events in this case a Section 846 conviction is an aggravated felony, . . . this Court had not addressed the issue at that time (and has not done [so even] today)." But the government raised this issue for the first time on appeal. "Arguments raised for the first time on appeal are considered waived." United States v. Wallace, 573 F.3d 82, 96 n.13 (1st Cir. 2009).

case and testified only about his "customary practice." But even assuming he gave such a warning, Padilla required more here.

It is true that the Kentucky Supreme Court (the court that issued the opinion that the Supreme Court reviewed) had rejected Padilla's claim because, in its view, advice concerning deportation fell "outside the scope of representation required by the Sixth Amendment" altogether. Padilla, 559 U.S. at 365 (quoting the Kentucky Supreme Court). And the Court first rejected that premise. Id. at 367 ("[A]dvice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."). But it did not stop there. It went on to define the scope of the constitutional right it had just recognized.[7] The Court acknowledged that "immigration law can be complex" and it drew a distinction based on the clarity of the governing law. Id. at 369. When the immigration consequences are unclear and uncertain, counsel need only advise the defendant that the pending criminal charges "may carry a risk of adverse immigration consequences." Id. (emphasis added). And that it is only when

[7] The government suggests that this portion of Padilla was dicta. Even if those statements were not strictly necessary to the Court's resolution of the case, they represent the Court's considered explanation of the constitutional duty it had just recognized. At a minimum, they are highly persuasive, and we see no reason to depart from them here. "[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings[.]" In re Fin. Oversight & Mgmt. Bd. for P.R., 178 F.4th 747, 758 (1st Cir. 2026) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)).

the immigration consequences of a conviction are "succinct, clear, and explicit" that counsel must give correspondingly clear advice. Id. at 368-69. The latter was the case in Padilla and is also the case here. Thus, we think the district court got it right when it concluded that Morillo's counsel's performance had been deficient.

**2. Prejudice**

Deficient performance, of course, is only half of the ineffective-assistance inquiry. Morillo must also show that counsel's deficient performance prejudiced her. In the plea context, that requires her to demonstrate a "reasonable probability that, but for counsel's error[], [she] would not have pleaded guilty and would have insisted on going to trial." Lee, 582 U.S. at 364-65 (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). This standard demands a "case-by-case examination" of the "totality of the evidence." Id. at 367 (quoting Williams v. Taylor, 529 U.S. 362, 391 (2000)).

Before we apply that standard, let us review one more Supreme Court case, Lee v. United States, which will guide most of our analysis. Lee also involved a claim that counsel performed deficiently by incorrectly assuring the defendant that he would not be deported if he pleaded guilty, even though his conviction made deportation mandatory. 582 U.S. at 360-61. The government conceded deficient performance, leaving only whether Lee had established prejudice. Id. at 364.

Lee argued that he never would have accepted a guilty plea had he known that he would be deported as a result. Id. at 366. The government countered that Lee's argument was insufficient to establish prejudice because he had no viable defenses at trial. Id. The Court sided with Lee. It explained that the absence of a viable defense, though relevant, was not dispositive: "[D]efendants obviously weigh their prospects at trial in deciding whether to accept a plea . . . . But common sense (not to mention our precedent) recognizes that there is more to consider than simply the likelihood of success at trial." Id. at 367. In particular, the immigration consequences of a guilty plea may matter so much to a defendant that he would "reject[] any plea leading to deportation -- even if it shaved off prison time -- in favor of throwing a 'Hail Mary' at trial." Id. 367-68.

Central to the Court's finding of prejudice was the evidence that "[t]here [wa]s no question that 'deportation was the determinative issue in Lee's decision whether to accept the plea deal.'" 582 U.S. at 369 (emphasis added). Lee had strong ties to the United States, repeatedly expressed concerns about deportation to his counsel, and testified that he would have gone to trial had he known that pleading guilty would make deportation certain. Id. at 369-71. Had Lee been properly advised, the Court reasoned, he would have understood that pleading guilty would "certainly lead to deportation," whereas proceeding to trial would "[a]lmost

certainly" produce the same result. Id. at 371. And for a defendant whose overriding concern was avoiding deportation, that distinction could "make all the difference." Id.

The Court emphasized, however, that Lee presented "unusual circumstances," and it cautioned that "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Id. at 369. Rather, "[j]udges should . . . look to contemporaneous evidence to substantiate a defendant's expressed preferences." Id.

Now let us return to the facts of our case. The government argues that Morillo, like Lee, also lacked a viable defense at trial. And that what is left of her argument is exactly the sort of post hoc assertions about which the Lee court expressed concern. We disagree on both fronts.

To begin, from Morillo's perspective, trial was not the "Hail Mary" it was for Lee. In order for Morillo to have been found guilty at a trial, the government would have had to prove, beyond a reasonable doubt, that: "(1) a conspiracy existed; (2) [Morillo] had knowledge of the conspiracy; and (3) [Morillo] knowingly and voluntarily participated in the conspiracy." United States v. Corbett, 870 F.3d 21, 27-28 (1st Cir. 2017) (quoting United States v. Rivera-Ruperto, 846 F.3d 417, 432 (1st Cir. 2017)). This third element would have required the government to

show that Morillo "intended to join the conspiracy and that [s]he intended for its goals to be accomplished." Id. (quoting United States v. Paz-Alvarez, 799 F.3d 12, 25 (1st Cir. 2015)).

Morillo had evidence to contest the third element. In her affidavit, Morillo attested that her husband and co-defendant "ruled [her] life" and she "felt [she] was a slave in th[e] relationship and couldn't escape." She further attested that she "never had any intention of assisting him in any way with his business," that she was "terrified of him," and that he consistently threatened to kill her family and friends if she ever left him. Her daughter corroborated much of this account, stating: "[M]y mother did not do anything of her own mind during this time. [Frank] ruled her and everything in our home. She was literally like a captive slave to his violence." She wrote that "Frank told her he was going to kill her all the time. I believed that any day -- he would and could. She lived life in fear for her life and for mine." Both women swore that Frank abused Morillo physically and emotionally, tracked her, and "manipulat[ed]" her "to make [her] feel scared and alone." Based on this evidence, Morillo may have believed that a jury, hearing of her husband's attempts to kill, control, and track her, might not have found beyond a reasonable doubt that her participation in the conspiracy was intentional. See, e.g., United States v. López-Correa, 537 F. Supp. 3d 169, 181 (D.P.R. 2020) (vacating habeas petitioner's

conviction based on actual innocence after concluding that, "as a victim and a sex slave . . . , she did not have the mens rea to commit the offense").[8]

The government's response is that Morillo's defense would have failed at trial. But Morillo does not have to convince us that she would have been acquitted. While her chances of success bear on her decision calculus (and thus on our read of whether she would have proceeded to trial), it is not itself the test -- a defendant may rationally choose to go to trial even facing long odds, for reasons having nothing to do with the probability of acquittal. See Lee, 528 U.S. at 367-68 ("When [other] consequences are, from the defendant's perspective, similarly dire . . . the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking.").

That takes us to our second point. Morillo, like Lee, presented other such reasons why she would have rejected the plea

[8] In making this argument, the government keys into the viability of a possible affirmative defense of duress or coercion, but the district court also noted that Morillo had argued that "a plethora of available evidence of extreme and unrelenting domestic abuse negated a conspiracy and the requisite elements of mens rea" and observed that "what evidence exists lends credence to defendant's assertion that she would have gone to trial had she known of the Padilla consequences of her plea, and would have a plausible defense to assert." We further note that the government's insistence in a Fed. R. App. P. 28(j) letter that Morillo waived any argument regarding a mens rea defense is incorrect.

and proceeded to trial. She attested that, "[she] would never have taken the plea deal" and "would have gone to trial" if she had "known that [she] would be 100% unquestionably deportable and could never get lawful status in the United States." She further affirmed that "[she] made it clear to [counsel] that staying in the United States was [her] only concern" and that she "had defenses [she] wished to pursue but did not know [her] rights or how the procedure worked." She only took the plea due to her reliance on counsel's advice that it would not render her mandatorily removable, and she could work out her immigration status after serving her sentence.[9]

And, unlike in Lee, Morillo's account did not stand alone. Morillo's daughter and her family friend testified at the evidentiary hearing that Morillo's plan had always been to resolve her immigration status after serving her sentence and that Morillo was under the impression that she could do so. The government neither called Morillo to the stand for cross-examination nor

[9] We note that the Fourth Circuit recognized that "[a] defendant may be unable to show prejudice if at the Rule 11 proceeding the district court provides an admonishment that corrects the misadvice and the defendant expresses that he understands the admonishment." Akinsade, 686 F.3d at 253 (citation omitted). While we take no position on that now, we note that this case is distinct. Both the plea agreement and the district court told Morillo that a conviction "may" lead to deportation, which, if anything, further entrenched Morillo's belief that counsel's advice had been accurate. "This general and equivocal admonishment [was] insufficient to correct counsel's affirmative misadvice." Id. at 254.

introduced evidence contradicting these accounts or otherwise calling their credibility into question. So, this evidence stood uncontested and the district court found it credible.

To be sure, the government is right to point out that Morillo did not produce the same kind of contemporaneous evidence presented in Lee, where the defendant had told the district court during the plea proceeding itself that deportation would affect his decision to plead guilty. Id. at 369. But the Court's insistence on contemporaneous evidence in Lee arose in the context of cautioning courts against upsetting pleas "solely" based on defendants' post hoc assertions that, but for counsel's error, they would have gone to trial. Id. (emphasis added). Recall that Lee had nothing more to show for his prejudice analysis. Here, in contrast, Morillo offered more. She introduced corroborating testimony from other witnesses and a potential defense that gave her a concrete reason to take her chances at trial. In this context, we think the absence of contemporaneous evidence bears on the weight and credibility of Morillo's account, but it does not categorically defeat her showing of prejudice.

Taken together, Morillo's credible account of her overriding interest in remaining in the United States and the availability of a defense sufficiently convince us of a "reasonable probability" that she would have proceeded to trial had she been adequately counseled. Hill, 474 U.S. at 59; see Lee, 582 U.S. at

371 ("Not everyone in [petitioner's] position would make the choice to reject the plea. But we cannot say it would be irrational to do so."). Thus, the district court did not abuse its discretion in finding prejudice.

**C. Equitable Considerations**

On to our last point. "When all is said and done, issuing or denying a writ of error coram nobis must hinge on what is most compatible with the interests of justice, and [a district court's] discretion must be guided by that inquiry." George, 676 F.3d at 258-59 (citation omitted). In turn, our review of the district court's discretion is highly deferential. See, e.g., Caribbean Mgmt. Grp., Inc. v. Erikon LLC, 966 F.3d 35, 44 (1st Cir. 2020).

In what it acknowledged was a "rare" case, the district court held that the circumstances here warranted issuance of the writ because "[t]he very prejudice [Morillo] sought to avoid at all costs -- deportation -- was rendered mandatory by her plea, a plea she would not have offered had she been correctly advised of its mandatory consequences." The government argues that the district court abused its discretion by failing to consider Morillo's concession of guilt, the equities of requiring the government to retry the case now, and the government's interest in the finality of its convictions. We do not see it that way.

We note that all of the government's stated interests are legitimate and weighty. And we acknowledge that we have said that "when a defendant seeks to vacate a guilty-plea conviction by way of coram nobis," not only do "red flags accompany that request," but "great caution is warranted." Williams, 858 F.3d at 718 (citation modified). Still, we are not convinced that the government's interests compel reversal.

These considerations, alone, do not render the grant of the writ an abuse of discretion. With respect to Morillo's concession of guilt, courts have issued writs even after a defendant has entered a guilty plea and therefore conceded guilt. See, e.g., United States v. Kwan, 407 F.3d 1005, 1018 (9th Cir. 2005) (granting coram nobis relief on a pre-Padilla ineffective-assistance claim based on counsel's advice regarding the deportation consequences of a guilty plea); Akinsade, 686 F.3d at 250 (granting coram nobis relief on a post-Padilla ineffective-assistance claim following a guilty plea). And as to the government's latter two concerns, the prospect of retrying a years-old case and its interest in finality, those are implicated in virtually every coram nobis petition.[10] Were those

[10] We note that Padilla itself grappled with the government's interests in the finality of convictions obtained through guilty pleas. 559 U.S. at 371-73. The Court observed, however, that collateral attacks on guilty pleas have a built-in constraint -- namely, the risk of a successful challenge "result[ing] in a less favorable outcome for the

considerations alone enough to foreclose relief, the writ would offer little recourse to the very petitioners for whom it remains available -- those who have completed their sentences but continue to suffer the consequences of fundamentally flawed convictions.

That is not to say those interests are irrelevant. They form part of the interests-of-justice inquiry and may, in an appropriate case, counsel against relief. But the district court would have been entitled to weigh them against the fundamental constitutional error it found here and the consequences flowing from that error. Once again, Morillo pleaded guilty based on constitutionally deficient advice about the one thing that mattered most to her -- staying in the United States -- when she would have otherwise pursued trial.[11] On this record, we cannot say that the district court exceeded the bounds of its discretion in concluding that the interests of justice favored relief.

defendant" -- whereas a collateral attack to a conviction resulting from a jury trial "has no similar downside potential." Id. at 373. The same is true when a defendant seeks coram nobis relief from a guilty plea.

[11] This distinguishes Morillo's case from Aceituno. There, this Court found no Padilla error and emphasized this when it determined that equitable considerations did not favor granting the writ, cautioning that "[e]quity also requires that the finality of a great number of cases not be put at risk by extending Padilla beyond its requirements." Aceituno, 132 F.4th 572-73. (internal citation omitted).

## III. Conclusion

For the foregoing reasons, we **affirm** the district court's grant of the writ of coram nobis.

**-Dissenting Opinion Follows-**

**DUNLAP, Circuit Judge, dissenting.** The majority today holds that petitioner Mara Morillo ("Morillo") can obtain a writ of error coram nobis eight years after she was informed that her conviction would result in her deportation. Because I conclude that -- under our case law -- Morillo did not challenge her conviction in a timely manner, I must part ways with my colleagues.

The writ of coram nobis is "a remedy of last resort for the correction of fundamental errors of fact or law," United States v. George, 676 F.3d 249, 253 (1st Cir. 2012), reserved for "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice,'" United States v. Denedo, 556 U.S. 904, 911 (2009) (quoting United States v. Morgan, 346 U.S. 502, 511 (1954)); see George, 676 F.3d at 253. Coram nobis is "strong medicine, not profligately to be dispensed," and "successful petitions are . . . hen's-teeth rare." George, 676 F.3d at 254.

Given the extraordinary nature of coram nobis relief, it is a fundamental principle that such relief can be granted only if there is an adequate explanation for failing to seek earlier relief from judgment via withdrawal of a guilty plea or filing of a petition for habeas relief pursuant to 28 U.S.C. § 2255. Id.; Aceituno v. United States, 132 F.4th 563, 569-71 (1st Cir. 2025). A petitioner seeking a writ of coram nobis must act with reasonable diligence. Aceituno, 132 F.4th at 570 (citing Foont v. United States, 93 F.3d 76, 80-81 (2d Cir. 1996)); see United States v.

Salgueido, 185 F.4th 1067, 1073–74 (10th Cir. 2026); United States v. Lockhart, 165 F.4th 933, 936–37 (5th Cir. 2026). We have said that, in judging the timeliness of a petition for the writ of coram nobis, we will take into account when the petitioner was informed of the collateral consequences of the conviction, Aceituno, 132 F.4th at 570 -- as have other circuits, see Salgueido, 185 F.4th at 1073-74 (stating that a petitioner must be diligent in pursuing coram nobis after learning of the relevant facts); United States v. Delhorno, 915 F.3d 449, 455 (7th Cir. 2019) (same). And we have further held -- most recently in Aceituno v. United States -- that a lengthy delay between a conviction and petitioner's effort to challenge the conviction may justify a finding of untimeliness. 132 F.4th at 570-71 (finding a delay of ten years to be an "extraordinary" delay); see Thornburg v. United States, 574 F.2d 33, 36-37 (1st Cir. 1978) (petition untimely after a delay of almost three years). Again, our cases are consistent with the holdings of other circuits. See Lockhart, 165 F.4th at 937 (six-year delay); United States v. Kroytor, 977 F.3d 957, 959, 962-63 (9th Cir. 2020) (two-year delay).

Here, the district court found that Morillo "was certainly informed -- on two occasions [in 2017] -- that her guilty plea would almost certainly lead to her deportation: in the sentencing memorandum counsel prepared on her behalf and at her sentencing hearing." In the sentencing memorandum, defense

counsel wrote that "Morillo is facing a lengthy prison sentence, with almost certain deportation at the end of that sentence. She will be deported to Venezuela with three small children." (Emphasis added.) Then, at the sentencing hearing, defense counsel noted that "she's going to be deported" after the sentence had been served and "she's not going to have any choice but to go" to Venezuela. (Emphasis added.) As counsel further stated, "that's some additional punishment that will be imposed upon her." (Emphasis added.) Although the district court did not make a finding that Morillo read the sentencing memorandum, it did find -- and there is no dispute -- that she was present at the sentencing hearing.[12]

These statements put Morillo on notice that she would be deported -- placing upon her the obligation to take timely steps to seek relief from her guilty plea. See Aceituno, 132 F.4th at 570 (considering whether the petitioner acted promptly upon learning of the consequence of the conviction). Yet Morillo did not seek to withdraw her guilty plea; nor did she seek habeas relief under § 2255. See id. (noting the petitioner "took no steps to challenge that conviction though he could have done so"). Aceituno thus squarely controls this case. By waiting eight years

[12] Further, these statements followed the Presentence Investigation Report ("PSR"), which stated that Morillo "will face deportation proceedings due to her conviction for the instant offense." Defense counsel had reviewed the PSR with Morillo.

(until 2025) to seek coram nobis relief, Morillo waited too long. See id. at 571 (citing Ragbir v. United States, 950 F.3d 54, 64 (3d Cir. 2020); Thornburg, 574 F.2d at 36-37; Kroytor, 977 F.3d at 959, 960-61; Delhorno, 915 F.3d at 455; and Mendoza v. United States, 690 F.3d 157, 159-60 (3d Cir. 2012)); see also Lockhart, 165 F.4th at 937.

Both the district court and my colleagues in the majority emphasize the fact that Morillo had previously been informed of the possibility of deportation in conditional, not certain, terms. Morillo's written plea agreement noted that she "may be removed" from the United States as a consequence of her guilty plea. (Emphasis added.) And at the change of plea hearing, the district court noted that her plea "could result in immigration consequences that may include deportation." (Emphasis added.) This language echoed advice apparently provided to her by counsel. According to the district court and my colleagues, these statements meant that Morillo had no reason to pursue relief until she was informed by an immigration lawyer in 2025 that she was subject to mandatory deportation.

I disagree. Had these conditional statements been the only information presented to Morillo, this case would be different. But Morillo was also correctly informed of the consequences of her plea, given counsel's unequivocal statements at sentencing. At the very least, Morillo had a duty -- upon

hearing information that directly contradicted the information previously provided to her -- to investigate whether she had initially been misinformed. See Salgueido, 185 F.4th at 1073-74 (suggesting that a petitioner must act once "he or she could reasonably have known the relevant facts"); Delhorno, 915 F.3d at 455 (noting that petitioner should have pursued relief after "he knew or should have known about his immigration issues"); Foont, 93 F.3d at 80 (same). My colleagues reason otherwise because counsel's statements were made in the context of urging a more lenient sentence. But counsel owes the court a duty of candor, see United States v. Pomales-Lebron, 513 F.3d 262, 270 (1st Cir. 2008), so I see no reason for discounting the statement on that basis.[13] And although counsel did not "retract[]" his earlier, more ambiguous statements, his subsequent statements did furnish Morillo with the correct information that she alleges her counsel should have provided. In Aceituno, we held that the receipt of correct information clarifying an issue on which petitioner had

[13] My colleagues conclude that, in light of counsel's prior -- assertedly misleading -- advice, the district court acted within its discretion by "not finding this statement put Morillo on notice of the deportation consequences of her plea." But that conclusion seems to vitiate the requirement for a petitioner to act with reasonable diligence. Aceituno, 132 F.4th at 570 (citing Foont, 93 F.3d at 80-81). It is hard to imagine anything more directly relevant to the inquiry regarding whether a petitioner "could reasonably have known the relevant facts," Salgueido, 185 F.4th at 1073-74, than the fact that the petitioner heard an undisputedly correct statement of the deportation consequences of her plea.

received inadequate advice puts the petitioner on notice -- even without any correction by counsel. 132 F.4th at 567-68, 570. Having received notice of the consequences of her conviction (or at least having reason to inquire further), Morillo delayed too long by failing to challenge her conviction for eight years.

That should end the inquiry. Even if the majority were right, however, that the statements she heard at sentencing in 2017 were not enough, Morillo's petition is still untimely. Morillo received a notice of intent to issue a final administrative removal order in 2021, which gave Morillo further cause to exercise due diligence. The notice informed her that she was deportable because she had "been convicted of an aggravated felony." A final removal order issued shortly after. Although Morillo apparently talked to some additional lawyers at some unspecified later date, it took her another four years to seek relief even though it was clear at that point that her removal -- far from contingent -- was inevitable. In Aceituno, we found that receipt of such a document is sufficient notice of immigration consequences. 132 F.4th at 567, 570. This four-year delay by itself suffices to establish that her petition is untimely. Id. (discussing four-year delay between receiving ICE notice and taking any steps to reenter the United States); see Lockhart, 165 F.4th at 937; Kroytor, 977 F.3d at 959, 962-63.

The majority dismisses the relevance of the notice for two reasons. Neither is persuasive.

First, the majority notes that in Aceituno, unlike here, the notice did not contradict any prior statement by counsel regarding the immigration consequences of the plea. See 132 F.4th at 567. But I do not read Aceituno so narrowly; instead, it stands for the reasonable proposition that, where a petitioner receives an immigration notice clarifying the consequences of a conviction as to which the petitioner had assertedly been inadequately informed by counsel, the petitioner must promptly seek relief from the conviction after receipt of that notice. Reading Aceituno as the majority does essentially eliminates petitioner's duty to pursue relief after she "knew or should have known about [her] immigration issues." Delhorno, 915 F.3d at 455 (emphasis added).

Second, the majority notes that Morillo "acted upon the notice she received" by contacting counsel. But what is missing here is critical: a basis to find timely action. The district court did not find, and the record does not state, that Morillo acted promptly after receiving the notice. As the government points out, we do not know when Morillo sought advice from new counsel after receiving the notice. Because Morillo bears the burden to obtain coram nobis relief, see Murray v. United States, 704 F.3d 23, 29 (1st Cir. 2013); George, 676 F.3d at 254-55, this deficiency in her efforts to establish that she acted diligently

is fatal. And even if she did promptly seek out lawyers after receiving the deportation notice, it is doubtful that initially failing to identify the correct legal path for obtaining relief is a valid excuse. See Salgueido, 185 F.4th at 1074 ("[I]t is well established that ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing." (quoting Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000))); Kroytor, 977 F.3d at 959, 962-63 (delay in challenging conviction not excused by efforts to obtain advice from multiple attorneys, even when that advice was incorrect).[14]

Because I find Morillo's petition to be untimely, I would go no further in resolving close questions regarding whether Morillo suffered prejudice from the alleged ineffective assistance of counsel, Lee v. United States, 582 U.S. 357, 368–71 (2017), and

[14] Finally, although not determinative, it is also worth noting how far afield the district court went to explain Morillo's apparent delay by blaming lack of financial resources. Morillo's affidavit does not suggest any such limitation, and Morillo did not testify at the evidentiary hearing held by the district court. Morillo's attorney was the only one to mention a lack of financial resources, but she only mentioned it in argument. Even if she had been a sworn witness, it is doubtful that her say-so would be admissible to prove Morillo's financial condition or ability to obtain funds to pay an attorney over the intervening years, as there is no suggestion that counsel had direct knowledge of those facts. Fed. R. Evid. 801(c); see Garuti v. Roden, 733 F.3d 18, 25 & n.4 (1st Cir. 2013) (applying the Federal Rules of Evidence and rejecting the district court's consideration of unsworn hearsay in the analogous habeas context). Nor does counsel's statement address the availability of pro bono representation or other alternatives.

whether -- assuming Morillo can cross the threshold showing of entitlement to coram nobis relief -- "justice demands the extraordinary balm of coram nobis relief," George, 676 F.3d at 255. I nevertheless note two further reservations.

First, I am concerned that the majority finds that Morillo suffered prejudice from counsel's asserted ineffective assistance based solely on post-hoc, self-serving testimony by Morillo, her daughter, and a family friend, together with a retrospective assessment of a potential defense available at trial -- a finding in some tension with the Supreme Court's mandate that courts "look to contemporaneous evidence" that the petitioner would have proceeded to trial absent the erroneous advice.[15] Lee, 582 U.S. at 369.

Second, I have substantial concerns with the district court's failure to even mention -- in weighing the interests of justice -- the relevance of Morillo's guilty plea, the difficulty of re-trying the case after the passage of so many years, and the government's interest in finality. Each is a relevant factor in determining the interests of justice. Aceituno, 132 F.4th at 572–73; George, 676 F.3d at 257-58. Although our review is deferential, "a material error of law invariably constitutes an

[15] It is worth emphasizing, however, that the majority's holding is a narrow one; had the government contested the evidence or called the witnesses' credibility into question in any way, the outcome would likely be different.

abuse of discretion," Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013), and a district court abuses its discretion when it fails to even consider relevant factors, see Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003).

In my view, these concerns counsel further caution in allowing Morillo to seek coram nobis relief at this late hour, contrary to Aceituno. I respectfully dissent.